David B. Rosenbaum, Atty. No. 009819
Dawn L. Dauphine, Atty. No. 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2100
Phoenix, AZ 85012-2794
Telephone: (602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Michael L. Banks, *Pro Hac Vice*
William J. Delany, *Pro Hac Vice*
Amy Covert, *Pro Hac Vice*
Azeez Hayne, *Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
mbanks@morganlewis.com
wdelany@morganlewis.com
acovert@morganlewis.com
ahayne@morganlewis.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Allen, Richard Dippold, Melvin Jones, Donald McCarty, Richard Scates and Walter G. West, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Honeywell Retirement Earnings Plan, Honeywell Secured Benefit Plan, Plan Administrator of Honeywell Retirement Earnings Plan, and Plan Administrator of Honeywell Secured Benefit Plan,<br><br>Defendants. | No. CV04-0424 PHX ROS<br><br><br>DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION<br><br>(ORAL ARGUMENT REQUESTED) |

Pursuant to the Court's Order, Defendants file this Supplemental Brief, which is supported by the Declarations of Dawn L. Dauphine, Craig Chapman, Maureen Rojas, Cindy Burnelko, Marie Gangone, Connie Zeller, Diane Sucharski, all filed this same date.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................1

II.  ARGUMENT ..................................................................................................3

    A.   Ninth Circuit Precedent Establishes That Each Putative Class Member's Claims Accrued When He or She Had Actual or Constructive Knowledge of the Injuries Underlying Their Claims ..........................................................3

        1.   The Court should reject Plaintiffs' attempt to conflate distinct claims under Sections 502(a)(3) and 502(a)(1)(B) of ERISA ...............4

        2.   Plaintiffs' distinct claims are governed by multiple statute of limitations periods, not a single six-year period as Plaintiffs suggest ...6

        3.   The Court should reject Plaintiffs' attempt to fashion a self-serving accrual standard, and apply the federal "knew or should have known" accrual rule to Plaintiffs' claims ..............................................8

        4.   The Court should reject Plaintiffs' continuing accrual argument, as it has been rejected by the Ninth Circuit ............................................11

    B.   Class Treatment of Plaintiffs' Claims Is Inappropriate Because Individualized Inquiries Into When Each Putative Class Member Knew or Should Have Known of the Injury Underlying His or Her Claims Predominate Over Common Issues and Render the Claims Atypical. ...........12

        1.   Complaints and Inquiries by Plan Participants Regarding the SBA Offset. ..............................................................................................14

        2.   Complaints Led the Company to Prepare Presentations Designed to Address the SBA Offset ...................................................................6

    C.   Plaintiffs' Tolling Arguments Do Not Eliminate the Intractable Individual Issues Surrounding the Affirmative Defenses. ...................................................24

        1.   The tolling agreement does not eliminate any individualized inquiries ..........................................................................................25

        2.   Defendants were not obligated to notify Plaintiffs of their right to appeal or file a civil action until after their initial claims for benefits were denied .......................................................................................25

        3.   Plaintiffs' claims were not tolled for failure to provide requested documents ......................................................................................26

        4.   The statute of limitations was not tolled during the administrative claims process .................................................................................27

    D.   Defendants Adequately Preserved Their Affirmative Defenses .....................27

        1.   Defendants adequately preserved their affirmative defenses at the partial summary judgment stage ......................................................28

        2.   Defendants adequately preserved their affirmative defenses at the administrative claims stage ..............................................................29

    E.   Defendants' Laches Argument Is Viable and Requires an Individualized Inquiry. .........................................................................................................30

III. CONCLUSION ..............................................................................................31

1
2
## TABLE OF AUTHORITIES
3
### CASES
4
*Atwood v. Newmont Gold Co.*, 45 F.3d 1317 (9th Cir. 1995)..........................................14

*Bellas v. CBS, Inc.*, 73 F. Supp. 2d 493 (W.D. Pa. 1999)..................................................6

*Bennett v. Federated Mut. Ins. Co.*, 141 F.3d 837 (8th Cir. 1998)..................................11

*Bibeau v. Pac. Nw. Research Found., Inc.*, 188 F.3d 1105 (9th Cir. 1999), *amended*
    208 F.3d 831 (9th Cir. 2000) ...................................................................................9

*Blanton v. Anzalone*, 760 F.2d 989 (9th Cir. 1985).........................................................11

*Brief of Appellee*, 1994 WL 16014668, *Loewy v. Ret. Comm., Plan Adm'r of the*
    *Motorola, Inc. Pension Plan*, No. CV-03-2284-PHX-FJM ...................................10

*Cameron v. E.M. Adams & Co.*, 547 F.2d 473 (9th Cir. 1976).......................................12

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001).......................................................11

*Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44
    (2d Cir. 1999)..................................................................................................11, 26

*Chappel v. Lab. Corp. of Am.*, 232 F.3d 719 (9th Cir. 2000) ...............................5, 25, 27

*Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18 (D.D.C. 2000)....................6

*Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105 (11th Cir. 1997).................27

*D'Amico v. CBS Corp.*, 297 F.3d 287 (3d Cir. 2002) .........................................................5

*Dongelewicz v. PNC Nat'l Bank Ass'n*, 2004 WL 1661863 (3d Cir. 2004)......................13

*Flanagan v. Inland Empire Elec. Workers Pension Plan & Trust*, 3 F.3d 1246
    (9th Cir. 1993) ...................................................................................................11

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) ....................................................11

*Gluck v. Unisys Corp.*, 960 F.2d 1168 (3d Cir. 1992).......................................................7

*Graphic Commc'ns Union Dist. Council No. 2 v. GCIU-Employer Ret. Benefit Plan*,
    917 F.2d 1184 (9th Cir. 1990) .....................................................................5, 6, 25

*Great-West Life & Annuity Life Ins. Co. v. Knudson*, 534 U.S. 204 (2002)....................30

*Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201 (3d Cir. 2001) .........................12

*Johnson v. St. Frances Xavier Cabrini Hosp. of Seattle*, 910 F.2d 594 (9th Cir. 1990) .....5

*Loewy v. Ret. Comm., Plan Adm'r of the Motorola, Inc. Pension Plan*, No. CV-03-
    2284-PHX-FJM ..................................................................................................10

*M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833 (9th Cir. 2002) ....5

*Martin v. Constr. Laborers Trust for S. Cal.*, 947 F.2d 1381 (9th Cir. 1991) ............10, 24

*May v. Dep't Store Co. v. Fed. Ins. Co., 305 F.3d 597 (7th Cir. 2002)*..........................4, 5

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Plan*, 856 F.2d 1418
    (9th Cir. 1988)..............................................................................................................7, 11

*Mitchell v. First Unum Life Ins. Co.*, 65 F. Supp. 2d 686 (S.D. Ohio 1998)....................29

*N. Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo
    Mkts., Inc.*, 906 F.2d 1371 (9th Cir. 1990)....................................................9, 11, 27

*O'Bryhim v. Reliance Standard Life Ins. Co.*, 997 F. Supp. 728 (E.D. Va. 1998),
    *aff'd*, 188 F.3d 502 (4th Cir. 1999) .........................................................................29

*Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509
    (9th Cir. 1991).................................................................................................................12

*Pierce County Hotel Employees & Rest. Employees Health Trust v. Elks Lodge,
    B.P.O.E. No. 1450*, 827 F.2d 1324 (9th Cir. 1987).........................................7, 9, 11

*Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326 (9th Cir. 1996) ....................9, 10, 11, 12

*Reich v. Ladish Co., Inc.*, 306 F.3d 519 (7th Cir. 2002)....................................................29

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005)..................................7, 8, 10, 11

*Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735 (8th Cir. 2002)..........6

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) .........................................28

*Stone v. Travelers Corp.*, 58 F.3d 434 (9th Cir. 1995) ......................................................8

*Sullivan v. Chase Inv. Servs. of Boston*, 79 F.R.D. 246 (N.D. Cal. 1978)........................12

*Syed v. Hercules, Inc.*, 214 F.3d 155 (3d Cir. 2000) ........................................................10

*Tahoe- Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    216 F.3d 764 (9th Cir. 2000) .................................................................................28

*Thomas v. Oregon Fruit Prods. Co.*, 228 F.3d 991 (9th Cir. 2000)..................................30

*Tinley v. Gannett Co.*, 55 Fed. Appx. 74 (3d Cir. 2003) ..................................................12

*Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325 (8th Cir. 1998)......................................10

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .................12

*Veltri v. Bldg. Serv. 32B-J Pension Funda, 393 F.3d 318 (2d Cir. 2004)*.................25, 26

*Waste Mgmt.t Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000).........................12

*Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d
    643 (9th Cir. 2000)..................................................................................8

*Williams v. Sinclair*, 529 F.2d 1383 (9th Cir. 1975) .......................................12

*Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003)..............................................11

*Zhu v. Fujitsu Group 401(k) Plan*, 2003 WL 24030329 (N.D. Cal. Sept. 9, 2003)............6

*Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889 (3d Cir. 1986) ...................................5

*Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356 (8th Cir. 1997)................................29

## CODE AND RULES

29 U.S.C. § 1002(2) ...........................................................................8

29 U.S.C. § 1113 ...............................................................................4

29 U.S.C. § 1132(a)(1)(B) ...................................................................5

29 U.S.C. § 1132(a)(3).......................................................................5

29 U.S.C. § 1132(a)(3).......................................................................30

29 U.S.C. § 1113 ...............................................................................4

Fed. R. Civ. P. 8(c) ...........................................................................28

Fed. R. Civ. P. 23(a) .........................................................................31

## II.    **INTRODUCTION**

Plaintiffs' Reply Memorandum confirms that Defendants' affirmative defenses, and in particular their statute of limitations defenses, are now front and center in this lawsuit.  Plaintiffs attempt to brush these defenses aside, however, by framing the analysis in an improper context – they make summary judgment arguments aimed at the legal sufficiency of the Named Plaintiffs' claims.  Arguing for the application of erroneous legal standards and distorting facts, Plaintiffs attempt to create the impression that their claims, and thereby the claims of all members of the putative class, will ultimately survive Defendants' affirmative defenses.  In doing so, Plaintiffs miss the point while, at the same time, they underscore the individual factual inquiries inherent in the case.  The very need for such fact specific inquiries defeats typicality and the predominance of common issues, and thereby eliminates any arguable benefit of the class certification vehicle.  Put another way, the sufficiency of the putative class members' claims do not stand or fall with those of the Named Plaintiffs.

As an example of Plaintiffs' oversimplification and factual overreach, Plaintiffs argue that the statute of limitations as to all putative class members' claims did not begin to accrue until the Named Plaintiffs' administrative claims were denied.  Plaintiffs' argument flies in the face of controlling precedent.  Their statutory claims as well as their claims for benefits under the plans accrued when they *knew or should have known* of the injuries underlying their claims.  Such a factual inquiry will turn on the knowledge of each Plaintiff and putative class member.

In relation to their own claims, Plaintiffs suggest that Defendants failed to place them on notice of the alleged harm that supposedly flowed from the challenged plan amendments.  Contrary to Plaintiffs' allegations, however, the record reveals that Defendants disclosed the salient details immediately after the plans were amended in 1983, and later engaged in a communications campaign to address the discord among some employees over the SBA offset.

It is Defendants' position that the disclosures in the 1984 summary plan

1

description, brochures, and other plan communications put participants on notice of the facts that triggered the running of the statute of limitations.  Plaintiffs disagree; it is important to note, in this regard, that Plaintiffs are the ones who invite individualized inquiries into innumerable factual variations.  If, as they contend, the 1984 SPD and other plan communications were insufficient, then the unavoidable consequence is an excruciatingly detailed examination of dozens of meetings, communications, speeches and publications over the ensuing 15 or more years that address every aspect of the SBA and Social Security offsets.  It must be determined which of the participants received or are deemed to have received information to put them on notice of the facts underlying their claims.  Perhaps they can explain why:  (1) some of the participants had enough information to assert detailed claims and challenges in 1984 and the mid-1990s, as discussed below, while others did nothing; and (2) no one filed a lawsuit before this case was commenced in 2004.  Meanwhile, among the facts and histories to be examined on an individualized basis are the following, each of which reveals that many participants knew or should have known of the triggering events between 1984 and 1999:

- As early as 1985, almost 100 participants signed a petition complaining about the offsets.  By 1995, hundreds of participants complained that the SBA offset was a "takeaway."

- The Company frequently offered presentations designed to educate participants about their benefits.  One such presentation series, offered in 1995, was specifically designed to address the SBA offset.  Hundreds of members of the putative class participated in these presentations, and many reacted angrily.

- Participants received a multitude of statements, estimates, and calculations that demonstrated the effect of the offsets on their particular benefits, and detailed how the offsets were calculated.  These statements and estimates were provided at varying times to individual members of the putative class, and in most instances were provided well outside of the limitations period.

- In exit interviews, one-on-one meetings, and over a hotline, participants frequently asked benefits specialists for clarification about how the offsets were calculated.  Many of these conversations likewise occurred well outside the limitations period.

- Certain members of the putative class filed multiple administrative claims

2

challenging the offsets as early as 1985 and 1993.

- Numerous putative class members sought advice of counsel, some at least as early as 1995, regarding their belief that the SBA offset was illegal. Indeed, one lawyer responded to an inquiry with concern that the statute of limitations had already run on any such claims.

- Many class members complained about the offsets to government agencies. For example, one group of over 100 putative class members directly challenged that the SBA and Social Security offsets violated ERISA.

These examples demonstrate the range of events and documents that must be explored on a person-by-person basis to resolve each plan participant's claims. Such individualized inquiries also apply to Defendants' other defenses, such as laches, for which individualized determinations of knowledge and any legitimate reasons for delay in taking action are necessary. (*See* Defs.' Opp. To Mot. Class Cert. at 15-19.)

These facts can be examined for the six Named Plaintiffs, but there is no realistic way to conclude such an analysis for more than 10,000 putative class members. Thus, for the reasons set forth below, and in Defendants' Response Memorandum, the Court should deny Plaintiffs' motion for class certification.

## III.    ARGUMENT

### A.    Ninth Circuit Precedent Establishes That Each Putative Class Member's Claims Accrued When He or She Had Actual or Constructive Knowledge of the Injuries Underlying Their Claims.

Defendants demonstrated in their opening brief that the statute of limitations governing Plaintiffs' statutory claims began to run when Plaintiffs knew or should have known of the supposed reductions in their accrued benefits. Likewise, Plaintiffs' claims for benefits began to run when they knew or should have known of a clear repudiation of the obligation to pay benefits in the manner sought by Plaintiffs, regardless of whether or when administrative claims were filed or denied. Determining when the statutes of limitations accrued under these standards is a fact-intensive inquiry that can be decided only on an individualized basis.

Plaintiffs now contend that none of their claims accrued until their administrative claims were filed and denied. In order to make this strained argument, Plaintiffs conflate

3

two distinct types of ERISA claims:  claims for alleged statutory violations under ERISA § 502(a)(3), and claims for benefits based on the terms of the plan under ERISA § 502(a)(1)(B).  Based on this untenable premise, Plaintiffs argue that all of their claims are for benefits to be paid under the terms of the plans, and that the claims accrued only when their administrative claims were denied.  This argument founders upon contrary Ninth Circuit precedent, and directly contradicts Plaintiffs' prior arguments.  Indeed, the "knew or should have known" accrual rule governs Plaintiffs' claims, and requires individualized inquiries.

Plaintiffs argue in the alternative that their claims did not accrue until they had a heightened version of "actual knowledge" of their claims.  They base this argument, however, on cases interpreting ERISA Section 413, 29 U.S.C. § 1113, which applies only to claims for breaches of fiduciary duty.  There are no such claims in this case.  Plaintiffs also argue that a separate claim and limitations period accrued with each pension check calculated under the challenged amendments.  The Ninth Circuit, however, specifically rejected this argument under circumstances indistinguishable from the instant case.  The Court, therefore, should reject Plaintiffs' attempts to deviate from the rule in this Circuit relating to the accrual of claims for statutory violations of ERISA.

1.     **The Court should reject Plaintiffs' attempt to conflate distinct claims under Sections 502(a)(3) and 502(a)(1)(B) of ERISA.**

Plaintiffs argue that their claims for violation of ERISA's anti-cutback rule are actually claims to enforce the terms of the plan.  They essentially contend that all claims based on statutory requirements can be recast as claims for plan benefits because ERISA plans incorporate ERISA's provisions by implication.  (Pls.' Rpy. Br. at 6-7 (citing *May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597 (7th Cir. 2002)).)  In the same vein, Plaintiffs argue that, because their anti-cutback claims rely to some extent on the pre-amendment terms of the plan, they seek to "enforce rights under a pension plan."  (*Id.*)  Plaintiffs are wrong for a number of reasons.

It is well established that statutory claims and claims for benefits under the terms of

1    a plan are wholly separate claims that arise under distinct statutory enforcement

2    provisions.[1]  The Ninth Circuit has recognized the importance of this distinction, requiring

3    a claimant to exhaust administrative remedies before bringing a suit for benefits under the

4    terms of a plan, but not before bringing a suit for violations of ERISA's statutory

5    provisions.  *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000); *Graphic*

6    *Commc'ns Union Dist. Council No. 2 v. GCIU-Employer Ret. Benefit Plan*, 917 F.2d

7    1184, 1187 (9th Cir. 1990).  It is the substance of the claim, rather than the label a plaintiff

8    chooses to affix to it, that determines the statutory enforcement provision under which it

9    arises.  *See Johnson v. St. Frances Xavier Cabrini Hosp. of Seattle*, 910 F.2d 594, 596

10   (9th Cir. 1990) (noting that the "key question is whether the answer settling the dispute 'is

11   to be found in the [plan] or in ERISA's provisions'"); *accord D'Amico v. CBS Corp.*, 297

12   F.3d 287, 291 (3d Cir. 2002) (holding that the question is whether "resolution of the

13   claims rests upon an interpretation of an ERISA-regulated plan rather than on an

14   interpretation and application of ERISA itself").[2]

15       In its July 19, 2005 Order, the Court found that Plaintiffs' anti-cutback claims were

16   "statutory claims," and determined that "[i]nterpretation of ERISA, a federal statute, is a

17   question of law subject to *de novo* review."  (Doc. # 73, at 12.)  Plaintiffs' attempt to

---

18   [1]    Adopting Plaintiffs' argument would also render important provisions of the statute meaningless.

19        Citing *May*, Plaintiffs argue that every plan implicitly contains every ERISA provision.  Yet,
         ERISA specifically distinguishes between claims brought to enforce the terms of the plan, *see* 29

20        U.S.C. § 1132(a)(1)(B), and claims brought to enforce ERISA's provisions.  *See* 29 U.S.C. §
         1132(a)(3).  Plaintiffs' argument would render Section 502(a)(3) mere surplusage, and should be

21        rejected.  *See, e.g., M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 844
         (9th Cir. 2002) (rejecting proposed statutory interpretation that would render statutory provision

22        "mere surplusage").

23   [2]    Plaintiffs' reliance on *May* is misplaced.  *May* addressed the proper interpretation of an exclusion
         from an insurance contract, not ERISA's enforcement provisions.  305 F.3d at 600.  The Seventh

24        Circuit's pronouncements regarding ERISA's enforcement provisions are merely *dicta*, which this
         Court need not, and should not, follow, because to do so would effectively convert all statutory

25        claims into claims for plan benefits.  This result is inconsistent with ERISA's plain terms and
         established principles of statutory construction.   It is also inconsistent with the Ninth Circuit's

26        well-established rule that statutory claims need not be administratively exhausted, while claims for
         benefits under the terms of the plan must be.  *Chappel*, 232 F.3d at 724; *Graphic*, 917 F.2d at

27        1187; *see also Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 891 (3d Cir. 1986) (noting that the
         Seventh Circuit's rule on exhaustion of statutory claims is contrary to the Ninth Circuit's rule).

28

1    merge their statutory claims and claims for benefits under the terms of the plan would

2    contravene this basic premise, which has provided the framework under which this case

3    has been litigated for the last ten months.[3]  *See Graphic*, 917 F.2d at 1188 n.6 (claim that

4    plan provision violated ERISA alleges a violation of the statute); *Ross v. Rail Car Am.*

5    *Group Disability Income Plan*, 285 F.3d 735, 740-41 (8th Cir. 2002) (claims that "seek to

6    invalidate [] amendments can only be characterized as arising under 29 U.S.C. §

7    1132(a)(3), section 502(a)(3) of ERISA").  *See also Coleman v. Pension Benefit Guar.*

8    *Corp.*, 94 F. Supp. 2d 18, 21 (D.D.C. 2000) (characterizing ERISA § 204(g) claim as

9    asserting a statutory violation, not a claim for benefits under the terms of a plan); *Bellas v.*

10   *CBS, Inc.*, 73 F. Supp. 2d 493, 497 (W.D. Pa. 1999) (rejecting argument that ERISA §

11   204(g) claim was for benefits under the plan, rather than a claim for a statutory violation);

12   *Zhu v. Fujitsu Group 401(k) Plan*, 2003 WL 24030329, at *2-3 (N.D. Cal. Sept. 9, 2003)

13   (claim to invalidate amendment based on ERISA § 203(c)(1)(B) did not seek to enforce

14   terms of the plan, but asserted statutory claim under § 502(a)(3)).

15           2.    **Plaintiffs' distinct claims are governed by multiple statute of**

16                   **limitations periods, not a single six-year period as Plaintiffs suggest.**

17   In their opening brief, Defendants did not argue that any specific statute of

18   limitations period governed Plaintiffs' claims, because the Court need not decide this

19   question in order to rule on the motion for class certification.  Rather, the critical

20   questions are when the limitations period accrued, and whether the time of accrual differs

21   for the plan participants based on their degree of knowledge of the implications of the

22   challenged plan amendments.  Nevertheless, some discussion of the appropriate

23   limitations period is probably useful to put this dispute in its proper context.

---

24   [3]    Plaintiffs' current attempt to blur the distinction between their claims is also directly contrary to

25   the arguments they made during the administrative claims process, when Plaintiffs emphasized that they were not required to exhaust their "legal claims for *violations of ERISA* . . . before filing suit."  (Doc. # 16 at HW0000447 (emphasis added); *see also* Doc. # 16 at HW0000494 n.6 ("We

26   are discussing *ERISA violations* on this appeal as we did in the Claim Letters in an effort to resolve the claims without resort to litigation.  Our inclusion of legal issues is without waiver or

27   prejudice to our position that there is no requirement to exhaust administrative remedies on legal issues.") (emphasis added).)

28

1      ERISA does not provide a statute of limitations for claims that do not involve

2  breaches of fiduciary duty. *Romero v. Allstate Corp.*, 404 F.3d 212, 220 (3d Cir. 2005);

3  *see also Pierce County Hotel Employees & Rest. Employees Health Trust v. Elks Lodge,*

4  *B.P.O.E. No. 1450*, 827 F.2d 1324, 1328 (9th Cir. 1987).  As a result, federal courts

5  borrow and apply the most analogous state statute of limitations to such claims.  *See, e.g.,*

6  *Pierce*, 827 F.2d at 1328.

7      In their reply, Plaintiffs assert that Arizona's six-year statute of limitations for

8  actions based on contracts signed within the state governs all of their claims.  (Pls.' Rpy.

9  Br. at 5.)  They are mistaken.

10      The Ninth Circuit has never decided which state statute of limitations is most

11  analogous to an anti-cutback claim under Section 204(g) of ERISA.  *Cf. Meagher v. Int'l*

12  *Ass'n of Machinists & Aerospace Workers Plan*, 856 F.2d 1418 (9th Cir. 1988)(applying

13  ERISA § 413 limitations clause to breach of fiduciary duty claim based on failure to

14  correct prior anti-cutback violation).  At least one other appellate court, however, has

15  addressed this exact question twice.  *See Romero*, 404 F.3d at 220 (applying

16  Pennsylvania's catchall statute of limitations to § 204(g) claim); *Gluck v. Unisys Corp.*,

17  960 F.2d 1168, 1181-82 (3d Cir. 1992) (same).  In both cases, the Third Circuit rejected

18  the use of Pennsylvania's contract statute of limitations, and held that, because an ERISA

19  § 204(g) claim, which involves "complex issues of statutory interpretation, had no

20  counterpart in Pennsylvania law," Pennsylvania's "catchall" statute of limitations applied.

21  *Romero*, 404 F.3d at 220 (quoting *Gluck*, 960 F.2d at 1181-82).  Consistent with the

22  analysis of *Romero* and *Gluck*, Defendants submit that Plaintiffs' anti-cutback claims in

23  this case should be subject to Arizona's one-year statute of limitations for actions upon "a

24  liability created by statute, other than a penalty or forfeiture."  *See* ARS § 12-541(5).

25  Alternatively, Arizona's four-year general limitations period should apply.  *See* ARS § 12-

26  550.

27      Plaintiffs' claims based on the terms of the plans, on the other hand, would be

28  governed by the appropriate contract statute of limitations.  *See Wetzel v. Lou Ehlers*

7

1   *Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643, 648 (9th Cir. 2000)

2   (*en banc*) (finding California's contract statute of limitations most analogous to claim for

3   benefits).  Arizona has three contract statutes of limitation.  *See* ARS §§ 12-541(3), 12-

4   544(3); 12-548.  The Ninth Circuit has not yet decided which one of these statutes is most

5   analogous to a claim for benefits.  Defendants submit that Arizona's one-year statute of

6   limitations for "breach of an oral or written employment contract . . . ," ARS § 12-541(3),

7   is most analogous to a claim for benefits under an "employee pension benefit plan."[4]  *See*

8   *Syed v. Hercules, Inc.*, 214 F.3d 155, 160-62 (3d Cir. 2000) (Alito, J.) (finding one-year

9   contract statute specifically "covering employment disputes" to be more analogous to

10  claim for benefits than three-year contract statute "for general actions on a promise").[5]

11          Finally, Plaintiffs' claims for statutory penalties under ERISA § 502(c) are

12  governed by the one-year period in ARS § 12-541.  The Ninth Circuit has held that a

13  Section 502(c) claim is most analogous to an "action upon a liability created by statute,

14  other than a penalty or forfeiture."  *See Stone v. Travelers Corp.*, 58 F.3d 434, 438-39 (9th

15  Cir. 1995).  Arizona's one-year statute of limitations for actions "[u]pon a liability created

16  by statute, other than a penalty or forfeiture," therefore, governs Plaintiffs' Section 502(c)

17  claims.  *See* ARS § 12-541.

18                    3.      **The Court should reject Plaintiffs' attempt to fashion a self-
                                serving accrual standard, and apply the federal "knew or should
19                              have known" accrual rule to Plaintiffs' claims.**

20          Plaintiffs argue that their claims are governed by a novel and unsupported version

21  of the clear repudiation standard that was triggered only when the plan administrator

22  formally denied their administrative claims.  (Pls.' Rpy. Br. at 5-7.)  As a purported "fall

23  back" position, and relying on fiduciary duty cases applying ERISA § 413, Plaintiffs

---

24  [4]      An "employee pension benefit plan" means "any plan . . . maintained by an employer . . . to the
25          extent that by its express terms . . . provides retirement income to employees . . . ."  29 U.S.C. §
            1002(2)(A).

26  [5]      Alternatively, Arizona's four-year statute of limitations for actions "upon an instrument in writing
27          executed without the state," ARS § 12-544(3), would be most analogous to Plaintiffs' claim for
            benefits based on the terms of the plan, which was "EXECUTED at San Diego, California . . . ."
            (Doc. # 16 at HW0000378.)

28

8

1   argue that "actual knowledge" of the basis for the claims is required to trigger the running

2   of the statute of limitations.  (*Id.* at 7-8).  Plaintiffs' primary and "fall back" positions are

3   wrong, and conflict with controlling Ninth Circuit authority.  Rather, the federal

4   "discovery rule" governs the accrual of their claims.

5         Although state law provides the limitations *period*, federal common law governs

6   *when* this period begins to run.  *See, e.g., N. Cal. Retail Clerks Unions & Food Employers*

7   *Joint Pension Trust Fund v. Jumbo Mkts., Inc.*, 906 F.2d 1371, 1372 (9th Cir. 1990)

8   ("Because the cause of action is federal, however, federal law determines the time at

9   which the cause of action accrues.").  In ERISA actions, as in other federal claims

10   generally, the statute of limitations accrues "when the plaintiff knows or has reason to

11   know of the injury that is the basis of the action."  *Pisciotta v. Teledyne Indus., Inc.*, 91

12   F.3d 1326, 1331 (9th Cir. 1996); *Jumbo Mkts.*, 906 F.2d at 1372 (applying "knew or

13   should have known" standard to ERISA § 515 claim for delinquent contributions due

14   under the terms of a collective bargaining agreement); *Pierce*, 827 F.2d at 1328 (same);

15   *see also Romero*, 404 F.3d at 222-23 (applying federal discovery rule to ERISA § 204(g)

16   claims).  Plaintiffs must be diligent in discovering the critical facts, and what Plaintiffs

17   knew and when they knew it are questions of fact.  *See Bibeau v. Pac. Nw. Research*

18   *Found., Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999) *amended* 208 F.3d 831 (9th Cir. 2000).

19         The federal "knew or should have known" accrual standard, therefore, governs

20   Plaintiffs' claims, including both the anti-cutback claims, *see Romero*, 404 F.3d at 224

21   (holding that the federal discovery rule applies to ERISA § 204(g) claims), and the claims

22   for benefits under the terms of the retirement plan.  Indeed, in *Pisciotta*, the Ninth Circuit

23   applied the "knew or should have known" standard to bar claims for benefits under

24   Section 502(a)(1)(B).  *See Pisciotta*, 91 F.3d at 1331 (applying discovery rule to bar

25   plaintiffs' claims); Brief of Appellee, 1994 WL 16014668, at *3, *30 (noting that claims

26

27

28

1    arose under § 502(a)(1)(B)).[6]

2            Consistent with the discovery rule, some courts have ruled that the statute of

3    limitations on a claim for benefits under a plan begins to run when the plaintiff knew or

4    should have known that "there has been a clear and continuing repudiation of rights under

5    the pension plan." *Martin v. Constr. Laborers Trust for S. Cal.*, 947 F.2d 1381, 1384 (9th

6    Cir. 1991); *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 48

7    (2d Cir. 1999) (noting that the "clear repudiation" standard is "consistent with the

8    'discovery rule'"); *Bennett v. Federated Mut. Ins. Co.*, 141 F.3d 837, 838-39 (8th Cir.

9    1998) (same); *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998) (same).

10   That standard, however, is not tied exclusively to the denial of an administrative claim for

11   benefits. On the contrary, a claim for plan benefits can accrue before a formal claim

12   denial, and indeed, even if the plaintiff never files a claim. *See Martin*, 947 F.2d at 1384-

13   86; *Carey*, 201 F.3d at 48 (holding that benefit claim can accrue "regardless of whether

14   the plaintiff has filed a formal application for benefits"); *Beckham*, 138 F.3d at 330

15   (same). Thus, Plaintiffs' claims are governed by the federal "discovery rule," and accrued

16   when they knew or should have known of the injury forming the basis of the action,

17   regardless of whether administrative claims had been asserted or denied. *Pisciotta*, 91

18   F.3d at 1331; *Jumbo Mkts.*, 906 F.2d at 1372; *Pierce*, 827 F.2d at 1328; *Romero*, 404 F.3d

19   at 222-23.

20           Plaintiffs' "fall back" position – that the statute of limitations did not begin to run

---

21   [6]    Plaintiffs rely heavily on this Court's unpublished opinion in *Loewy v. Ret. Comm., Plan Adm'r of the Motorola, Inc. Pension Plan*, No. CV-03-2284-PHX-FJM. However, *Loewy* actually supports

22   Defendants' position. *See Loewy*, slip. op. at 20 (applying "knew or should have known" accrual standard to plaintiff's claims). The fact that the Court rejected the defendant's statute of

23   limitations argument in *Loewy*, moreover, is easily distinguishable from this case. In *Loewy*, the plaintiff claimed that he was entitled to an actuarial increase in his pension. The defendants

24   argued that the plaintiff knew or should have known of his claim because: (1) he knew that he had not received a suspension of benefits notice, and (2) he received pension checks that did not

25   include the actuarial increase he sought. (*See* Declaration of Dawn Dauphine at Ex. 1, p. 13.) The Court found these two facts insufficient to trigger the statute of limitations, but its decision was

26   based on the specific facts in the record. By contrast, as discussed below, and in Defendants' opening brief, numerous communications and other sources of information provided Plaintiffs and

27   the putative class members with actual or constructive knowledge of their claims.

28

1   until participants gained a heightened form of "actual knowledge" – is equally untenable.

2   (Pls.' Rpy. Br. at 8.)  Plaintiffs base their argument on the Second Circuit's decisions in

3   *Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006), and *Caputo v. Pfizer, Inc.*, 267 F.3d

4   181 (2d Cir. 2001).  These courts, however, applied ERISA § 413's "actual knowledge"

5   accrual rule, a provision that has no application here.  *Frommert*, 433 F.3d at 272-73;

6   *Caputo*, 267 F.3d at 193.  "By its terms," ERISA § 413 "applies only to a claim which

7   alleges a breach of fiduciary duty."  *Flanagan v. Inland Empire Elec. Workers Pension*

8   *Plan & Trust*, 3 F.3d 1246, 1252 (9th Cir. 1993) (holding that ERISA § 413 does not

9   apply to claim for benefits).  Plaintiffs do not assert a claim for breach of fiduciary duty

10  (Doc. # 47), and, thus, § 413's actual knowledge requirement is inapplicable, and

11  *Frommert* and *Caputo* are irrelevant.[7]

12           4.     **The Court should reject Plaintiffs' continuing accrual argument,**
                    **as it has been rejected by the Ninth Circuit.**

13          Plaintiffs also suggest that a continuing violation or accrual rule applies to their

14  claims, relying on ERISA § 413 and a case applying that fiduciary statute of limitations,

15  *Meagher*, 856 F.2d 1418.  (Pls.' Rpy. Br. at 11 n.8).  Since *Meagher*, however, the Ninth

16  Circuit has clarified that when a series of alleged breaches are of the same kind or

17  character, a plaintiff's knowledge of one such breach commences the statute of limitations

18  running for all of them.  *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944

19  F.2d 509, 520-21 (9th Cir. 1991).  Plaintiffs argue that the continuing accrual rule remains

20  viable in spite of *Phillips* because the *Phillips* panel could not overrule the earlier

21  *Meagher* decision.  Plaintiffs' argument misses the mark.  *Meagher*'s continuing accrual

22  rule was adopted in the distinguishable context of ERISA's unique statute of limitations

23

---

24      [7]      Moreover, even if ERISA § 413 did control Plaintiffs' claims, *Frommert* and *Caputo* would not
                apply.  In *Frommert* and *Caputo*, the Second Circuit applied an interpretation of Section 413 that

25      conflicts with the Ninth Circuit's construction of the statute.  *See Wright v. Heyne*, 349 F.3d 321,
        328 (6th Cir. 2003) (distinguishing the Second Circuit's "hybrid view of the actual knowledge

26      requirement" from the Seventh, Eighth, Ninth, and Eleventh Circuits' rules).  Contrary to the
        Second Circuit's rule, in the Ninth Circuit, a breach of fiduciary duty claim accrues under the

27      "actual knowledge" prong of the standard when the plaintiff obtains "knowledge of the transaction
        that constituted the alleged violation."  *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985).

28

1   applicable to breach of fiduciary duty claims, ERISA § 413.  The Ninth Circuit has never

2   applied the continuing accrual rule to ERISA claims governed by the most analogous state

3   statute and the federal discovery rule.  To the contrary, the Ninth Circuit has specifically

4   rejected a plaintiff's attempt to do so.  *Pisciotta*, 91 F.3d at 1332.[8]

5           **B.      Class Treatment of Plaintiffs' Claims Is Inappropriate Because
                      Individualized Inquiries Into When Each Putative Class Member Knew**
6                     **or Should Have Known of the Injury Underlying His or Her Claims
                      Predominate Over Common Issues and Render the Claims Atypical.**
7
8               Plaintiffs argue that individualized affirmative defenses should not prevent class

9   certification.  There is nothing unique, however, about affirmative defenses in relation to

10  Rule 23's requirements.  In a case such as this, where the affirmative defenses are the

11  central remaining issue and will require individualized determinations, class certification

12  does not provide a superior method to adjudicate Plaintiffs' claims.  These individualized

13  issues render Plaintiffs' claims atypical,[9] and the few remaining common issues[10] do not

14  predominate over thousands of mini-trials that will be necessary to decide the merits of

15  the affirmative defenses.  *See, e.g., Dongelewicz v. PNC Nat'l Bank Ass'n*, 2004 WL

16  1661863, at *816 (3d Cir. 2004) (affirming decision to decertify class because applying

17  "knew or should have known" standard would result in an "'extremely fact specific'

18  individualized inquiry" given the differing circumstances of the individual putative class

19  members)  (citing *Mathews v. Kidder*, 260 F.3d 239, 250 (3d Cir. 2001)).

---

[8]     *See also Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 214-15 (3d Cir. 2001) (rejecting
20      continuing accrual rule in § 502(a)(1)(B) claim); *Tinley v. Gannett Co.*, 55 Fed. Appx. 74, 78-79
        (3d Cir. 2003) (rejecting continuing accrual rule).

21  [9]     Plaintiffs' citations address the question of affirmative defenses in the context of Rule 23(b)(3)
22          predominance, not Rule 23(a) typicality.  *See Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir.
            1975); *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976); *Waste Mgmt.t
23          Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295-96 (1st Cir. 2000); *In re Visa Check/MasterMoney
            Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) (addressing individualized damages, not statute
24          of limitations, issues); *Sullivan v. Chase Inv. Servs. of Boston*, 79 F.R.D. 246, 264 (N.D. Cal.
            1978).  Plaintiffs' cases, therefore, simply do not address Defendants' argument that the
25          individualized defenses render the class claims atypical under Federal Rule of Civil Procedure
            23(a).  (Defs.' Opp. To Class Cert. at 3-4.)

26  [10]    In footnote 2 of their Reply, Plaintiffs identify a number of "other claims" they allege are
27          susceptible to class-wide treatment and, thus, support their Motion.  However, all of the identified
            claims are either duplicative of those on which summary judgment has already been granted by
28          this Court, or raise claims for relief that pale in significance to the main claims in this case.

1    Despite Plaintiffs' overly restrictive view of the accrual rule, each putative class

2    member's claims accrued when he or she knew or should have known of the *injuries*

3    giving rise to their claims.  There is abundant evidence of numerous communications from

4    which any participant could or should have learned the consequences of the challenged

5    amendments and interpretations.  Most or all participants should have learned of their

6    claims through summary plan descriptions and other broadly distributed communications.

7    Indeed, Defendants will argue in a motion for summary judgment that broadly distributed

8    communications (among other available information) placed Plaintiffs (and would have

9    placed other participants) on notice of their claims.  For example, in January 1984

10   participants received two brochures that explained the merger of the Garrett plans into the

11   Signal plans.  (*See* Doc. # 146, Ex. H.)  These brochures disclosed the Social Security

12   offset, that the SBA would earn over 12% interest, and that the SBA offset would be

13   calculated using this high interest rate.  (*Id.* at BA0371, 372, 375.)

14   Defendants will contend at the appropriate juncture that this information, and other

15   broadly distributed communications, gave Plaintiffs actual or constructive knowledge of

16   the injuries underlying their claims.  Although the merits of that argument are not ripe for

17   disposition yet, it is critical to recognize the necessity of individualized determinations on

18   these issues.  Perhaps there are some participants who lacked knowledge of the relevant

19   facts in the 1980s or by the mid-1990s, as unlikely as that seems given the breadth of the

20   communications about the plan amendments and the workings of the retirement plans.

21   The claims of such persons, however, will survive or fail based on facts that are unique to

22   each individual.  The claims simply cannot be tried or evaluated on a representative basis,

23   thus, eliminating the prospect of a rational determination on the merits that will bind the

24   class of participants and Defendants.  As discussed below, there were innumerable ways

25

26

27

28

in which putative class members may have been put on notice of their claims.[11]

1.    **Complaints and Inquiries by Plan Participants Regarding the SBA Offset.**

In the decades following the challenged plan amendments, the Company received numerous complaints from participants challenging the SBA offset. For example, not long after the challenged plan merger, nearly ninety employees submitted a petition challenging the integration between the Retirement Plan and the SBA account. (*See* Dauphine Decl. Ex. 14 ("When Signal did this in January 1984, our Severance Account became our Retirement Account.")) The Company also received a series of letters from participants expressing concern over the effect of the SBA offset on their pension and requesting more information. (See Declaration of Marie Gangone at Ex. B ("I have heard many stories about losing my retirement if I take my severance account. I would like to find out about my own personal account."))

Although participants complained about the SBA offset as early as 1984 and 1985, the complaints escalated in the 1990s. (*See* Declaration of Craig Chapman ¶¶ 10-28; Declaration of Maureen Rojas ¶ 3; Declaration of Cindy Burnelko ¶¶ 5, 8.) In 1995, a series of meetings was held to address the SBA offset; hundreds of employees attended and became extremely angry, shouting and challenging that the offsets were a "takeaway" of their benefits. (*Id.*)

These facts exemplify the individualized inquiries that will be necessary to determine what facts were known to employees – the protesters and others who remained silent – so that each person's claim can be assessed on the merits.

---

[11]    Plaintiffs argue that a summary plan description is the only communication that could have provided participants knowledge of their claims. (Pls.' Rpy. Br. at 9 (citing *Pisciotta*, 91 F.3d at 1329).) Nothing in *Pisciotta* even remotely suggests that only notice in an SPD can cause a claim to accrue. Indeed, Plaintiffs' argument conflicts with the Ninth Circuit's clear rule that an SPD need only provide notice of the "events" or "actions" that may give rise to a loss or reduction in benefits. *See, e.g., Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321-22 (9th Cir. 1995). Plaintiffs' argument also conflicts with their own theory that a claim accrues when a formal administrative claim is made and denied.

2.      **Complaints Led the Company to Prepare Presentations Designed to Address the SBA Offset.**

As a result of the chorus of complaints in 1995 that the offsets were improper, the Company conducted a number of presentations to educate participants. (Chapman Decl. ¶¶ 10-17, 42-43; Rojas Decl. ¶¶ 3, 14-19.)  One series of presentations was aimed at addressing the participants' concerns over the SBA offset, and provided specific examples of how the SBA offset was calculated and disclosed the precise formula by which the Social Security offset was calculated.  (*See* Chapman Decl. ¶¶ 11-16; Dauphine Decl. Ex. 7 at BA0175-76.)[12]  Over 1,000 employees attended these presentations.  (Chapman Decl. ¶ 11.)  After the presentations, several employees complained by email to Craig Chapman, Director of Human Resources.  (Chapman Decl. ¶¶ 18-20.)  For example, Gary Hertzler complained:

> When reviewing my paperwork at home that evening, I find that the original literature, which was put out at the time of the creation of the SBA, states that the offset would be calculated on a rate of 3.5% not the 7.5% stated Tuesday [at the meeting].  Since this makes a big difference on the size of the offset an expatiation [sic] would be helpful.

(Chapman Decl. ¶ 20; Ex. 5.)  Mr. Hertzler's complaint graphically illustrates that participants had all the information necessary to discover their claims.

Another presentation series by AYCO, an outside vendor, in 1995 educated participants about their retirement benefits.  (*See* Rojas Decl. ¶¶ 14-16; Chapman Decl. ¶ 42; Dauphine Decl. Ex. 8); (*see also* Dauphine Decl. Ex. 13 at 147-152 (Allen attended the presentation with her husband, most likely in 1997.))  It disclosed exactly how the Social Security offset was calculated, (Dauphine Decl. Ex. 8 at BA0851), and explained

---

[12]    Indeed, Plaintiff Allen's husband took notes on a copy of a handout during one such presentation. (Allen Dep. at 142.)  On a page providing an example of the SBA offset, he wrote "SBA offset" "Project out to 65," and "Signal Plan 1-1-84."  (Dauphine Decl. Ex. 7 at BA0175.)  He also noted "÷ 153.31," the precise annuity conversion factor used to calculate the SBA offset, a factor which the handout materials do not disclose.  (*Id.*)  These notations provide strong evidence that the presentations provided a great deal of information regarding the SBA offsets which would have placed participants on notice of their claims.  There is no way, however, to discover and present, let alone adjudicate, this evidence on a class-wide basis.

15

1   the SBA offset in detail.  (*Id.* at BA0853-855); (*see also* Rojas Decl. ¶ 16; Chapman ¶ 42.)

2   There is no way to identify who attended these presentations and to adjudicate

3   whether or not they obtained actual or constructive knowledge of their claims on a class-

4   wide basis.  Again, discovery, proof, and adjudication would be required if this case is

5   expanded to cover the myriad putative class members who may have participated in the

6   meetings.

7   3.   **The Company Created a "Focus Group" to Better Understand Employee Complaints Regarding the SBA Offset, and to Create More Effective Communications Regarding the Offsets.**

8

9   As a result of the vocal reaction of several hundred employees in a presentation

10  regarding the SBA offset, the Company formed a "focus group" designed to identify

11  employee concerns and to determine how to communicate better with employees

12  concerning the SBA offset.  (*See* Chapman Decl. ¶¶ 10-25; Rojas Decl. ¶ 4.)  The focus

13  group had four meetings, "led by an outside facilitator," and had "the full resources of the

14  Company . . . available to answer our questions and assist us in [their] mission."  (Doc. #

15  146 Ex. R at BA0209); (*see also* Chapman Decl. ¶ 27-36.)

16  In October 1995, the participants in the focus group set forth their concerns

17  regarding the SBA offset in a letter, and noted that their concerns "represent[ed] the views

18  of the majority of Engines employees with SBA accounts."  (Doc. # 146 Ex. R; Chapman

19  ¶¶ 28-36.)  Significantly, the letter challenged the use of both the 7.5% and the 12.3%

20  rates to calculate the SBA offset, and recommended that the Company re-examine "the

21  policy of offsetting retirement with SBA funds."  (*Id.*)  Quite obviously, therefore, the

22  focus group members (at a minimum) understood that the SBA offset was not calculated

23  based on a 3.5% credited interest rate.  (*See* Chapman Decl. ¶¶ 18-36.)

24  Plaintiffs denigrate this evidence arguing that it:

25  does not show knowledge by those employees that the interest
26  rates being utilized were different than those required under
    the "Credited Interest" rate set forth in the Garrett Plan.

27  (Pls.' Rpy. Br. at 9 n.5.)  Plaintiffs' argument is both legally and factually flawed.  First,

28

1    Plaintiffs forget that this is not a summary judgment argument.  The Court need not and

2    should not decide at this stage whether this evidence is sufficient to demonstrate that

3    certain members of the putative class knew or should have known of the alleged harm.

4    Rather, the evidence demonstrates yet another sub set of putative class members who very

5    likely knew or should have known of their claims based on information from multiple

6    sources.  Furthermore, the fact that the focus group members "talked extensively with

7    [their] co-workers" suggests that other putative class members may have been placed on

8    notice of their claims.

9        Second, Plaintiffs' arguments are strained from a factual standpoint.  There is

10   simply no way to believe that a group of employees who had "the full resources of the

11   company" available to "answer [their] questions" did not receive at least constructive

12   notice of their claims after four meetings designed to explain the SBA offset.  Indeed, one

13   focus group member, Bill Shoup, prepared an eight-page summary designed to

14   "enlighten[] co-workers with SBA accounts about the SBA program . . . ."  (*See* Chapman

15   Decl. Ex. 23.)  Mr. Shoup's summary explains the exact method by which the SBA offset

16   is calculated, including all of the interest rates used, and the fact that the SBA offset is

17   projected forward to age 65 when computing the offset.  (*Id.*)  Mr. Shoup[13] clearly

18   understood, therefore, that the offset was not calculated using only the old 3.5% interest

19   rate.  Because Mr. Shoup also designed the document to educate other employees, it is

20   quite likely that it placed other employees at least on constructive notice of their claims.

21       The information gleaned from the focus group led the Company to mail to the

22   homes of all SBA participants a detailed pamphlet describing the SBA, as well as a Q & A

23   designed to clarify questions that were identified in the focus groups.  (*See* Chapman

24   Decl. ¶¶ 33, 37-41; Rojas Decl. ¶¶ 6-13.)  These communications, in November 1995,

25

26

27

28

---

[13]    Defendants have learned from Plaintiffs' counsel that Mr. Shoup is deceased.  This fact, however, does not alter the conclusion that Mr. Shoup's summary suggests that other participants may have gained actual or constructive knowledge of their claims from their dealings with Mr. Shoup. What's more, Mr. Shoup's death demonstrates that the concerns underlying laches and limitations defenses are strongly implicated in this case.

1   described the history of the SBA offset, reaffirmed that the formula used to calculate the

2   SBA offset was changed on January 1, 1984, and again advised employees that the offset

3   was calculated based on a 12.3% rate of growth.  (*Id.*)  Again, the thousands of employees

4   may have had varying degrees of knowledge or understanding after receiving these

5   mailings, but such questions cannot be answered based on the experiences of the six

6   Named Plaintiffs.

7             4.    **Administrative Claims.**

8             Participants' use of the Plans' administrative claims process is further evidence that

9   individuals were on notice of the alleged harm sufficient to begin accrual of the

10  limitations period.  For example, in January 1984, employee Lyle Six challenged the

11  calculation of the SBA offset, contending that the post-merger plan terms created an SBA

12  offset that was larger than allowed by the old plan.[14]  (*See* Declaration of Connie Zeller

13  Ex. A at HWBF00477235-36.)  Mr. Six calculated the "Apparent Excess Reduction"

14  under the new plan compared to the old plan, and argued that the SBA offset was more

15  than double what he believed it should be.  (*Id.*)  The Company rejected Mr. Six's claim,

16  and explained in detail how the offset was calculated.  (*Id.* at HWBF00477227-229.)

17  Based on the correspondence between Mr. Six and the Company, the conclusion is

18  inescapable that Mr. Six knew or should have known of his claims in 1984, nearly 20

19  years before Plaintiffs filed the instant action.  (*Id.* at Ex. A.)

20            Without individualized discovery, proof, and adjudication, it is impossible to

21  determine how many other putative class members had similar concerns based on the vast

22  information that was provided to them, but it is clear that others have expressed those

23  concerns.  (*See, e.g.*, Chapman Decl. at Ex. 5 (participant complaining of use of 7.5%

24  rather than old 3.5% rate in offset calculation).)  Charles Kinney submitted a claim

25  ---

[14]    Plaintiffs' counsel represented Mr. Six in the administrative process in this case in 2002 and 2003.
26      Defendants recently learned from Plaintiffs' counsel that Mr. Six is also deceased.  Given the
        passage of time, there are undoubtedly many other witnesses and putative class members who
27      have passed away and from whom Defendants are no longer able to obtain oral evidence critical to
        their defenses, which is one of the very reasons justifying laches and limitations defenses.

28

1   challenging the SBA offset in 1993.  (*See* Zeller Decl. Ex. C at HW0019336-38.)  In

2   August 1993, the Company denied the claim and provided Mr. Kinney with a specific

3   outline of the manner in which his offset was calculated, including 149 pages of plan

4   documents and a notice of his appeal rights.  (*Id.* at HW0019372-82; *see also id.* at

5   HW0019344-45.)  Similarly, Eugene Kerkman filed a claim challenging the deduction of

6   administrative expenses from the SBA in 1996, which was denied.  (*See* Zeller Decl. Ex.

7   B.)

8        Plaintiffs will undoubtedly argue that prior administrative claims are isolated

9   occurrences, because if others existed, Defendants would have identified them.  Plaintiffs'

10  protestation is misplaced and misses the point.  Defendants maintain benefit files on

11  behalf of all of the 10,000+ putative class members in this litigation.  Claim documents

12  are contained in those files, much like a needle in a hay stack.  It is simply unrealistic to

13  suggest that Defendants should be capable of identifying all such claims from the huge

14  volume of benefit files.  Moreover, the fact that participants made such claims is

15  important not to prove that their individual claims are barred, but rather because it is

16  demonstrative of the relevant individualized knowledge inquiry.

17       On a more fundamental level, it is important to emphasize that the issue is not who

18  asserted claims, but what information was provided to participants.  Plaintiffs do not

19  contend, nor could they do so in good faith, that Messrs. Six, Kinney and Kerkman

20  received documents and information that were not provided to other participants.  For

21  whatever reason, these three employees challenged the Company.  Perhaps others

22  believed that there was nothing unlawful in an increase in the interest rate embodied in the

23  SBA, or maybe they understood that their net benefit was increased or at the least

24  preserved.  The critical point is that information was provided that enabled participants to

25  gain actual knowledge of the changes in the benefit formula.  (*See, e.g.*, Chapman Decl. ¶

26  20; Zeller Decl. at Ex. A.)  Unless Plaintiffs are prepared to concede that all participants

27  had such information, they cannot bypass the need for individualized examinations of the

28  claims and defenses.

5.   **Consultation with Attorneys.**

Other evidence demonstrating actual or constructive knowledge includes documents revealing that employees consulted with counsel regarding the SBA offset. Perhaps the most glaring instance is the case of Jack Gilmore (and those unidentified individuals on whose behalf he purported to act), and his exchange with attorney Blair Brininger, Esq. regarding the offsets at issue in this case. (*See* Docs. # 146, 172 Ex. S at BA2131-BA2135.)[15]   In 1999, Mr. Gilmore sought advice from Mr. Brininger regarding the offsets.  (*Id.* at BA2131.) Mr. Brininger replied to Mr. Gilmore:

> Thank you for sending me copies of your documents.  I have reviewed them and think you may have a case.  *However, I am concerned that back in 1984 everyone knew that Allied was doing this*.  The statute of limitations, at most, would be 6 years for breach of fiduciary duty. . . .  I believe time is of the essence.

(*Id.* emphasis added.)  Mr. Gilmore, undeterred by Mr. Brininger's advice, responded as follows:

> Thank you for reviewing our material we sent you and also thank you for the phone call.  I know we have a case, but we have to find someone who believes in us and *find ways around the ERISA laws.  I know there has to be some loop holes in the law that will benefit us*. . . .

(*Id.* at BA2132 (emphasis added).)   Mr. Gilmore likely had conversations with Ms. Allen and an unknown number of other putative class members about his discussions with an attorney.[16]  (*See* Dauphine Decl. Ex. 13 at 193-199 (Plaintiff Allen testifying that she had talked with Mr. Beilert about his attempts to contact an attorney).)  It is these types of facts that will need to be explored to adjudicate the defenses if this case is expanded beyond the six Named Plaintiffs.

---

[15]   Mr. Gilmore produced this document to the Department of Labor and to other individuals, thereby waiving any privilege that may have attached to it.  Plaintiff Allen produced this document to Defendants in this litigation.

[16]   For example, Mr. Gilmore, together with Paul Beilert, had gathered a group of "over 100" individuals to challenge the offset.  (*See* Docs. # 146, 172 Ex. S at BA1905-06.)

It is not simply a theoretical possibility, moreover, that other putative class members consulted with attorneys.  A flyer was posted in 1995 at one of the Company's facilities that solicited employees to speak to the "Law Firm of William M. Spence, P.C." to challenge the SBA offset.  (*See* Declaration of Diane Sucharski Ex. A.)  While this flyer does not specifically raise the same claims that the current Plaintiffs do, there can be no doubt that the "concerned employee" who posted the flyer, and anyone who considered seeking or sought representation, believed that the Company had acted illegally and that employees were entitled to "damages."  (*Id.*)  Still other participants were working to create a class to challenge the SBA offset in this time frame.  (*See* Chapman Decl. ¶ 45.) Such participants were at least on inquiry notice to pursue their rights with due diligence.

6.     **Efforts to Involve Government Agencies.**

Just as some participants sought legal counsel from private attorneys, many participants complained to government agencies about the SBA offset.  For example, Mr. Gilmore, Mr. Beilert, and "over 100" participants, (*see* Docs. # 146, 172 Ex. S at BA1905-6, BA1969), corresponded extensively with the U.S. Department of Labor alleging that the SBA and Social Security offsets violated ERISA.  (*See id.* at BA1677-2187.)  Plaintiffs attempt to mischaracterize this evidence, asserting that "this small group was voicing their belief that the mere existence of Honeywell's offsets somehow constituted tax fraud."  (Pls.' Rpy. Br. at 9 n.5.)  Contrary to Plaintiffs' characterization, however, this group of over 100 participants claimed that the Company had violated "the Department of Labor (ERISA laws)," (Docs. # 146, 172 Ex. S at BA 1677), and that Honeywell "has no right to deduct [the SBA offset] from our retirement pension."  (*Id.* at BA1710; *see also* BA1885; BA1890 (asking that Honeywell "be held accountable in a court of law"); BA1961 (claiming that offsets were "in violation off the ERISA laws"); BA1965 (alleging "ERISA laws violations.").)  The group also directly challenged the Social Security offset.  (*Id.* at BA1721; *see also id.* at BA1820 (asking whether SBA and Social Security offsets were "Illegal and FRAUD?"); BA1840 (challenging Social Security offset).)  Although this group did not couch their challenges in the sophisticated

1  legal terms Plaintiffs' counsel now uses, they certainly were aware of the alleged "injury"

2  (the offsets) and who caused the injury.  This is all that was required to place them at least

3  on inquiry notice of their claims.[17]

4         **7.**    **Benefits Calculations, Estimates, and Statements.**

5       Over the decades between the challenged amendments and the instant lawsuits, the

6  Company also gave benefits statements and estimates to individual participants that

7  disclosed the effect of the offsets on benefits.  In 1984 and 1985, participants received

8  packages entitled "Your Personal Statement of Benefits."  (*E.g.* Doc. # 146 Ex. J;

9  Dauphine Decl. Ex. 2.)  This statement provided a projection of benefits to normal

10  retirement age, including a calculation of the SBA offset.  (*Id.* at BA0608-9.)  The

11  statement specifically noted that the SBA was projected to grow at 12.3% interest, and

12  projected a monthly retirement benefit with and without the SBA offset calculated under

13  that assumption.  *Id.*  In other words, the statement provided an estimate of the exact

14  dollar effect of the SBA offset on a participant's pension based on SBA growth at 12.3%

15  interest.

16       Other statements given to participants at other times also provided estimates of the

17  precise impact of the SBA offset on pension benefits.  (*See, e.g.*, Dauphine Decl. Exs. 15-

18  18.)  Likewise, participants were able to request estimates of benefits at any time, some of

19  which provided the specific dollar effect of the SBA offset on a participant's benefits.

20  (*See, e.g.,* Dauphine Decl. Exs. 3-5, 9-11.)  Such statements should have led participants

21  who believed the offset was a "takeaway," (*see* Chapman Decl. ¶ 17; Burnelko Decl. ¶ 5),

22  or like Barbara Allen, who believed that "the offset for the SBA was going to be one or

23  1.5 percent," to investigate further.  (Dauphine Decl. Ex. 13 at 69.)

24       Retiring participants also received final calculations upon their retirement, and

25  

___

[17]    This group of participants was not alone in seeking to involve a government agency to challenge
26  the offsets.  A participant whose signature is illegible wrote to the Department of Labor to
challenge the SBA and Social Security offsets.  (*See* Gangone Decl. Ex. A at HW0004523-4531.)
27  Likewise, it appears that Mr. Kinney may have written to the Internal Revenue Service in 1993 to
challenge the SBA offset to his pension.  (*See* Zeller Decl. Ex. C at HW0019337.)

28

1   other participants could request full calculations prior to retirement, and many did.  (*See,*

2   *e.g.,* Doc. # 146 Ex. G, N, T; Dauphine Decl. 6, 12.)  These calculations placed

3   participants on notice of their claims.  Surprisingly, after complaining that many of

4   Defendants' communications were not detailed enough, Plaintiffs suggest that the final

5   calculations were too long and "fundamentally unintelligible, confusing and incomplete."

6   (Pls.' Rpy. Br. at 12.)  In fact, the final benefit calculations provided participants with the

7   precise information needed to evaluate potential claims.  For example, the calculations

8   computed a participant's credited service at the time of termination, (*e.g.,* Doc. # 146 Ex.

9   G at DM0005 at (A10), showing credited service at termination of 33.2500 years), and

10  demonstrate that the Social Security offset is calculated based on a participant's total

11  years of credited service (*e.g. id.* at DM0022 (at (D1)-(D6), calculating Social Security

12  offset based on the credited service calculated at (A10).).  The calculations also provide

13  the precise amount of the Social Security offset.  *Id.*

14       Similarly, the final calculation provides a participant with the precise manner in

15  which the SBA offset is calculated.  First, the calculation discloses that an SBA offset is

16  applied to both the Normal and Minimum Benefit formulae.  (*E.g., id.* at DM0022 (at

17  (D12), applying SBA offset to the greater of the results of the Normal (D6) and Minimum

18  (D10) formulas.)  Later, the calculation also demonstrates the exact manner in which the

19  SBA offset is calculated.  (*E.g., id.* at DM0026-DM0011.)  It shows that the calculation

20  involves projecting the account balance forward to normal retirement age, (*e.g. id.*

21  (projecting balance from termination date to Normal Retirement Date), and demonstrates

22  that the "Basic" and "Surplus" balances are projected forward at different rates (*id.*

23  (projecting basic balance forward with factor of 1.02340, and surplus balance forward at

24  factor of 1.0804044)).  Finally, the calculation shows that the offset is calculated by

25  dividing the projected balance by a factor of 153.31.  (*Id.* at DM0011.)  The calculation

26  worksheet, therefore, provides the exact manner in which the offsets are applied to a

27

28

participant's benefit.[18]

8.    **Individual Benefits Meetings, Exit Interviews, and Other Oral Communications.**

In addition to the presentations described above, many participants met with benefits personnel to discuss their retirement benefits.  (*See* Chapman Decl. ¶¶ 4-8; Burnelko Decl. ¶¶ 4, 6-7.)  During these meetings, benefits personnel pointed out the SBA and Social Security offsets to participants.  (*Id.*)  When asked, they also explained to participants precisely how the offsets were calculated, and directed them to other sources of information.  (*Id.*)  Indeed, an Administrative Manual used to help counsel participants provided extremely detailed explanations of the SBA offset, including easy to grasp charts and an SBA offset calculation worksheet.  (*See* Burnelko Decl. ¶ 6; Ex. 1.)  Furthermore, upon request, participants were provided with a detailed letter demonstrating exactly how the SBA offset was calculated, along with their estimated SBA offset amount.  (*Id.* at ¶ 7.) Finally, participants were able to call a "hotline" to obtain retirement estimates and other information regarding their benefits from counselors who were prepared to answer questions about the offsets.  (Chapman Decl. ¶ 38; Rojas Decl. ¶ 7.)

C.    **Plaintiffs' Tolling Arguments Do Not Eliminate the Intractable Individual Issues Surrounding the Affirmative Defenses.**

Plaintiffs argue that class certification is appropriate based on a number of erroneous and irrelevant tolling arguments.  Specifically, Plaintiffs argue that the statute of limitations was tolled (1) by agreement of the parties; (2) because Defendants failed to notify Plaintiffs of their right to appeal or file a civil action; (3) because Defendants failed to provide Plaintiffs with plan documents that Plaintiffs requested; and (4) by operation of law during the administrative claims process and by agreement of the parties.  Plaintiffs' arguments, however, are irrelevant to the class determination, and in many instances are legally and/or factually unsupported.

---

[18]    Plaintiffs' argument that the final calculation is somehow ineffectual because it is missing "Look up Factors from Tables" is a red herring.  *Id.*  The Table referred to by Plaintiffs is wholly irrelevant to the issues challenged in this litigation.

1

1.    **The tolling agreement does not eliminate any individualized inquiries.**

The tolling agreement entered on January 24, 2003 between Defendants and those individuals represented by Plaintiffs' counsel is irrelevant to the issue of whether class treatment of Plaintiffs' claims is appropriate.  Significantly, the tolling agreement specifically states that it does not revive any claims that were stale as of January 24, 2003.  (Doc. # 167 at Ex. A.)  Any claims already barred for the reasons noted above remain extinguished.  Moreover, the agreement does not address the fundamental issue of when an individual's claim began to accrue.  At most, the agreement merely defines the contours of the limitation period for certain members of the putative class.[19]  Thus, the tolling agreement does not eliminate the need for individualized inquiries.

2.    **Defendants were not obligated to notify Plaintiffs of their right to appeal or file a civil action until *after* their initial claims for benefits were denied.**

Plaintiffs also erroneously argue that the statute of limitations was tolled as to all of their claims even before they filed an administrative claim "as a result of Defendants' failure to notify Plaintiffs of their rights to appeal or file a civil action."  (Pls.' Rpy. Br. at 14 (citing 29 C.F.R. §§ 2560.503-1(g)(1) and (j); *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 325 (2d Cir. 2004)).)  First, Plaintiffs' illogical argument cannot possibly apply to Plaintiffs' statutory claims, since it ignores that a plaintiff need not exhaust such claims administratively.  *Chappel*, 232 F.3d at 724; *Graphic*, 917 F.2d at 1187.  Plaintiffs' argument, moreover, conflicts with the well-established rule that claims for benefits accrue regardless of whether the plaintiff files an administrative claim.  *See Martin*, 201 F.3d at 1384-85 (benefit claim accrued before plaintiff formally applied for benefits); *Carey*, 201 F.3d at 49 (holding benefit claim can accrue "regardless of whether the plaintiff has filed a formal application for benefits").  Indeed, any other rule would

---

[19]    The tolling agreement may actually increase the divergence among putative class members, since it purports to toll only the claims of individuals represented by Susan Martin during the administrative claims procedure.   (Doc. # 167, Ex. A.)

25

1    render the statute of limitations meaningless.[20]

2    Nothing in Plaintiffs' cited authority suggests, let alone compels, the illogical result

3    Plaintiffs suggest.  Plaintiffs' reliance on *Veltri* is misplaced.  In that case, the court

4    merely held that the limitations period was tolled as to a plan administrator who had an

5    obligation following the claim process to notify the claimant of her right to file suit and

6    failed to do so.  The Second Circuit in *Veltri* cautioned, however, that it was "not

7    establishing a simple mechanical rule that failure to notify a claimant of her right to bring

8    an action in court mechanically tolls the statute of limitations."  303 F.3d at 326.  Rather,

9    the court required an inquiry into each claimant's knowledge of her right to bring suit, and

10   also stated that the equitable defenses of laches and estoppel "remain available to

11   defendants."  *Id.*  Thus, *Veltri* confirms the types of individualized inquiries that are

12   attendant to Defendants' affirmative defenses.

3.    **Plaintiffs' claims were not tolled for failure to provide requested documents.**

13

14   Plaintiffs also make the bold assertion that the statute of limitations was tolled

15   because Defendants failed to provide Plaintiffs plan documents that they requested.

16   Plaintiffs do not cite a single case that supports their argument.  Rather, Plaintiffs

17   erroneously rely on *Veltri*, but that decision does not address the failure to provide

18   requested documents, let alone support tolling the statute of limitations as a remedy for

19   the failure to provide requested documents.  *Id.* at 318-27.[21]  Thus, this argument fails.

20

21

22

---

[20]   Plaintiffs' argument also ignores the facts.  Defendants unambiguously notified participants of
their right to file suit to challenge a denied benefit claim.  For example, the 1996 AlliedSignal
Retirement Program SPD contained a statement of ERISA rights that specifically explained, "If
you have a claim for a pension that is denied or ignored, in whole or in part, you may file suit in a
state or federal court."  (Doc. # 142, Ex. I at BA0418.)

[21]   Even if tolling did apply, however, Plaintiffs' argument would require an individualized inquiry
into whether and when each participant requested plan documents.  We note that the June 2001
document request Plaintiffs cited in their brief, (Pls.' Rpy. Br. at 15), was made on behalf of only
three people.  (Doc. # 33, Ex. 1. ("This office represents Richard Scates, Jack Gilmore, and Paul
Beilert . . . .  On behalf of our clients, we again request complete copies of the following . . . .").)

4.    **The statute of limitations was not tolled during the administrative claims process.**

Finally, Plaintiffs argue that the statute of limitations was tolled during the administrative claims process by operation of law.  Again, Plaintiffs' argument is legally unsupported and irrelevant to the Rule 23 analysis.  Plaintiffs' citations simply do not stand for the proposition that the statute of limitations is tolled during the administrative claims process.  *See Chappel*, 232 F.3d 719 (discussing enforceability of mandatory arbitration provision); *Jumbo Mkts.*, 906 F.2d 1371 (applying "knew or should have known" standard to ERISA § 515 claim); *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105 (11th Cir. 1997) (noting that the usual consequence of inadequate benefits termination notice is "remand to the plan administrator for an out-of-time administrative appeal").  In any event, even if such tolling applied during the claims review process as a matter of law, it would not revive stale claims or address the individualized determinations of when claims accrued.[22]

D.    **Defendants Adequately Preserved Their Affirmative Defenses**

Plaintiffs also advance two unsupported and irrelevant arguments that Defendants waived their right to assert affirmative defenses: (1) that Defendants waived their right to assert affirmative defenses by failing to "prove them" in response to Plaintiffs' Motion for Partial Summary Judgment; and (2) that Defendants are precluded from asserting all affirmative defenses, other than the statute of limitations, because they did not raise them at the administrative stage.  (Pls.' Rpy. Br. at 16-17.)  The Court need not reach these arguments, as they are irrelevant to the class determination.  Whether Defendants waived certain defenses as to the Named Plaintiffs does not change the level of individualized inquiry that would be necessary to dispose of putative class members claims.  Indeed, if Plaintiffs' argument were correct, which it is not, it would merely underscore that the claims of the putative class members do not "stand or fall" with those of the Named

---

[22]    Again, even if tolling did apply, Plaintiffs' argument would require further individualized inquiry to determine who filed a claim and when.

1    Plaintiffs.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

2    Similarly, whether Defendants waived certain affirmative defenses, other than the statute

3    of limitations, would not change the significant individual inquiries attendant to that

4    defense alone.  Moreover, as discussed below, Plaintiffs arguments are factually and

5    legally wrong.

6            1.    **Defendants adequately preserved their affirmative defenses at**
                   **the partial summary judgment stage.**
7

8            In response to Defendants' Motion for Clarification, Plaintiffs previously argued

9    that Defendants waived affirmative defenses during the initial legal briefing in this matter.

10   (Doc. # 102 at 15-19.)  In their Motion for Clarification, Defendants sought to clarify the

11   Court's Order granting partial summary judgment on certain legal issues to confirm that

12   the Court did not intend to foreclose the assertion of Defendants' affirmative defenses.

13   Defendants noted the unique posture of this case, the fact that Defendants had not yet had

14   the opportunity to answer Plaintiffs' Complaint, and the fact that Plaintiffs' Motion was a

15   *partial* summary judgment motion that was directed only at certain discreet legal issues in

16   the case, as was Defendants' Motion to Dismiss.  The Court ruled specifically on this

17   issue stating that "Defendants' understanding of the Court's decision as set forth in [their]

18   Motion For Reconsideration is correct," and the Court "did not intend to foreclose

19   Defendants from taking discovery on an[d] asserting affirmative defenses related to

20   individual putative class members' claims."  (Doc. # 138 at 14.)

21           Plaintiffs now contend that the Court's Order did not address the Named Plaintiffs'

22   claims.  There is no logical reason for such a fine distinction, and the case law Plaintiffs

23   rely upon is easily distinguishable.  Not one of those cases addressed the salient question

24   of whether a defendant waives an affirmative defense by failing to prove it fully in

25   response to a pre-answer partial summary judgment motion.  Indeed, this is hardly

26   surprising, for neither the Federal Rules of Civil Procedure nor the Ninth Circuit require a

27   party to even *raise* its affirmative defenses in pre-answer motions, much less prove them.

28   Fed. R. Civ. P. 8(c) (parties shall set forth affirmative defenses in "pleadings"); *Tahoe-*

1   *Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Planning Agency*, 216 F.3d 764, 788 (9th Cir.

2   2000) (holding that defendant did not waive statute of limitations defense in pre-answer

3   motions because it subsequently raised the defense in its answer). Ultimately, Defendants

4   raised their affirmative defenses in their answer and, therefore, they are preserved. (Doc.

5   # 78 at 22-23.)

6       The facts also do not support Plaintiffs' position. In opposition to Plaintiffs'

7   Motion for Partial Summary Judgment, Defendants explicitly identified the statute of

8   limitations as one of several affirmative defenses. (Doc. # 70 at 38.) This was more than

9   sufficient to preserve Defendants' affirmative defenses. *Zotos v. Lindbergh Sch. Dist.*,

10  121 F.3d 356, 361 (8th Cir. 1997) (statute of limitations defense is sufficiently raised "by

11  its *bare assertion*") (emphasis in original) (cited with approval in *Tahoe*, 216 F.3d at 788).

12  Accordingly, the Court should reject Plaintiffs' waiver argument.

13              2.   **Defendants adequately preserved their affirmative defenses at
                      the administrative claims stage.**

14

15      Plaintiffs' argument that Defendants waived certain affirmative defenses other than

16  statute of limitations by failing to preserve them at the administrative claims process is

17  wrong. The cases Plaintiffs rely upon in no way suggest that a plan administrator must

18  raise purely procedural defenses to a *lawsuit* at the administrative claims stage. *See*

19  *Mitchell v. First Unum Life Ins. Co.*, 65 F. Supp. 2d 686, 696-97 (S.D. Ohio 1998);

20  *O'Bryhim v. Reliance Standard Life Ins. Co.*, 997 F. Supp. 728 (E.D. Va. 1998), *aff'd*, 188

21  F.3d 502 (4th Cir. 1999); *Reich v. Ladish Co., Inc.*, 306 F.3d 519, 524 n.1 (7th Cir. 2002).

22  Rather, Plaintiffs' cases suggest that a plan administrator may not raise new reasons *based*

23  *on the terms of the plan* to justify a denial after the administrative process has concluded.

24  But unlike plan-based reasons for denial of benefits, which generally require that the

25  Court review the administrator's decision for an abuse of discretion, there is no reason to

26  require a plan administrator to raise procedural defenses to a later *lawsuit* at the

27  administrative stage. Indeed, it is the Court, not the plan administrator, who must decide

28  those legal issues once a lawsuit is filed. Thus, just as a plaintiff need not exhaust purely

29

statutory claims before filing suit, a plan administrator need not raise purely legal defenses to a lawsuit at the administrative stage.

Furthermore, even though they were not required to do so, Defendants explicitly preserved their procedural defenses to a lawsuit at the outset of the claims process.  In a letter to Plaintiffs' counsel dated August 20, 2002, Defendants' Assistant General Counsel stated:

> Please be advised that the plan administrator's consideration of the claims raised in your letter does not constitute a waiver of *any* procedural claims that the plan administrator may assert at a later date (e.g., whether some or all of the claims are time-barred, whether the claims may be properly asserted on a group basis).

(*See* Dauphine Decl. Ex. 19 (emphasis added).)  Thus, Defendants expressly preserved the very defenses Plaintiffs now claim are waived.

**E.    Defendants' Laches Argument Is Viable and Requires an Individualized Inquiry.**

Attempting to side-step the individualized inquiries inherent in Defendants' laches defense, Plaintiffs argue that the doctrine of laches bars only claims in equity, not claims at law, and they claim their ERISA claims are "legal."  (Pls.' Rpy. Br. at 19.)  Plaintiffs' arguments ignore controlling Ninth Circuit precedent.  In *Thomas v. Oregon Fruit Prods. Co.*, the Ninth Circuit recently reaffirmed that "the remedies available to a participant or beneficiary under ERISA are equitable in nature."  228 F.3d 991, 997 (9th Cir. 2000) (holding that claims for benefits under § 502(a)(1)(B) were equitable rather than legal).  Plaintiffs' argument, therefore, fails.[23]  Defendants' laches defense remains viable, and the need for an individualized inquiry into each putative class member's circumstances to

---

[23]    Plaintiffs' argument is also disingenuous.  Plaintiffs seek remedies under ERISA § 502(a)(3), a statutory provision that unambiguously allows only "appropriate *equitable* relief."  29 U.S.C. § 1132(a)(3) (emphasis added); *see also Great-West Life & Annuity Life Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (noting that § 502(a)(3) authorizes only relief typically "available in *equity*") (emphasis added).  Likewise, Plaintiffs' argument conflicts with their assertion that certification under Rule 23(b)(2) is appropriate.  As Plaintiffs note, certification under Rule 23(b)(2) is appropriate only when "the primary goal is to obtain declaratory or injunctive relief."  (Pls.' Motn. Class Cert. at 9.)

1   resolve this defense precludes class certification in the current context of this case.

2   **IV.    CONCLUSION**

3          Federal Rule of Civil Procedure 23(a) requires that the "claims or *defenses* of the

4   representative parties are typical of the claims or *defenses* of the class." Fed. R. Civ. P.

5   23(a) (emphasis added).  This lawsuit is now focused primarily on Defendants'

6   affirmative defenses – which, by their very nature, require individualized inquiries into the

7   facts and circumstances of each individual's claim.  No efficiency is gained by certifying

8   a class, when such individualized determinations are necessary.  Accordingly, for the

9   reasons discussed above, Defendants respectfully request that this Court deny Plaintiffs'

10  Motion for Class Certification.

11         Respectfully submitted this 30th day of June, 2006.

12                              OSBORN MALEDON, P.A.

13

14                      By:   /s/ David B. Rosenbaum_____
                              David B. Rosenbaum
15                            Dawn L. Dauphine
                              Osborn Maledon, P.A.
16                            2929 North Central Avenue, Suite 2100
                              Phoenix, AZ  85012-2794
17
18                            Michael L. Banks *(Pro Hac Vice)*
                              William J. Delany *(Pro Hac Vice)*
19                            Amy Covert *(Pro Hac Vice)*
                              Azeez Hayne *(Pro Hac Vice)*
20                            MORGAN, LEWIS & BOCKIUS LLP
                              1701 Market Street
21                            Philadelphia, PA 19103
22
                               Attorneys for Defendants
23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2         I do certify that on June 30, 2006, I electronically transmitted the attached document to the

3   Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic

4   Filing to the following CM/ECF registrants:

5

6         Susan Martin
      Martin & Bonnett P.L.L.C.
      3300 N. Central Avenue, Suite 1720

7         Phoenix, Arizona 85012-2517
      Attorney for Plaintiff

8

9                                         <u>s/ Ann E. Blacketer</u>
                                      Ann E. Blacketer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28