David B. Rosenbaum, Atty. No. 009819
Dawn L. Dauphine, Atty. No. 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ  85012-2794
Telephone:  (602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Michael L. Banks, *Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Telephone:  (215) 963-5000
mbanks@morganlewis.com

Howard Shapiro, *Pro Hac Vice*
Robert Rachal, *Pro Hac Vice*
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA  70130-6146
Telephone: (504) 310-4088
howshapiro@proskauer.com
rrachal@proskauer.com

Amy Covert, *Pro Hac Vice*
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, NJ  07102
Telephone:  (973) 274-3258
acovert@proskauer.com

Christopher Landau, P.C., *Pro Hac Vice*
Craig S. Primis, P.C., *Pro Hac Vice*
Abigail Diaz-Pedrosa, *Pro Hac Vice*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone: (202) 879-5000
clandau@kirkland.com
cprimis@kirkland.com
adiaz-pedrosa@kirkland.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Allen, Richard Dippold, Melvin Jones, Donald McCarty, Richard Scates and Walter G. West, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Honeywell Retirement Earnings Plan, Honeywell Secured Benefit Plan, Plan Administrator of Honeywell Retirement Earnings Plan, and Plan Administrator of Honeywell Secured Benefit Plan,<br><br>Defendants. | No.  CV04-0424 PHX ROS<br><br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS** |

Pursuant to LRCiv 56.1(a), Defendants set forth the following Statement of Facts ("DSOF") in Support of Defendants' Motion for Summary Judgment on All Remaining Claims:

## I. PLAN HISTORY.

### A. The Pre-1984 Garrett Plans.

1. Prior to January 1, 1984, the Garrett Corporation operated a retirement program for its employees that consisted of the Garrett Retirement Plan and the Garrett Severance Plan.  (July 2, 2010 Declaration of Lawrence Sher, attached at Tab 1 ("Sher Decl.") at ¶¶ 6, 8, 22;[1] May 12, 2010 Deposition Transcript of Brian Marcotte, attached at Tab 2 ("Marcotte Dep."), at 13:12-14:14;[2] Marcotte Dep. Ex. 1, attached at Tab 3, at HW0036536.)

2. The Garrett Retirement Plan provided eligible participants with a traditional defined benefit pension—a monthly pension payable during retirement based on the employee's service and compensation history as of the date of retirement.  (Sher Decl., Tab 1, at ¶¶ 6-7; May 25, 2010 Deposition Transcript of Kevin Covert, attached at Tab 4 ("Covert Dep."), at 49:15-50:20; Covert Dep. Ex. 6, attached at Tab 5 ("Garrett Retirement Plan"),[3] at §§ 4.1-4.3.)

3. Pursuant to the determination letter issued by the Internal Revenue Service, the Garrett Severance Plan was a defined contribution plan, and provided

---

[1] Expert reports are being submitted in their entirety, but without exhibits.  Those exhibits are either irrelevant to the cited fact and/or contain confidential information.  To the extent the Court would like to receive an exhibit to an expert report that is confidential, Defendants will file a copy of that exhibit under seal or, in the case of electronic exhibits, coordinate delivery of that electronic document to chambers.

[2] Where, as here, deposition testimony is being cited solely to authenticate a subsequently-cited deposition exhibit, that testimony will only be cited at the first citation of the subject exhibit.  Note that throughout the DSOF, only cited excerpts of deposition testimony are being provided at the related Tab.

[3] Relevant excerpts only.  If the Court would like to refer to a full copy of the Signal Retirement Plan, please see Doc. 16 at Ex. E.

for an individual account (a "Secured Benefit Account," or "SBA") for participants, and for benefits based solely on the amount contributed to the account. (Sher Decl., Tab 1, at ¶ 8; June 4, 2010 Declaration of Claude Poulin, attached at Tab 6 ("Jun. 2010 Poulin Decl."), at ¶ 11; May 24, 2010 Deposition Transcript of David Gordon, attached at Tab 7 ("Gordon Dep."), at 42:22-43:6.)

4. The Garrett Plans were coordinated in a floor-offset arrangement, with the defined benefit plan operating as the "floor" and the defined contribution plan operating as the "base." (Sher Decl., Tab 1, at ¶ 14.)

5. If the "base" benefit from the Garrett Severance Plan provided a benefit at least equal to the minimum benefit established under the "floor" benefit from the Garrett Retirement Plan, the participant received the Severance Plan benefit as her retirement benefit, and no benefit was paid from the Garrett Retirement Plan. If, however, the Severance Plan benefit provided less than the minimum benefit established under the Garrett Retirement Plan, benefit payments were made from the Garrett Retirement Plan to offset the shortfall in the Severance Plan benefit. (Garrett Retirement Plan, Tab 5, at § 4.1(a).)

6. The Garrett Retirement Plan provided that a participant's "Normal Retirement Benefit" was equal to the excess, if any, of the employee's "Objective Retirement Income" over her "Potential Retirement Income," plus the value of her Severance Benefit. (Garrett Retirement Plan, Tab 5, at § 4.1(a); Doc. 24 at ¶ 1 (Plaintiffs' June 16, 2004 Separate Statement of Facts).)

7. An employee's "Objective Retirement Income" was defined by the Garrett Retirement Plan as a monthly retirement annuity beginning at "Normal Retirement Date," equal to one-twelfth of: (a) 1.0% of Final Average Compensation up to the Social Security Integration Level, plus (b) 1.5% of

Final Average Compensation above the Social Security Integration Level times (c) years of Credited Service.  (Sher Decl., Tab 1, at ¶¶ 6-7; Garrett Retirement Plan, Tab 5, at § 4.1(b)(2); Doc. 24 at ¶ 1 (Plaintiffs' June 16, 2004 Separate Statement of Facts).)

8.  The Garrett Retirement Plan contained two other formulas as well, one based on career average pay, and the other not related to pay.  (Garrett Retirement Plan, Tab 5, at §§ 4.1(b)(1) & (3).)

9.  The Garrett Retirement Plan defined a participant's "Potential Retirement Income" as the monthly normal retirement annuity that can be provided from the employee's SBA as of the employee's retirement date or earlier date of termination, increased by projecting the account balance at date of termination of employment to age 65, with "Credited Interest" (then set at 3.5% annual interest compounded semi-annually), and dividing the result by 153.31.  (Garrett Retirement Plan, Tab 5, at § 4.1(c); Sher Decl., Tab 1, at 8; July 2, 2010 Declaration of Kurt Denlinger, attached at Tab 8 ("Jul. 2010 Denlinger Decl."), at ¶¶ 8, 10; Jun. 2010 Poulin Decl., Tab 6, at ¶ 11; Doc. 24 at ¶ 1 (Plaintiffs' June 16, 2004 Separate Statement of Facts.)

10. The participant's date of termination was the date when the participant could elect whether or not to transfer his or her SBA balance to the Garrett Retirement Plan.  (Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8; Garrett Retirement Plan, Tab 5, at §§ 3.2, 4.1(c).)

11. Thus, under the terms of the Garrett Retirement Plan, a participant's SBA offset could not be calculated until the date of his termination.  (October 1, 2004 Declaration of Claude Poulin, attached at Tab 9 ("Oct. 2004 Poulin Decl."), at ¶ 21 (". . . the actual dollar amount of the benefit reduction on the date of the merger could not be calculated because it was, in part, a function of the participant's date of termination which was unknown on December 31, 1983."); June 18, 2010 Deposition Transcript of Claude

3

Poulin, attached at Tab 10 ("Jun. 2010 Poulin Dep."), at 384:4-24 (reaffirming as "true and accurate" his October 2004 declaration), 544:12-18 (agreeing that under the Garrett Retirement Plan, the "first step in calculating the offset attributable to the severance plan is to look at the account balance of that plan at the date of termination"); Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8.)

12. By using different accrual rates in its benefit formula that were then applied to final average compensation below and above a specified level (sometimes referred to as the "Social Security Integration Level"), the Garrett Retirement Plan "integrated" with—or reduced the gross benefit to reflect—Social Security. (Sher Decl., Tab 1, at ¶¶ 7, 9-13.)

13. William Coffey, the actuary who designed The Signal Companies, Inc. Retirement Plan ("Signal Retirement Plan") amendments in 1984, confirmed that "the Garrett plan [had] an integration formula for Social Security benefits prior to December 31, 1983." (April 28, 2010 Deposition Transcript of William Coffey, attached at Tab 11 ("Coffey Dep."), at 21:14-22:21, 64:8-11.)

14. James McLeod, then Garrett's Director of Compensation and Benefits, who was responsible for implementing and communicating post-merger plan changes to former Garrett employees, agreed that "[y]es . . . there's an offset to the [Signal] retirement plan. There was one in the Garrett Plan." (May 22, 2010 Deposition Transcript of James McLeod, attached at Tab 12 ("McLeod Dep."), at 21:23-22:1; 145:1-3; *see also id.* at 132:17-23; May 24, 2010 Deposition Transcript of Raymond Azar, attached at Tab 13 ("Azar Dep."), at 52:20-53:8.)

15. Plaintiffs' experts have described the Garrett Retirement Plan's integration with Social Security. (Oct. 2004 Poulin Decl., Tab 9, at ¶ 15 ("The Garrett Retirement Plan contained several benefit formulas which included a

1    defined benefit Social Security 'excess' formula.  This generally means that

2    the benefit accrual rate above the Social Security integration level is greater

3    than the benefit accrual rate below the integration level."); July 23, 2010

4    Declaration of James Holland, attached at Tab 14 ("Holland Decl."), at ¶ 5

5    ("The Garrett plan provided a retirement benefit for a participant that as

6    based upon a formula that reflects Social Security benefits[.]"); August 3,

7    2010 Deposition Transcript of James Holland, attached at Tab 15 ("Holland

8    Dep."), at 103:18-105:7 (agreeing that "Garrett integrated with Social

9    Security for service when the Garrett Retirement Plan was effective[,] that

10    is[,] for service before 1/1/84.".)

11    16. "Integration" can be achieved through one of two approaches, both of

12    which can be designed to produce similar results: direct, expressed as an

13    offset, or indirect, expressed as a "step up."  Both approaches can be

14    designed to produce mathematically equivalent formulas.  (Sher Decl., Tab

15    1, at ¶¶ 11-12.)

16    17. The Garrett Retirement Plan formula integrated with Social Security using

17    the indirect method.  (Sher Decl., Tab 1, at ¶ 13; Garrett Retirement Plan,

18    Tab 5, at § 4.1(b)(2).)

19    18. The Garrett Retirement Plan formula thus provided a "flat 1% of

20    compensation for each year of credited service up to the Social Security

21    integration level."  (Oct. 2004 Poulin Decl., Tab 9, at ¶ 16; Jun. 2010 Poulin

22    Decl., Tab 6, at ¶ 27.)

23    **B.    The Plan Merger Effective January 1, 1984.**

24    19. By 1983, there were over 20 distinct employee retirement plans sponsored

25    by The Signal Companies, Inc., and its affiliates, and the total plan assets

26    exceeded liabilities for all accrued benefits.  (Coffey Dep., Tab 11, at 20:5-

27    11, 36:24-37:2, 38:19-25.)

28    20. Signal wanted to merge those plans to (a) utilize plan assets more

5

efficiently on behalf of employees, (b) provide for easier plan administration, and (c) facilitate the transfer of employees among the divisions. (Coffey Dep., Tab 11, at 19:18-20:24; November 10, 2005 Deposition Transcript of Barbara Allen, attached at Tab 16 ("Nov. 10 Allen Dep."), at 17:4-18:5; Hon. Ex. 3, attached at Tab 17, at BA0374 (Signal Retirement Plan brochure outlining the reasons for the plan merger).)

21. Under its Amendment IV, the Garrett Severance Plan was amended effective December 31, 1983 to provide for its merger with the Signal Companies, Inc. Savings and Stock Purchase Plan ("Signal Savings Plan"). (Gordon Dep., Tab 7, at 53:19-54:6; Gordon Dep. Ex. 18-A, attached at Tab 18, at HW0042617-20.)

22. Under its Amendment IX, the Garrett Retirement Plan was amended effective December 31, 1983 to stop benefit accruals under the Garrett Retirement Plan and to merge into the Signal Retirement Plan, after which merger all benefits that were to have been paid from the Garrett Retirement Plan would be paid under the Signal Retirement Plan, and to provide that no participant would be entitled to any benefits except "to the extent expressly provided" under that plan. (Gordon Dep. Ex. 18-A, Tab 18, at HW0042615, ¶ 4.)

23. Specifically, Amendment IX to the Garrett Retirement Plan provided in part:

> Effective December 31, 1983, this Plan shall be merged with and into The Signal Companies, Inc. Retirement Plan (the "Signal Retirement Plan"). Subsequent to such merger, all benefits which are to be paid from this Plan shall be paid under the Signal Retirement Plan solely in accordance with the provisions of the Signal Retirement Plan. Upon such merger, no Participant in this Plan or any former Participant shall be entitled to any rights or benefits under this Plan except to the extent expressly provided under the Signal Retirement Plan.

(Gordon Dep. Ex. 18-A, Tab 18, at HW0042615, ¶ 4.)

24. Amendment IX also acknowledged that the Garrett Severance Plan was

being merged into the Signal Savings Plan.  Amendment IX to the Garrett Retirement Plan made clear that the floor-offset arrangement would continue, and stated that the benefits under the Signal Retirement Plan shall be "offset, using the assumptions set forth in the Signal Retirement Plan, by the value of each Participant's account in the Signal Savings Plan derived from his former account in the Severance Plan."  (Gordon Dep. Ex. 18-A, Tab 18, at HW0042615-16, ¶ 5.)

**C.     The Post-1984 Signal Plans.**

25. The Signal Retirement Plan was amended and restated to (a) admit former participants in the Garrett Retirement Plan who continued in active employment as new participants in the Signal Retirement Plan and (b) grant them past service credit for their years of participation in the Garrett Retirement Plan.  (Coffey Dep., Tab 11, at 44:10-45:4; Hon. Ex. 606, attached at Tab 19 ("Signal Retirement Plan"),[4] at §§ 1.16, 2.1.)

26. The amended and restated Signal Retirement Plan was effective January 1, 1984.  (Signal Retirement Plan, Tab 19, at HW0000315-16; McLeod Dep., Tab 12, at 110:25-113:1 ("Q.  Was that your understanding at the time that the Garrett Plan would merge into the Signal Plan effective January 1, 1984?  A.  Yes."); Hon. Ex. 710, attached at Tab 20 ("The new [Signal] plan will be effective January 1, 1984."); Coffey Dep., Tab 11, at 54:11-15 ("Q.  In your professional opinion, if a plan is restated effective January 1, 1984, when do those terms go into place?  A.  January 1, 1984.") (objection omitted); June 21, 2010 Supplemental Declaration of Pam Baker, attached at Tab 21 ("Baker Supp. Decl."), at 5 ("[T]he restated Signal Plan was made effective as of January 1, 1984."), 9 ("When a plan amendment is adopted retroactively, the plan must nevertheless continue to operate

---

[4] Relevant excerpts only.  If the Court would like to refer to a full copy of the Signal Retirement Plan, please see Doc. 16 at Ex. E.

between the effective date of the amendment and the date it is actually put in place.") & 3-4, 7-8, 10.)

27. Under the Signal Retirement Plan, a participant who retired on or after his "Normal Retirement Date" (age 65) was to receive a "Normal Retirement Benefit" consisting of a monthly benefit. (Signal Retirement Plan, Tab 19, at § 4.2(a).)

28. The Signal Retirement Plan included a benefit formula that integrated with Social Security by calculating: "(i) 1.5% of his Average Final Compensation multiplied by his Credited Service, minus (ii) 1.5% of his Primary Social Security Benefit multiplied by his Credited Service (not in excess of 33 1/3 years)." (Signal Retirement Plan, Tab 19, at § 4.2(b); Jun. 2010 Poulin Decl., Tab 6, at ¶ 12.)

29. The Signal Retirement Plan benefit formula thus directly integrated with Social Security because it was expressed as an offset. (Sher Decl., Tab 1, at ¶¶ 11-12, 18.)

30. The Signal Retirement Plan's Social Security integration formula was designed to achieve the same result as the Garrett Retirement Plan's Social Security integration provision. (Coffey Dep., Tab 11, at 64:12-16 ("Q. How would you compare the Social Security offset provisions of both plans? A. They were comparable provisions that were drafted to attain the same result in a different language, using different language.").)

31. The Signal Retirement Plan also provided for a 1% minimum benefit formula: "1% times final average compensation times years of credited service." (Jun. 2010 Poulin Decl., Tab 6, at ¶ 12; Signal Retirement Plan, Tab 19, at § 4.2(c)(i).)

32. Thus, lower-paid employees (earning up to the Social Security Integration Level) would receive the same 1% of compensation without any reduction for Social Security as they had received under the Garrett Retirement Plan.

8

(Jun. 2010 Poulin Decl., Tab 6, at ¶ 23; Sher Decl., Tab 1, at ¶ 21.)

33. Plaintiffs' expert has explained that the 1% minimum benefit formula in the Signal Retirement Plan was "identical" to the maximum Social Security deduction formula used in the Garrett Retirement Plan.  (Jun. 2010 Poulin Decl., Tab 6, at ¶ 23 ("the Basic Formula under the Garrett Retirement Plan (1% times final average compensation multiplied by years of credited service) is *identical* to the 1% Minimum Formula under the Signal Plan.") (emphasis added); Jun. 2010 Poulin Dep., Tab 10, at 452:16-23 (agreeing that Garrett's Basic Formula and Signal's 1% Minimum Formula are "identical"); Oct. 2004 Poulin Decl., Tab 9, at ¶¶ 15-16; *see also* Sher Decl., Tab 1, at ¶¶ 20-21.)

34. The Signal Retirement Plan's direct integration with Social Security, and its more generous definition of final average compensation, *see infra*, DSOF ¶¶ 35, 66, also resulted in a smaller reduction for Social Security for higher-paid employees.  (Sher Decl., Tab 1, at ¶¶ 20-21, 35-36.)

35. Plaintiffs' expert has agreed that the Signal Retirement Plan defined final average compensation more generously than the Garrett Retirement Plan did, and has recognized the smaller reduction for Social Security for higher-paid employees under the Signal Retirement Plan.  (Jun. 2010 Poulin Dep., Tab 10, at 453:8-454:9 (acknowledging that the only difference between the two plans' formulas was a final average compensation calculation methodology "in favor of the Signal plan"); Jun. 2010 Poulin Decl., Tab 6, at ¶ 23 (identifying the improved final average compensation calculation methodology as a change under the Signal Retirement Plan); Oct. 2004 Poulin Decl., Tab 9, at ¶ 16 (describing it as a "relatively smaller offset for highly paid employees" under the Signal Retirement Plan.)

36. The Signal Plans preserved the Garrett Plans' floor-offset arrangement. (Sher Decl., Tab 1, at ¶ 22; Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8; Signal

9

Retirement Plan, Tab 19, at § 4.2(e)(i).)

37. For a Signal Retirement Plan participant with an SBA, their Normal Retirement Benefit depended upon whether that participant elected to transfer his or her SBA into the Signal Retirement Plan. (Signal Retirement Plan, Tab 19, at § 4.2(e)(i); Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8.)

38. The participant's date of termination was the date when the participant could elect whether or not to transfer his or her SBA balance to the Signal Retirement Plan. (Signal Retirement Plan, Tab 19, at § 4.2(e)(i); Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8.)

39. If the participant decided to transfer his or her SBA balance into the Signal Retirement Plan, he or she would receive the full Normal Retirement Benefit with no offset for the SBA. (Signal Retirement Plan, Tab 19, at § 4.2(e)(i)(a).)

40. If the participant decided not to transfer his or her SBA balance into the Signal Retirement Plan, then the Normal Retirement Benefit was to be "offset by the value of the account balance not transferred (the 'Offset')." (Signal Retirement Plan, Tab 19, at § 4.2(e)(i)(b).)

41. The SBA Offset under the Signal Retirement Plan was calculated "at the earlier of the time the Participant reaches Normal Retirement Date [age 65] or the time the Participant has a Separation from the Service (the 'Offset Calculation Date')." (Signal Retirement Plan, Tab 19, at § 4.2(e)(i)(b); Jul. 2010 Denlinger Decl., Tab 8, at ¶ 8; Jun. 2010 Poulin Decl., Tab 6, at ¶¶ 13-14.)

42. The SBA Offset under the Signal Retirement Plan was calculated by determining the "Offset Portion" and the "Remainder Amount." The Offset Portion equaled the account balance on December 31, 1983, before reflecting the excess asset allocation, and was assumed to grow at 3.5% per year compounded semi-annually from December 31, 1983 to date of

10

termination of employment.  The Offset Portion was subtracted from the participant's actual account balance at date of termination to calculate the Remainder Amount.  The Offset Portion was projected from date of termination to age 65 at 1.75% semiannually; the Remainder Amount was projected from date of termination to age 65 at 7.5% compounded annually. Those two amounts were then added together and divided by 153.31. (Signal Retirement Plan, Tab 19, at § 4.2(e)(i)(b); Sher Decl., Tab 1,  at ¶ 22; Jun. 2010 Poulin Decl., Tab 6, at ¶ 14.)

43. Under the Signal Retirement Plan, this Offset could not be calculated until the participant's date of termination.  (Sher Decl., Tab 1, at ¶ 29 n.25; Jun. 2010 Poulin Decl., Tab 6, at ¶¶ 13-14; Jun. 2010 Poulin Dep., Tab 10, at 544:19-24 (agreeing that "under the Signal retirement plan, to calculate the SBA offset, the first step is to look at the account balance of the SBA at the date of termination").)

44. The SBA Offset must be calculated on the date of termination because the account balance in the defined contribution plan must reflect the investment performance through that date, which protects the participant against risk of loss.  (Jul. 16, 2010 Deposition Transcript of Lawrence Sher, attached at Tab 22, at 64:20-69:1 ; Holland Decl., Tab 14, at ¶¶ 14-15; Holland Dep., Tab 15, at 145:11-149:14; August 24, 2010 Deposition Transcript of Ian Altman, attached at Tab 23, at 96:16-101:19.)

45. Thus, the Signal Retirement Plan continued the Garrett methodology for calculating the offset, with the one change in the projection-forward interest rate from 3.5% to 7.5% for a portion of the SBA balance.  (Sher Decl., Tab 1, at ¶ 22; Jun. 2010 Poulin Decl., Tab 6, at ¶ 13.)

46. Human Resource personnel attended informational meetings beginning in January 1984 whose purpose was to educate those officers on these terms of the new Signal Retirement Plan and SBA.  Examples of how the SBA

11

account worked beginning in January 1984 were discussed, and the 3.5% and 7.5% projection-forward interest rates for the basic and surplus SBA balances, respectively, were explained so that the Human Resources officers could calculate the SBA Offset under the Signal Plan as of January 1984. (McLeod Dep., Tab 12, at 115:21-119:12; Hon. Ex. 584, attached at Tab 24,[5] at HW0045145, HW0045147-48.)

47. The Signal Retirement Plan granted the Plan Administrator the power to "conduct the general administration of the Plan in accordance with the Plan," including the discretion to interpret the plan terms and any rules adopted "for the administration, interpretation and application of the Plan as are not inconsistent with the Plan or applicable law[.]" (Signal Retirement Plan, Tab 19, at § 7.1; Sher Decl., Tab 1, at ¶ 28.)

48. The Signal Retirement Plan had to be "interpreted, administered and enforced in accordance with the Internal Revenue Code and ERISA and the rights of Participants, Former Participants, Beneficiaries, Contingent Annuitants and all other persons shall be determined in accordance therewith[.]" (Signal Retirement Plan, Tab 19, at § 8.13.)

**D.    The Honeywell Retirement Earnings Plan.**

49. Effective June 30, 2000, the Honeywell Retirement Earnings Plan became the operative plan for what had been the Signal Retirement Plan. (Covert Dep., Tab 4, at 97:23-98:7; Covert Dep. Ex. 11, attached at Tab 25,[6] at HW0000539-540.)

50. The Honeywell Retirement Earnings Plan grants the Plan Administrator "full discretionary authority and power to control and manage all aspects of the Plan, including but not limited to . . . adopt rules of procedure and

---

[5] Relevant excerpts only.

[6] Relevant excerpts only. If the Court would like to refer to a full copy of the Honeywell Earnings Retirement Plan, please see Doc. 341-3 at Ex. A.

regulations necessary for the proper and efficient administration of the Plan; . . . [and] to determine questions of fact and law[.]"  (Covert Dep. Ex. 11, Tab 25, at § 12.02.)

## II.    THE PLAN AMENDMENTS DID NOT REDUCE ACCRUED BENEFITS.

### A.    The Signal Retirement Plan's Savings Clause.

51. The Signal Retirement Plan defined "Accrued Benefit" as "the meaning given in Section 4.10." (Signal Retirement Plan, Tab 19, at § 1.2.)

52. Section 4.10 defined a participant's "Accrued Benefit" as "equal to his Normal Retirement Benefit computed under Section 4.2."   (Signal Retirement Plan, Tab 19, at § 4.10(b).)

53. Section 4.2(a) provides that a "Participant who retires on or after his Normal Retirement Date shall receive a Normal Retirement Benefit which shall not be less than the Participant's Accrued Benefit provided in Section 4.10(c)."  (Signal Retirement Plan, Tab 19, at § 4.2(a).)

54. Section 4.10(c)(ii) provides that "the 'Accrued Benefit' as of December 31, 1983 of any Employee or Former Employee who was a participant in any plan which merged with this Plan effective January 1, 1984 shall not be less than his 'Accrued Benefit' as of December 31, 1983 determined under the terms of such other plan and, for Participants eligible to commence benefits on December 31, 1983, further determined by reference to the actuarial equivalence tables or interest assumption actually specified in such other plan on December 31, 1983[.]"   (Signal Retirement Plan, Tab 19, at § 4.10(c)(ii).)

55. Section 4.10(c)(ii) is what is known as a "savings clause." (Sher Decl., Tab 1, at ¶ 29; Jul. 2010 Denlinger Decl., Tab 8, at ¶ 9; Baker Supp. Decl., Tab 21, at 3, 5-7; June 29, 2010 Deposition Transcript of Pam Baker, attached at Tab 26, at 44:16-45:9; Coffey Dep., Tab 11, at 45:5-46:1; Covert Dep., Tab 4, at 79:2-24.)

13

56. Section 4.2(a)'s interaction with section 4.10(c)(ii) confirms that there is no limitation on the temporal scope of the saving's clause's protection of accrued benefits.  (Sher Decl., Tab 1, at ¶ 28.)

57. Plaintiffs' expert testified that the interpretation of the Signal Retirement Plan's savings clause provisions, as set forth above in DSOF ¶ 56, is a reasonable one.  (Holland Dep., Tab 15, at 199:5-201:8 (agreeing that it was "reasonable" to read "that 4.2(a) says you can't get a benefit less than 4.10(c) as of any point in time").)

58. By virtue of the savings clause provisions, under the terms of the Signal Retirement Plan, a former Garrett Retirement Plan participant cannot receive less than his December 31, 1983 Garrett Retirement Plan floor benefit (the Objective Retirement Income), based on final average compensation and credited service on that date.  For participants who do not elect to transfer their SBA, that benefit also includes a deduction for the offset for the SBA (the Potential Retirement Income). That offset is determined by taking the SBA balance when the participant terminates employment, projecting it to Normal Retirement Date using the Garrett Retirement Plan's terms on December 31, 1983 at a 3.5% interest rate, compounded semi-annually, and converting the result to a monthly annuity by dividing it by 153.31.  (Sher Decl., Tab 1, at ¶¶ 29, 31; Jul. 2010 Denlinger Decl., Tab 8, at ¶ 10; Marcotte Dep., Tab 2, at 36:13-37:11; Covert Dep., Tab 4, at 79:2-24; Coffey Dep., Tab 11, at 45:5-47:3.)

**B.    The Net Benefit Enhancements Under The Signal Retirement Plan.**

59. During the plan merger discussions between Garrett and Signal, benefits managers from both companies worked to ensure that Garrett employees would not receive lesser benefits under the Signal Retirement Plan than they received under the Garrett Retirement Plan. (McLeod Dep., Tab 12, at 107:21-108:24; Coffey Dep., Tab 11, at 21:14-22:21, 43:3-44:9, 85:10-

86:19.)

60. William Coffey, Manager of Employee Benefits and Executive Compensation for Signal at the time of the Garrett-Signal plans' merger, explained that the goal of Signal and Garrett executives was to ensure "[t]hat the benefits available to Garrett participants were substantially greater than the benefits provided by the Garrett programs prior to January 1, 1984, in virtually all cases." (Coffey Dep., Tab 11, at 85:10-16.)

61. Mr. Coffey's then-counterpart at Garrett, James McLeod, agreed that executives from both Garrett and Signal "directed [him] to make sure that Garrett employees did not receive a benefit under the Signal plan that was lower than . . . what they would have received under the Garrett plan." (McLeod Dep., Tab 12, at 108:19-109:4.)

62. It was understood that the total benefits and overall features of the new Signal Retirement Plan were better than or equal to the benefits and overall features of the Garrett Retirement Plan. (McLeod Dep., Tab 12, at 107:21-109:21, 111:9-114:1; May 27, 2010 Deposition of Frank Zembik, attached at Tab 27, ("Zembik Dep.") at 100:5-100:21; April 20, 2010 Deposition Transcript of Tom Donovan, attached at Tab 28, ("Donovan Dep."), at 90:21-91:13; Azar Dep., Tab 13, at 37:13-17, 42:15-43:25; 48:13-21; Hon. Ex. 710, Tab 20 ("All employees can be assured that the benefits and overall features of the new Signal Companies, Inc. Retirement Plan are equal to or exceed our former [Garrett] plan."); McLeod Dep., Tab 12, at 113:21-114:1 (confirming that, as Garrett's Director of Compensation and Benefits in December 1983, he had agreed with the statement from Hon. Ex. 710 that "the benefits and the overall features of the new Signal Plan would be equal to or exceed the former Garrett Plan"; Coffey Dep., Tab 11, at 50:21-52:20 ("I knew that because of my ERISA training that the plan had to provide a benefit that was equal to or greater than the accrued benefit

1    provided by the plans that merge into the Signal plan on December 31,
2    1983.”); Hon. Ex. 608, attached at Tab 29 (confirming, in a December 21,
3    1983 letter “To All Signal Companies, Inc. Employees,” which included
4    Garrett employees, that “[m]any of the [new Signal Plan’s] changes are
5    improvements; where they are not, present participants in the Plan will be
6    entitled upon termination or retirement to select the better feature, so that no
7    present participant will receive lesser benefits as a result of any of the
8    changes.”).)

63. Garrett employees scheduled to retire in the winter of 1983 wanted to retire
    under the Signal Retirement Plan because doing so would be better
    financially for them.  (Donovan Dep., Tab 28, at 51:3-20, 62:23-63:19.)

64. A January 1984 brochure describing the merger of the plans advised
    participants that they “will not receive a lesser pension benefit under the
    new Signal Plan than [they] would have received from the Garrett
    Retirement Plan.”  (Hon. Ex. 3, Tab 17, at BA0370; McLeod Dep., Tab 12,
    at 125:4-127:12 (discussing this same January 1984 brochure, marked at the
    McLeod deposition as Hon. Ex. 519.)

65. The Signal Retirement Plan provided more generous early retirement
    factors for participants who were eligible to retire early upon termination of
    employment.  (Sher Decl., Tab 1, at ¶¶ 20, 35-36; Coffey Dep., Tab 11, at
    175:2-17; McLeod Dep., Tab 12, at 129:5-12; *compare* Garrett Retirement
    Plan, Tab 5, at § 4.3(a) *with* Signal Retirement Plan, Tab 19, at § 4.4.)

66. The Signal Retirement Plan’s definition of final average compensation was
    more generous than the Garrett Retirement Plan’s definition.  (Sher Decl.,
    Tab 1, at ¶¶ 20, 35-36; Jun. 2010 Poulin Dep., Tab 10, at 561:18-562:10;
    Coffey Dep., Tab 11, at 175:2-17; McLeod Dep., Tab 12, at 128:17-129:4;
    *compare* Garrett Retirement Plan, Tab 5, at HW0000015-16 *with* Signal
    Retirement Plan, Tab 19, at § 1.7.)

67. By directly integrating with Social Security, for higher-paid employees the Signal Retirement Plan formula provided a smaller reduction for Social Security than provided for under the Garrett Retirement Plan formula. (Sher Decl., Tab 1, at ¶¶ 21, 35-36; Oct. 2004 Poulin Decl., Tab 9, at ¶ 16; Holland Dep., Tab 15, at 106:20-107:2; *compare* Garrett Retirement Plan, Tab 5, at § 4.1(b) *with* Signal Retirement Plan, Tab 19, at § 4.2(b)-(c).)

68. For lower-paid employees, the Signal Retirement Plan's 1% minimum benefit formula intentionally limited the Social Security offset in the Signal Retirement Plan to at most 0.5% of final average compensation per year of service—the same limitation in effect under the benefit formula in the Garret Retirement Plan.  (Sher Decl., Tab 1, at ¶ 21.)

69. For many participants, the Signal Retirement Plan grants one more month of credited service than the Garrett Retirement Plan would have.  (Sher Decl., Tab 1, at ¶¶ 35-36; Jun. 2010 Poulin Dep., Tab 10, at 556:10-22; McLeod Dep., Tab 12, at 127:13-128:16; *compare* Garrett Retirement Plan, Tab 5, at HW0000012-14 *with* Signal Retirement Plan, Tab 19, at § 1.16.)

70. The flat dollar minimum formula was increased from $19.50 per year of credited service under the Garrett Retirement Plan to $20.00 per year of credited service under the Signal Retirement Plan. (Sher Decl., Tab 1, at ¶¶ 35-36; Jun. 2010 Poulin Decl., Tab 6, at ¶¶ 10, 12; *compare* Garrett Retirement Plan, Tab 5, at § 4.1(b)(3) & Amendment VI *with* Signal Retirement Plan, Tab 19, at § 4.2(c)(i).)

71. The July 1, 2000 plan amendment introduced a new benefit formula for former Garrett Retirement Plan participants that in many cases enhanced benefits, but in no case lowered benefits.  (Sher Decl., Tab 1, at ¶¶ 35-36.)

72. A dual calculation of benefits under the Signal Retirement Plan ensured that former Garrett Retirement Plan participants would not receive a benefit under the Signal Retirement Plan that was less than their accrued benefit

17

under the Garrett Retirement Plan. (McLeod Dep., Tab 12, at 129:18-130:12; Hon. Ex. 3, Tab 17, at BA0370.)

73. Viewed collectively with the impact of the change in the SBA offset calculation methodology, the net impact of the Signal Retirement Plan amendments resulted in approximately $369 million in increased benefits for class participants. (Sher Decl., Tab 1, at ¶¶ 36-37.)

74. Each of the named Plaintiffs enjoyed enhanced benefits at actual retirement under the Signal Retirement Plan as compared to the benefits they would have received under the Garrett Retirement Plan, for a total increase of $318,339 and an average increase of $53,056 per named Plaintiff. (Sher Decl., Tab 1, at ¶ 38.)

75. The vast majority of participants received a benefit at retirement that was better than, or at least equal to, their accrued benefit under the Garrett Retirement Plan as of December 31, 1983. (Jul. 2010 Denlinger Decl., Tab 8, at ¶ 7(a); Jun. 2010 Poulin Dep. , Tab 10, at 520:13-18 (acknowledging that it was not mathematically possible for the gross benefit under Garrett to be better than the gross benefit under Signal); Marcotte Dep., Tab 2, at 28:16-29:12; 36:13-37:11; 91:3-92:11, 93:8-12; Coffey Dep. , Tab 11, at 81:16-85:18; McLeod Dep. , Tab 12, at 109:22-110:24; Zembik Dep., Tab 27, at 100:22-24; Azar Dep., Tab 13, at 37:9-12, 48:8-21.)

76. By Plaintiffs' own calculations, only 260 of the approximately 13,000 participants they considered when doing their calculations received an actual benefit at retirement that was purportedly less than their Garrett accrued benefit. (Jun. 2010 Poulin Decl., Tab 6, at ¶¶ 19-21 (laying out calculation methodology); June 16, 2008 Declaration of Claude Poulin, attached at Tab 30 ("Jun. 2008 Poulin Decl."), at ¶ 21 (setting forth the 260 figure); Jun. 2010 Poulin Dep., Tab 10, at 467:7-469:1 (confirming that the 260 figure is the figure meant to be asserted in his June 4, 2010

declaration).)

77. By that same calculation, approximately 98% of the class received benefits under the Signal Retirement Plan at their actual date of retirement that were greater than their accrued benefit as of December 31, 1983 under the Garrett Retirement Plan.   (Jun. 2010 Poulin Dep., Tab 10, at 471:24-472:21) ("Q.  Would you also agree that 98 percent approximately received a higher benefit under the Signal Plan at date of termination than their Garrett accrued benefit as of 12-31-81? . . . A.  The answer is yes.").)

78. None of the named Plaintiffs is among the 260 participants that Plaintiffs have identified as receiving an actual Signal Retirement Plan benefit upon retirement that was lower than their Garrett accrued benefit.  (Jun. 2008 Poulin Decl., Tab 30, at ¶¶ 21-22; Sher Decl., Tab 1, at ¶ 38).)[7]

79. Plaintiffs' 260 figure is overstated by 145 participants because Plaintiffs' expert made the following errors in arriving at that number:

  a. He incorrectly assumed that participants' employment terminated on December 31, 1983;

  b. He ignored the positive impact of July 2000 plan amendments;

  c. He incorrectly calculated the Garrett Retirement Plan's benefit formula;

  d. He incorrectly compounded interest on the basic SBA balance annually instead of compounding it semiannually;

  e. He ignored the offset for pre-1984 SBA withdrawals; and

---

[7] Exhibit E to Mr. Poulin's June 2008 Declaration is a password-protected electronic spreadsheet that sets forth the names and related confidential information of the 260 participants Plaintiffs have identified as receiving an actual Signal benefit that was lower than their Garrett accrued benefit.  A search of those names confirms that none of the named Plaintiffs is listed in the exhibit.  If Plaintiffs dispute the fact set forth in DSOF ¶ 78, or if the Court would like to review that spreadsheet, Defendants will make arrangements to provide the data to the Court.

f.     He made other data errors.

(Jul. 2010 Denlinger Decl., Tab 8, at ¶¶ 22-27; September 15, 2010 Supplemental Declaration of Kurt Denlinger, attached at Tab 31 ("Sept. 2010 Denlinger Supp. Decl."), at ¶¶ 4-5; Sher Decl., Tab 1, at ¶ 32; Jun. 2010 Poulin Decl., Tab 6, at ¶ 20.)

**C.     Operational Errors.**

80. Defendants have identified 115 participants who had a higher Garrett accrued benefit than the benefit they received or were scheduled to receive under Signal. (Jul. 2010 Denlinger Decl., Tab 8, at ¶¶ 11-20; Sept. 2010 Denlinger Supp. Decl., Tab 31, at ¶¶ 2-5.)

81. Those participants, none of whom are named Plaintiffs, had received or were scheduled to receive a lesser benefit because the savings clause provisions were erroneously misapplied in calculating their benefits under the Signal Retirement Plan. (Jul. 2010 Denlinger Decl., Tab 8, at ¶¶ 11-20; Sept. 2010 Denlinger Supp. Decl., Tab 31, at ¶¶ 2-5.)

82. Defendants have already corrected, or are in the process of correcting, this error by issuing make-up payments to the 23 surviving participants who actually received smaller past payments, at a total cost of $68,147.15. (Jul. 2010 Denlinger Decl., Tab 8, at ¶ 16; Sept. 2010 Denlinger Supp. Decl., Tab 31, at ¶¶ 2-3.)

83. Defendants are also correcting this error by amending the benefit records for the remaining 90 participants who are not yet in pay status, so that they are scheduled to receive at least their Garrett accrued benefit. These participants have never received any payments, and when they retire, they will receive a payment equal to or greater than their Garrett accrued benefit. (Jul. 2010 Denlinger Decl., Tab 8, at ¶¶ 17-18; Sept. 2010 Denlinger Supp. Decl., Tab 31, at ¶ 4.)

84. Plaintiffs' expert has testified that mistaken payments, such as those

20

1   identified in DSOF ¶¶ 80-83, are operational errors, not cutbacks.  (Holland

2   Dep., Tab 15, at 129:9-11 (stating that an operational failure "is a failure to

3   operate the plan in accordance with its terms."); *id.* at 129:12-130:5

4   (conceding that a failure to give effect to a plan's savings clause is "an

5   example of . . . an operational failure."); *see also* Jul. 2010 Denlinger Decl.,

6   Tab 8, at ¶¶ 11-20; Sept. 2010 Denlinger Supp. Decl., Tab 31, at ¶¶ 2-5);

7   Coffey Dep., Tab 11, at 65:21-70:17.)

**D.    Plaintiffs' Hypothetical Termination Theory**

85. Plaintiffs argue that approximately 71% of former Garrett Retirement Plan
    participants could have had a lesser benefit under the Signal Retirement
    Plan than the benefit they had accrued under the Garrett Retirement Plan as
    of December 31, 1983.  (Jun. 2010 Poulin Decl., Tab 6, at ¶ 18.)

86. Plaintiffs arrive at that figure by computing and comparing "(a) the normal
    retirement benefits, *i.e.*, the accrued benefits payable at the normal
    retirement age of 65 under the Garrett Retirement Plan benefits formulas as
    if each participant had terminated employment on December 31, 1983, and
    (b) the normal retirement benefits, *i.e.*, the accrued benefits payable at the
    normal retirement age of 65 under the Signal Plan benefits formulas as if
    each participant had terminated employment on January 1, 1984."  (Jun.
    2010 Poulin Decl., Tab 6, at ¶ 18; *see also* Sher Decl., Tab 1, at ¶ 31.)

87. Plaintiffs did not consider the impact of section 4.2(a) and section
    4.10(c)(ii) of the Signal Retirement Plan—the savings clause provisions—
    in performing those calculations.  (Jun. 2010 Poulin Dep., Tab 10, at
    436:25-438:9; Sher Decl., Tab 1, at ¶ 31.)

88. At most, one class member—Thomas Flatley—actually terminated
    employment on January 1, 1984, and his benefits increased under the Signal
    Retirement Plan.  (Sher Decl., Tab 1, at ¶ 31.)

1     **E.      Plaintiffs' Alternative "Freeze" Theory.**

2     89. Under this theory, Plaintiffs contend that (i) the protected accrued benefit at

3         the time of the merger required calculating the SBA offset using the former

4         Garrett Retirement Plan's projected interest rate of 3.5% to normal

5         retirement age, and (ii) that 3.5% projection rate must apply as of December

6         31, 1983 (not as of the date of actual termination).    (July 23, 2010

7         Declaration of Claude Poulin ("Jul. 2010 Poulin Decl."), attached at Tab 32,

8         at ¶¶ 5, 9, 20; Holland Decl., Tab 14, at ¶ 17; July 23, 2010 Declaration of

9         Ian Altman, attached at Tab 33, at ¶¶ 8, 10.)

10    **F.      Plaintiffs' Damages Models.**

11    90. Plaintiffs' damages expert, Claude Poulin, calculated damages for the SBA

12        Offset Claim and Social Security Offset Claim on a stand-alone basis.

13        Those calculations are presented in Exhibits L and M to his June 4, 2010

14        Declaration.   (Jun. 2010 Poulin Decl., Tab 6, at ¶ 38; Jun. 2008 Poulin

15        Decl., Tab 30, at ¶¶ 33-34 (explaining his SBA and Social Security Offset

16        damages calculations).)

17    91. Those calculations are made on a "stand-alone" basis because they do not

18        consider the impact of other, positive benefit improvements occurring as a

19        result of the plan merger.   (Sher Decl., Tab 1, at ¶ 45; Jun. 2010 Poulin

20        Dep., Tab 10, at 409:24-410:7.)

21    92. Mr. Poulin did not make any changes to those "stand-alone" damages

22        calculations after the Court issued its "net effects" ruling in August 2008.

23        (Jun. 2010 Poulin Dep., Tab 10, at 435:17-436:23 (confirming that he

24        "didn't make any changes to [his] stand-alone damages calculation in

25        response to the Court's August 2008 ruling"); July 29, 2010 Deposition

26        Transcript of Claude Poulin, attached at Tab 34 ("Jul. 2010 Poulin Dep."),

27        at 772:18-773:5 (admitting that he excluded benefit improvements from his

28        damages analysis).)

93. The calculations reflected in Exhibits L and M are based on a comparison of a Signal benefit with an offset against a Signal benefit without an offset. (Jun. 2010 Poulin Dep., Tab 10, at 413:17-25.)

94. Mr. Poulin also calculated damages for the SBA Offset Claim and the Social Security Offset Claim on a "going forward" basis. Those calculations are presented in Exhibit N to his June 4, 2010 Declaration and Exhibit 2 to his July 29, 2010 Rebuttal Declaration. (Jun. 2010 Poulin Decl., Tab 6, at ¶ 39 ("I was also requested to determine whether the Signal Plan provided higher or lower retirement benefits than the Garrett Retirement Plan by comparing benefits under the two plans for each participant had each plan been in effect."); *id.* at ¶ 47 (identifying Exhibit N as containing the results of that comparison); Jul. 2010 Poulin Decl., Tab 32, at ¶¶ 21-22 (identifying Exhibit 2 and equating it to Exhibit N).)

95. In this model, Mr. Poulin calculates a hypothetical Garrett benefit by assuming that both the Garrett Retirement and Severance Plans continued in existence unchanged after December 31, 1983. (Jun. 2010 Poulin Decl., Tab 6, at ¶ 40 ("In order to calculate the pension benefit participants would have been eligible to receive under the Garrett Retirement Plan had it applied until their termination date, I used the Garrett Severance Plan formulas as they existed on December 31, 1983."); Sher Decl., Tab 1, at ¶ 49.)

96. Mr. Poulin then assumes that the SBA accounts earned only 3.5% as investment earnings, instead of the 12.3% they actually earned. (Jun. 2010 Poulin Decl., Tab 6, at ¶ 42 ("I . . . accumulated the results from the date of termination to normal retirement date using a semiannual rate of interest of 1.75%, added these amounts to the pre-1984 SBA accounts accumulated to normal retirement date and divided the results by 153.31 to determine the monthly annuity[.]"); Sher Decl., Tab 1, at ¶ 51.)

23

97. He then compares those hypothetical SBA balances to the net benefit provided under the Signal Retirement Plan after the actual SBA balance is offset against the gross pension benefit. (Jun. 2010 Poulin Decl., Tab 6, at ¶ 48 ("In our calculations, the benefit formulas of the Signal Plan were used to compute the normal retirement benefit at the time of termination or retirement under the Signal Plan and the benefit formulas of the Garrett Retirement Plan were used to determine the normal retirement benefit that would have been payable under the Garrett Retirement Plan."); Sher Decl., Tab 1, at ¶ 51.)

98. This comparison evidences a fundamental conceptual error that results in a substantially-understated SBA balance to be used for the offset, and a correspondingly overstated "damages" amount. (Sher Decl., Tab 1, at ¶¶ 51-54; Jun. 2010 Poulin Dep., Tab 10, at 497:11-498:8 (acknowledging that if he had used the actual SBA balance at termination, his damages figures in Exhibit N would have been "much smaller").)

99. Mr. Poulin admitted that the Garrett plans ceased accruing benefits as of December 31, 1983. (Jun. 2010 Poulin Decl., Tab 6, at ¶ 9; Jul. 2010 Poulin Dep., Tab 34, at 679:17-23.)

100. Mr. Poulin admitted that the SBA earned 12.3% after December 31, 1983. (Jun. 2010 Poulin Dep., Tab 10, at 498:10-20.)

## III.    EMPLOYEE EDUCATION ON AND AWARENESS OF THE PLAN AMENDMENTS AND RETIREMENT BENEFITS.

### A.    The Named Plaintiffs' Relevant Employment History.

101. Barbara Allen worked in Phoenix for Honeywell and its predecessor companies from March 1977 through October 2000. (Nov. 10 Allen Dep., Tab 16, at 8:21-9:11, 10:4-21.)

102. Richard Dippold worked in Phoenix for a predecessor company of

Honeywell from August 1960 until he terminated with the company in 2001.  (November 12, 2005 Deposition Transcript of Richard Dippold, attached at Tab 35 ("Dippold Dep."), at 7:16-9:7.)

103. Richard Scates worked for predecessor companies of Honeywell from 1956 to 1959, and again from 1964 to 1991.  (November 12, 2005 Deposition Transcript of Richard Scates, attached at Tab 36 ("Scates Dep."), at 6:23-7:5, 7:15-23.)

104. Walter West worked for predecessor companies of Honeywell from January 1960 through October 1995.  (April 14, 2006 Deposition Transcript of Walter West Dep., attached at Tab 37 ("West Dep."), at 10:11-13, 11:25-12:1.)

105. Melvin Jones worked in Phoenix for predecessors of Honeywell from July 1955 through October 1993.  (November 11, 2005 Deposition of Melvin Jones, attached at Tab 38 ("Jones Dep."), at 9:9-12, 11: 22-12:2, 12:22-25.)

106. Donald McCarty worked for a predecessor company of Honeywell from June 1951 until 1985.  (November 10, 2005 Deposition Transcript of Donald McCarty, attached at Tab 39, ("McCarty Dep.") at 8:5-10, 20:5-6.)

**B.    History of Written Communications to Employees.**

1.    <u>1984 Communications</u> .

107. Garrett Human Resource personnel coordinated a "general employee communication" schedule of "communication events for the Garrett Retirement Plan Merger" that was launched in December 1983.  (McLeod Dep., Tab 12, at 119:23-120:17; Hon. Ex. 699, attached at Tab 40, at HW0045037-38.)

108. In January 1984, former Garrett employees received a letter from Paul Bouzan, Garrett's Vice President of Industrial Relations, enclosing two brochures explaining the Signal Plans, the new benefit formulas, and the benefits improvements.  (McLeod Dep., Tab 12, at 123:4-125:6 (confirming

that the Signal and Garrett 1984 brochures, referred to as "Honeywell [Exhibit] 519," were "distributed to all employees . . . in or around mid January of 1984"); Doc. 341-1, December 7, 2007 Declaration of James McLeod, attached at Tab 41, at ¶ 6 ("This [January 1984] letter and the enclosed brochures were distributed to Garrett Corporation employees . . . . I know that this brochure was sent through the mail because I received my copy of it at my home at the time it was mailed to Garrett Corporation employees.");[8] Hon. Ex. 3, Tab 17, (copy of Barbara Allen's January 1984 letter and brochures); McCarty Dep., Tab 39, at 53:5-55:1; Jones Dep., Tab 38, at 89:19-90:17.)

109. One of those brochures showed that one of the two benefit formulas under the Signal Retirement Plan included a deduction based on Social Security. (Hon. Ex. 3, Tab 17, at BA0375 (Signal Retirement Plan Brochure)):

> 1½% of final average compensation
> multiplied by
> your credited service
> – *minus* –
> 1½% of primary social security
> multiplied by
> your years of credited service
> (maximum 33⅓ years)

110. The other brochure provided a side-by-side comparison of the "Old Garrett" benefit formula to the "New Signal" formula, demonstrating that both plans integrated with Social Security. (Hon. Ex. 3, Tab 17, at BA0371 (Garrett Retirement Plan Brochure); *see also* McLeod Dep., Tab 12, at 131:7-132:23 (explaining that the Garrett Retirement Plan had a social security offset, which was reflected in the Garrett benefit formula set forth

---

[8] Pursuant to LRCiv 7.1(d), Defendants are not filing copies of documents they have previously filed with the Court; however, Defendants will provide hard copies of those materials in the courtesy copies they are submitting to the Court and to Plaintiffs' counsel.

below where it says "Average S.S. Wage Base"); Coffey Dep., Tab 11, at 64:4-16 (explaining that the Garrett and Signal Plans' respective Social Security offset provisions "were drafted to attain the same result in a different language."):

**Old Garrett**
**Benefit Calculation**

| | | |
|---|---|---|
| a) | Final Average Compensation | $3288.00 |
| b) | Average S.S. Wage Base | 3360.00 |
| c) | Excess of a) over b) | 0 |
| d) | (i) 1% of lower of a) & b) | 32.88 |
| | (ii) 1.5% of c) | 0 |
| | (iii) Total | 32.88 |
| e) | Years of credited service | 30 |
| f) | Garrett Benefit d) iii) times e) | $ 986.00 |

**New Signal**
**Benefit Calculation**

| | | |
|---|---|---|
| a) | Final Average Compensation | $3288.00 |
| b) | 1.5% of a) | 49.32 |
| c) | Years of credited service | 30 |
| d) | b) times c) | 1480.00 |
| e) | Social Security Benefit | 905.00 |
| f) | 1.5% times c) times e) | 407.00 |
| g) | Signal Benefit d)—f) | 1073.00 |
| h) | 1% of a) | 32.88 |
| i) | Minimum Benefit c) x h) | 986.00 |
| j) | Final Benefit greater of g) or i) | $1073.00 |

111. Each of those brochures also explained that the "credited service" component of the benefit formula was defined to include all prior service under the Garrett Retirement Plan.  Hon. Ex. 3, Tab 17, at BA0375 (Signal Retirement Plan Brochure) ("[c]redited service under your prior retirement plan counts toward the new Retirement Plan."); *id.* at BA0370 (Garrett Retirement Plan Brochure) ("[a]ll past credited service accrued under the Garrett Plan will be carried forward into the Signal Plan.").)

112. The brochures thus advised plan participants that there would "be a social security offset for Garrett employees under the Signal Plan."  (McLeod Dep., Tab 12, at 132:6-16; *see also id.* at 126:1-16.)

113. The brochures also explained that an employee's retirement benefit would be reduced if the employee withdrew the SBA balance instead of transferring it to the Signal Retirement Plan.  (Hon. Ex. 3, Tab 17, at

BA0372 (Garrett Retirement Plan Brochure) ("The amount withdrawn will reduce the monthly benefit payable from the Retirement Plan by the actuarial equivalent of the cash withdrawal.").)

114. At least named Plaintiff Barbara Allen recalled receiving the January 1984 brochures. (Nov. 10 Allen Dep., Tab 16, at 17:4-18:14, 20:15-20; Hon. Ex. 3, Tab 17, at BA0368-376 (copy of January 1984 brochures produced from Barbara Allen's files); *see also, e.g.*, May 31, 2008 Deposition Transcript of Paul Bielert, attached at Tab 42 ("Bielert Dep."), Tab 42, at 82:6-21.)

    2.    May 1984 Summary Plan Description.

115. The Signal offsets were again communicated to employees in a May 1984 Summary Plan Description ("SPD"). (McLeod Dep., Tab 12, at 143:8-146:2 (confirming that the Social Security and SBA Offsets were "communicated to Garrett employees broadly through the May of 1984 S[PD]"); Doc. 341-1, December 7, 2007 Declaration of James McLeod , Tab 41, at ¶ 7 ("Garrett Corporation's practice was to send out summary plan descriptions every year by direct mailing to employees. . . . The May 1984 Summary Plan Description was distributed to employees in keeping with this practice."); Donovan Dep., Tab 28, at 136:7-20, 138:8-15; Bielert Dep., Tab 42, at 204:22-205:8.)

116. The May 1984 SPD explained again that "CREDITED SERVICE" included service under the Garrett Retirement Plan. (Bielert Dep., Tab 42, at 204:22-205:8; Hon. Ex. 218, attached at Tab 43, at 905-Bielert00171.)

117. The May 1984 SPD explained that one of the benefit formulas under the new Signal Retirement Plan was calculated by subtracting "1.5% of estimated PRIMARY SOCIAL SECURITY multiplied by years of CREDITED SERVICE" from 1.5% of estimated "AVERAGE FINAL COMPENSATION multiplied by years of CREDITED SERVICE." (Hon. Ex. 218, Tab 43, at 905-Bielert00173-74; McLeod Dep., Tab 12, at 144:1-

145:8.)

118. The May 1984 SPD also advised that how much a person would receive upon retirement depended, in part, on whether the participant was transferring his "GARRETT SECURED BENEFIT ACCOUNT (SBA) to the Retirement Plan," noting that, if the balance was not transferred, the Normal Retirement benefit would be "somewhat reduced." (Hon. Ex. 218, Tab 43, at 905-Bielert00174; McLeod Dep., Tab 12, at 145:16-146:2.)

3.      Annual Benefit Statements.

119. Prior to 1984 and continuing through 1987, plan participants annually received "Your Personal Statement of Benefits" packages. (May 28, 2010 Deposition Transcript of Jean Payne, attached at Tab 44 ("Payne Dep.") at 84:11-85:21; Jones Dep., Tab 38, at 93:23-95:12; Scates Dep., Tab 36, at 79:18-80:6; West Dep., Tab 37, at 138:18-139:20; May 10, 2010 Deposition Transcript of Leroy Schafer, attached at Tab 45 ("Schafer Dep."), at 25:2-8.)

120. "These benefit statements were prepared in conjunction with the third-party administrator of the plan . . . [and] personalized for each employee. These statements were mailed directly to each employee by the third-party plan administrator using a mailing list generated by the Garrett Corporation Human Resources Department." (Doc. 341-1, December 7, 2007 Declaration of James McLeod, Tab 41, at ¶ 8.)

121. Those benefits packages included various forms of individualized benefit estimates that calculated the participant's projected retirement income, (Payne Dep., Tab 44, at 84:11-85:8; Payne Dep. Ex. 5, attached at Tab 46, at HW0024654, HW0024669-70), explained that "an important element of your retirement income is your secured benefit account," demonstrating the impact of the SBA offset on retirement income, (Payne Dep. Ex. 5, Tab 46, at HW0024671), and outlined the SBA and Social Security offsets, (*id.* at

HW0024677-78.)

122. Those benefits packages stopped being sent in 1987 because by then there were other resources for employees to get the same information, including, for example, local benefits administrators and electronic databases. (Payne Dep., Tab 44, at 85:22-86:14.)

    4.    1995 Fliers Regarding the SBA.

123. In 1995, Human Resources sent communications to employees to help them understand the basic elements of how the Garrett and Signal Plans worked, the fact that there was an SBA integration that dated back to the Garrett Plans, and the general reason for the SBA offset. (May 27, 2010 Deposition Transcript of Maureen Rojas, attached at Tab 47 ("Rojas Dep."), at 21:8-23:7.)

124. An October 1995 memo advised recipients that Human Resources was working with a focus group to "respond to your questions and concerns" regarding the SBA, and summarized that the "Secured Benefit Plan is now, and has always been, considered *part of* the total retirement benefit." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, attached at Tab 48, at Ex. 18 at HW0019558 (emphasis in original).)

125. The October 1995 memorandum also noted six examples of communications related to the "SBA offset and its impact on the retirement benefit" from 1967 through 1992, and invited employees to "learn more about your retirement benefit" by calling the Retirement Benefits Administration toll-free hotline. (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 18 at HW0019558-59.)

126. Again in November 1995, two fliers "that present information and answer the most frequently asked questions about AlliedSignal's Secured Benefit Plan (often called the SBA)" were "mailed to the homes of SBA participants." (Doc. 191, June 30, 2006 Declaration of Maureen Rojas,

attached at Tab 49, at Ex. 4 at HW0019390.)

127. The first flier presented "Facts About the SBA." That flier explained that the Signal Retirement Plan and the SBA worked together "to provide a major portion of your retirement income. . . . If you choose to retain your SBA, your Retirement Program benefit is reduced by the monthly value of your SBA balance. A specific actuarial formula is used to convert your SBA balance to a monthly amount, sometimes referred to as an 'offset.'" (Doc. 191, June 30, 2006 Declaration of Maureen Rojas, Tab 49, at Ex. 4 at HW0019391.)

128. The "Facts About the SBA" flier also set out four options of resources to contact for more information, and listed 7 examples of communications from 1960 to 1992      that "described the SBA's integration with the Retirement Program." (Doc. 191, June 30, 2006 Declaration of Maureen Rojas, Tab 49, at Ex. 4 at HW0019394.)

129. The second flier, entitled "Your Questions About the SBA and Retirement Plan," similarly explained that "[s]ince 1960, the SBA has been treated as *part of* the total retirement benefit. . . . When you retire, . . . you may elect to retain your SBA—in which case your pension benefit is reduced using a specific actuarial formula that converts your SBA balance to a monthly amount, sometimes referred to as an 'offset.'" (Doc. 191, June 30, 2006 Declaration of Maureen Rojas, Tab 49, at Ex. 4 at HW0019392) (emphasis in original).)

130. That same flier explained that the projection-forward calculation that would occur at a pre-age 65 retirement if a participant's SBA was not transferred to the Signal Retirement Plan: "the offset is calculated by projecting your SBA balance forward to age 65 at interest rates significantly lower than 12.3%." (Doc. 191, June 30, 2006 Declaration of Maureen Rojas, Tab 49, at Ex. 4 at HW0019393.)

31

5.     <u>April 1996 SPD</u>.

131. In April 1996, former Garrett employees received another SPD. (Doc. 341-2, December 7, 2007 Declaration of Craig Chapman, attached at Tab 50, at ¶¶ 7-8 (explaining that the April 1996 SPD "would have been mailed from Morristown directly to the homes of Former Garrett . . . Employees."); Bielert Dep., Tab 42, at 188:24-189:6; Hon. Ex. 233, attached at Tab 51 (April 1996 SPD); Nov. 10 Allen Dep., Tab 16, at 22:5-24.)

132. The April 1996 SPD was designed in part to address former Garrett employees' concerns related to the SBA offset. (Doc. 341-2, December 7, 2007 Declaration of Craig Chapman, Tab 50, at ¶¶ 4, 6.)

133. The April 1996 SPD explained that "[i]f you were employed by a Garrett Division before December 31, 1983 and had an account balance in the Garrett Severance Plan, now known as the . . . SBA, your benefit under the AlliedSignal Retirement Plan is reduced by the value of your SBA balance if you do not transfer the SBA balance to the retirement program. ***The calculation for the reduction is complicated and may produce an offset that will eliminate any Retirement Program benefit otherwise payable.***" (Hon. Ex. 233, Tab 51, at 905-Bielert01035) (emphasis added).)

134. The April 1996 SPD advised employees that if they wanted more details on the SBA offset calculation, they should contact Human Resources for additional information. (Hon. Ex. 233, Tab 51, at 905-Bielert1035; May 26, 2010 Deposition Transcript of Craig Chapman Dep., attached at Tab 52 ("Chapman Dep."), at 133:7-135:8.)

135. The April 1996 SPD, under the heading "**HOW SOCIAL SECURITY AFFECTS YOUR RETIREMENT BENEFITS**," included a six-paragraph explanation of the relationship between Social Security and Plaintiffs' retirement benefits, noting that "the plan takes your estimated Social Security retirement benefits into account when determining your

retirement benefits under the plan." (Hon. Ex. 233, Tab 51, at 905-Bielert1032.)

136. That written explanation in the April 1996 SPD was followed by a recitation of the basic retirement benefit formula showing the Social Security offset, as well as a sample benefit calculation that included an offset subtraction. (Hon. Ex. 233, Tab 51, at 905-Bielert1033-34.)

137. Barbara Allen received a copy of the April 1996 SPD in the "April 1996 time frame," which she then produced in this litigation. (Nov. 10 Allen Dep., Tab 16, at 22:5-24.)

138. Richard Dippold remembered receiving detailed documents describing his retirement benefits during his employment, and acknowledged that he must have received a copy of the April 1996 SPD. (Dippold Dep., Tab 35, at 59:9-12, 61:1-16.)

**C.    Various Options for Benefits Counseling**

    1.    <u>Company Counseling Sessions</u>.

139. By at least the mid-1980s, benefits administrators based out of Phoenix offered counseling sessions to individual retirement plan participants to ensure that employees were well-informed of their benefits options. (Payne Dep., Tab 44, at 11:4-12; 24:14-25:12, 30:10-32:10; May 19, 2010 Deposition Transcript of Cindy (Burnelko) Robinson, attached at Tab 53 ("Robinson Dep."), at 114:16-115:3, 116:11-117:12.)

140. Until approximately 1994, benefits administrators were located at the various company plants. (Robinson Dep., Tab 53, at 22:21-23:5.) From 1994 to 1995, benefits administrators were centrally located, and were based out of an organization called the Human Resource Operating Center, or HROC, which was located in Phoenix. (Robinson Dep., Tab 53, at 24:7-18; Payne Dep., Tab 44, at 29:16-30:1.) By 1996, benefits administration was coordinated out of corporate headquarters in Morristown, New Jersey.

(Robinson Dep., Tab 53, at 28:19-29:11; Payne Dep., Tab 44, at 22:3-9.)

141. Even after benefits administrators became centrally located, they continued to offer their services to local Human Resources offices, which included traveling to specific company locations to give presentations about retirement benefits. (Robinson Dep., Tab 53, at 57:1-19; Payne Dep., Tab 44, at 169:20-170:8.)

142. Administrators relied on an administration manual and related manuals setting forth retirement policies and procedures to help retirement plan participants understand their retirement options and benefits. The administration manual and related memos explained, for example, how the SBA offset worked, including the change from 3.5% to 7.5% in the interest projection rate. (Robinson Dep., Tab 53, at 21:20-25, 26:10-27:25; Payne Dep., Tab 44, at 18:7-20:1, 83:21-84:5, 95:9-96:15.)

143. Beginning immediately after the plan merger in 1984, divisional Industrial Relations staff gave monthly benefits presentations to employees and their spouses about their retirement benefits and how they were calculated, including the SBA and Social Security offsets. (Zembik Dep., Tab 27, at 64:14-66:19; Donovan Dep., Tab 28, at 132:18-133:22, 207:5-21; Chapman Dep., Tab 52, at 42:25-45:18.)

144. All employees were advised when those monthly meetings were taking place, and anyone interested could attend. (Zembik Dep., Tab 27, at 66:23-67:15.)

145. By at least the mid-1980s, (Payne Dep., Tab 44, at 15:12-16:11) participants could also request an estimate of their future retirement benefits, and benefits administrators would transmit the participant's data (*i.e.*, name, Social Security number, earnings, proposed retirement date) to Hewitt Associates, the actuary for the Signal Retirement Plan, who would return a benefits calculation to the administrator. The administrator would

then conduct an in-person, one-on-one meeting with the participant, during which the administrator would walk through Hewitt's calculation, which included an approximate Social Security amount, their final average compensation, and their SBA offset calculation, if the participant had an SBA offset account. (Payne Dep., Tab 44, at 19:24-21:1, 23:19-26:16; Robinson Dep., Tab 53, at 123:25-124:25; Doc. 341-1, December 7, 2007 Declaration of James McLeod, Tab 41, at ¶ 9 ("Upon request by the employee, the Human Resources Department for the Garrett employee's division would request an estimate or final benefit calculation from the Signal Companies, Inc. or its third-party retirement plan administrator. The estimates and calculations were prepared by Signal or its third-party administrator and sent back to the Garrett division. The division's Human Resources staff would then distribute the estimate or calculation to the individual employee.").)

146. These meetings were advertised through a newsletter, (May 10, 2010 Deposition of Walter Blackmore, attached at Tab 54 ("Blackmore Dep."), at 106:5-18), and the employees knew that they could request such a meeting. (Zembik Dep., Tab 27, at 75:19-23; Payne Dep., Tab 44, at 16:1-11, 24:14-25:12, 35:16-36:5; *see also* DSOF ¶ 145.)

147. When an individual was actually going to retire, a benefits administrator would provide additional information on their retirement benefits, and another counseling session was held for that participant to make his or her final retirement decisions. (Payne Dep., Tab 44, at 30:10-31:2, 32:21-35:15, 36:6-14; Robinson Dep., Tab 53, at 120:12-121:6, 123:7-24; Zembik Dep., Tab 27, at 75:3-17; Doc. 341-1, December 7, 2007 Declaration of James McLeod, Tab 41, at ¶ 9 ("It was the usual practice of the Garrett Corporation Human Resources Department to provide personalized final benefit calculations[.]"); May 30, 2008 Deposition Transcript of Jack

Gilmore, attached at Tab 55 ("Gilmore Dep."), at 26:1-28:8.)

148. During both of these types of counseling sessions, benefits administrators would address a participant's options with respect to the SBA, to the extent the participant had such an account. It was "standard . . . practice" (Payne Dep., Tab 44, at 170:24-171:17) for the administrator to explain what the basic account was, what the surplus account was, and project each balance at the appropriate interest rate—3.5% or 7.5%. (*Id.* at 30:10-31:16, 163:13-165: 24; Robinson Dep., Tab 53, at 67:20-69:13, 121:18-122:24.)

149. The benefits estimates also helped retirees "understand that there was a Social Security offset to [his or her] retirement." (Azar Dep., Tab 13, at 51:4-53:8.)

150. The final benefits calculations made clear, in writing, that a retiree's pension benefits were subject to an SBA offset, and demonstrated the effect of that offset on their benefits. (Gilmore Dep., Tab 55, at 28:9-29:13; 107:10-110:13; 113:23-115:8.)

151. Jean Payne alone conducted more than 8,000 individual counseling sessions. (Payne Dep., Tab 44, at 169:13-19.)

152. Each of the named Plaintiffs received an estimated benefits calculation before retirement, attended an exit interview upon retirement, and/or received a final benefit calculation upon retirement:

    a.    Donald McCarty received a final benefit calculation in 1985 after he retired. (McCarty Dep., Tab 39, at 29:25-30:23.)

    b.    At the time he retired in 1991, Richard Scates attended an exit interview, where he received a final benefits calculation. (Scates Dep., Tab 36, at 66:3-18, 62:7-63:2.) He understood at that time that if he moved his SBA into the Signal Retirement Plan, he would receive a higher monthly benefit, but would no longer have an SBA. (*Id.* at 56:18-58:2.)

c.    Melvin Jones attended his exit interview in 1993, (Jones Dep., Tab 38, at 21:2-7) and then received a final benefit estimate.  (*Id.* at 58:9-59:2.)   The SBA offset "hit [him] between the eyes" at his exit interview. (*Id.* at 98:9-16.)   He thought the company was calculating his pension incorrectly, and told his benefits counselor that the offsets seemed excessive. (*Id.* at 21:8-25.)  She responded that the offsets were not going to change. (*Id.* at 22:3-8.)

d.    Walter West retired in October 1995, (West Dep., Tab 37, at 11:25-12:1), and requested retirement estimates three to four times prior to his retirement.  (*Id.* at 14:1-6.)  He received a final estimate in September 1995, (*id.* at 42:17-43:20), and reviewed the calculation of his monthly pension benefit at his exit interview. (*Id.* at 127:7-12.)  He understood by that time that he had the option of moving his SBA balance into the Signal Retirement Plan, and that that rollover would result in a higher monthly pension amount.  (*Id.* at 36:9-37:24.)

e.    By at least 1996, well before she retired in 2000, Barbara Allen understood that she could elect to transfer the value of the SBA into the Signal Retirement Plan and receive a higher pension.   In 1999, she had requested several pension estimates.   (Nov. 10 Allen Dep., Tab 16, at 12:11-13:21, 25:3-28:8, 51:18-20, 58:15-59:14, 65:22-68:4.)

f.    Richard Dippold received a benefit calculation statement in 1995.  Long before he retired in 2001, he elected not to transfer his SBA into his Signal Retirement Plan, and understood that would result in a lower pension.  (Dippold Dep., Tab 35, at 12:12-13:12, 17:17-20:23.)

153. In addition to individualized counseling sessions, benefits administrators held group counseling sessions at various company locations. (Payne Dep., Tab 44, at 169:20-170:8; Robinson Dep., Tab 53, at 39:8-42:1; Chapman Dep., Tab 52, at 112:10-113:18.)

154. At those group sessions, benefits counselors also explained the change in the projection-forward interest rate from 3.5% to 7.5% to employees with a Secured Benefit Account. (Payne Dep., Tab 44, at 170:14-23; Robinson Dep., Tab 53, at 43:4-21; Chapman Dep., Tab 52, at 112:10-113:18.)

155. Jean Payne alone conducted approximately 35 group sessions per year, for groups from 10-120 employees. (Payne Dep., Tab 44, at 170:7-13.)

   2.   Pat McCarthy Presentations.

156. In the monthly meetings Industrial Relations officers held after the plan merger, an outside financial planner named Pat McCarthy would often speak on benefits formulas and calculations. (Donovan Dep., Tab 28, at 133:2-134:9.)

157. Over the years, the company continued to invite Mr. McCarthy to speak about retirement benefits under the Signal Plans. (Chapman Dep., Tab 52, at 99:21-100:8, 100:15-101:8; Robinson Dep., Tab 53, 48:15-49:8, 118:6-15.)

158. Mr. McCarthy's sessions were well-attended, and many participants even hired Mr. McCarthy as their personal financial advisor. (West Dep., Tab 37, at 152:24-153:12, 155:4-7; Schafer Dep., Tab 45, at 98:23-99:9; May 19, 2010 Deposition of W. Don Shaw, attached at Tab 56 ("Shaw Dep."), at 25:2-15; Blackmore Dep., Tab 54, at 80:8-13.)

159. Mr. McCarthy understood the SBA and Social Security offset formulas, and counseled plan participants on those calculations. (Chapman Dep., Tab 52, at 99:4-101:11; Chapman Dep. Ex. 4, attached at Tab 57 (copy of McCarthy presentation slides on SBA and Social Security offsets); Shaw

Dep., Tab 56, at 25:16-23; Robinson Dep., Tab 53, at 117:13-25.)

3.     <u>AYCO Presentations</u>.

160. In the mid-1990s, the Company hired Ayco Associates to conduct retirement-planning sessions for employees who had previously been covered by the Garrett Retirement Plan. (Robinson Dep., Tab 53, at 45:8-25, 118:21-119:5; May 7, 2010 Deposition Transcript of Peter Beschembossel, attached at Tab 58 ("Beschembossel Dep."), at 80:10-23; Schafer Dep., Tab 45, at 99:13-100:4, 100:21-22.)

161. Of the named Plaintiffs, at least Barbara Allen and Richard Dippold attended at least one AYCO presentation. (November 11, 2005 Deposition of Barbara Allen, attached at Tab 59 ("Nov. 11 Allen Dep."), at 146:19-147:20; Hon. Ex. 32, attached at Tab 60, at BA0845-870 (Barbara Allen's notes on copy of AYCO presentation); Dippold Dep., Tab 35, at 41:5-42:21.)

162. In addressing employee retirement benefits, AYCO representatives discussed the Social Security and SBA offsets, including the application of the 7.5% projection forward interest rate used to determine the SBA offset. (Hon. Ex. 32, Tab 60, at BA0851 ("How Your Pension is Calculated," referencing a subtraction for the "SS Benefit"); *id.* at BA0853 ("The Secured Benefit Account: . . . Pension Benefit Will Be Offset to Reflect SBA Benefits"); Beschembossel Dep., Tab 58, at 79:12-20, 81:3-82:10; Hon. Ex. 617, attached at Tab 61,[2] at 905-PCB00304 ("Withdraw SBA Balance: Receive Plan Benefit Minus SBA Offset ***Plus*** SBA Balance") (emphasis in original), 905-PCB00305 ("How Your Pension Is Calculated" includes a subtraction for the "SS Benefit"); Robinson Dep., Tab 53, at 119:6-120:6; Schafer Dep., Tab 45, at 99:20-100:20.)

---

[2] Relevant excerpts only.

**D.    1995 Presentations and Focus Group.**

163. By 1995, plan participants were "fully aware" and "complain[ing] about the continuing loss of benefits" due to the SBA.  (Chapman Dep., Tab 52, at 214:9-25; Chapman Dep. Ex. 39 (12/22/95 Shoup Email), attached at Tab 62; Nov. 11 Allen Dep., Tab 59, at 144:1-10 (admitting she was concerned about the size of her SBA offset by 1995).)

164. The employees had noticed "the growth of the [SBA] offset against their pension."  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 9.)

165. As a result, they "became more outspoken" with questions surrounding the SBA, "spreading" those questions "among themselves" until there was a "roar" of dissatisfaction and confusion about the SBA.  (Payne Dep., Tab 44, at 58:24-59:4.)

166. In "response to [these] general issues of concern that had been raised from various parts of the organization by employees," Human Resources put together a presentation "as an educational session for employees with SBAs."  (Chapman Dep., Tab 52, at 57:18-22; *see also* Payne Dep., Tab 44, at 58:17-59:4 (confirming that because issues related to the SBA had been "bubbling up" in the 1995 time frame, the Human Resources team decided to show employees "what a great benefit package they have and dull the roar."); Blackmore Dep., Tab 54, at 108:21-109:9 (confirming that there was a "general sentiment at the plant" of "anger," "frustration," and "question marks" about the SBA offset.)

167. Those presentations were given on at least four separate occasions in September 1995 in Phoenix by benefits administrator Jean Payne. (Chapman Dep., Tab 52, at 60:12-19; Payne Dep., Tab 44, at 62:16-20.)

168. Ms. Payne presented the same series of slides at each of the four presentations, and made a hard-copy version of that slide deck available to

attendees.  (Payne Dep., Tab 44, at 63:6-12; Chapman Dep., Tab 52, at 67:22-68:19; Nov. 11 Allen Dep., Tab 59, at 139:22-141:3; Hon. Ex. 31, attached at Tab 63 (Barbara Allen's copy of September 1995 presentation slides, with notes from Ms. Allen's husband.)

169. All Aerospace employees who were "a Garrett employee hired before 1/1/84" and to whom the Secured Benefit Plan applied were invited to attend the presentations.  (Bielert Dep., Tab 42, at 165:7-25; Hon. Ex. 227, attached at Tab 64.)

170. More than 1,000 people attended the four presentations.  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 2; Payne Dep., Tab 44, at 61:23-25; 62:7-20.)

171. Named Plaintiffs Barbara Allen and Richard Dippold—the two named Plaintiffs still employed by Honeywell and working at the Phoenix plant as of September 1995, *see* DSOF ¶¶ 101-102,—attended one of the presentations.  (Nov. 11 Allen Dep., Tab 59, at 139:22-142:23; Hon. Ex. 31, Tab 63 (Barbara Allen's copy of September 1995 presentation slides, with notes from Ms. Allen's husband); Dippold Dep., Tab 35, at 43:24-44:16.)

172. "Most of the discussion" at the September 1995 presentations "was about the [SBA] offset" because that seemed "to be what [the employees] were narrowing i[n] on."  (Payne Dep., Tab 44, at 72:3-5.)

173. At each presentation, Ms. Payne explained that the SBA offset was calculated differently depending on (1) whether an employee retired before or after December 31, 1983, and (2) whether the employee transferred his SBA balance to the Signal Retirement Plan or withdrew it.  (Payne Dep., Tab 44, at 68:6-71:15; Chapman Dep., Tab 52, at 67:22-68:19; Hon. Ex. 31, Tab 63, at BA0174-77 (slides addressing "SBA Payment Options," "SBA Example[s]," and "SBA Considerations.")

174. Ms. Payne addressed two "SBA Examples" that walked through seven

41

1    mathematical steps for arriving at a "Combined Retirement/SBA Benefit,"

2    with one of the steps being "Minus SBA offset."  (Hon. Ex. 31, Tab 63, at

3    BA0175-76 (slides addressing "SBA Example[s]").)

4    175. Following those examples, Ms. Payne laid out "SBA Considerations,"

5    which explained that if a participant chose to either "[t]ake SBA benefit in

6    installments or annuity" or "[l]eave SBA benefit in plan earning 12.3%

7    interest," the Retirement Plan benefit would be "reduced by SBA offset."

8    (Hon. Ex. 31, Tab 63, at BA0177.)

9    176. In walking through these aspects of the SBA, Ms. Payne explained that the

10    "basic" SBA balance was projected forward at a 3.5% interest rate, while

11    the "surplus" SBA balance was projected forward at a 7.5% interest rate,

12    and made available a worksheet that set out those interest rates.  (Payne

13    Dep., Tab 44, at 70:5-71:15; 166:8-167:17; Robinson Dep., Tab 53, at

14    105:10-107:25; Chapman Dep., Tab 52, at 231:4-233:2.)

15    177. At the first September 1995 presentation, after Ms. Payne noted the change

16    in the projection-forward interest rate from 3.5% to 7.5%, "the tone of the

17    meeting got somewhat challenging," (Chapman Dep., Tab 52, at 61:15-16),

18    the audience turned "hostile," (Payne Dep., Tab 44, at 59:8-10; Chapman

19    Dep., Tab 52, at 63:5-6) and attendees began "shouting" at Ms. Payne.

20    (Payne Dep., Tab 44, at 55:22-56:9.)

21    178. Attendees were "angry" about the SBA offset, (Chapman Dep., Tab 52, at

22    62:23-63:9), and Ms. Payne's discussion of the 7.5% interest rate touched

23    off a "firestorm."  (*Id.* at 231:9-21.)

24    179. Certain attendees claimed they were getting "ripped off," (Payne Dep., Tab

25    44, at 59:23-60:3), and there was a "sentiment that the company had

26    reneged on some . . . type of promise to the employees."  (Blackmore Dep.,

27    Tab 54, at 125:12-126:23.)

28    180. One attendee rose to give a "speech" protesting the 7.5% interest rate.

42

(Chapman Dep., Tab 52, at 63:16-64:17.)

181.  "[N]o matter what" Ms. Payne said to the crowd, the employees "weren't happy."  (Payne Dep., Tab 44, at 56:8-9.)

182. Ms. Payne ultimately had to turn the presentation over to a member of the management team, Craig Chapman, who, in turn, had to disband the meeting because it became even more "raucous" and "unprofessional." (Chapman Dep., Tab 52, at 62:18-64:25, 229:3-230:1.)

183. After one of the September 1995 presentations, Gary Hertzler sent an email to Mr. Chapman referencing the 7.5% rate Ms. Payne had discussed. He noted that "[his] paperwork at home . . . states that the offset would be calculated on a rate of 3.5% not the 7.5% stated [at the presentation] Tuesday."  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 5 (9/21/95 Email from Gary Hertzler to Craig Chapman); Chapman Dep., Tab 52, at 236:21-237:24; May 29, 2008 Deposition Transcript of Gary Hertzler, attached at Tab 65 ("Hertzler Dep."), at 65:23-66:10, 73:1-75:20, 79:14-22.)

184. Another September 1995 presentation attendee, Bill Shoup, sent a separate email to Mr. Chapman that also referenced the "7.5% offset" rate Ms. Payne discussed at the presentation, and attached "presentation charts" he had prepared based on what he had learned at that "difficult meeting." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 4 (9/19/95 Email from Bill Shoup to Craig Chapman and Jean Payne); Payne Dep., Tab 44, at 75:17-76:16; Chapman Dep., Tab 52, at 233:15-236:7.)

185. Mr. Shoup's charts set forth the "SBA offset" calculation, including the "Surplus Balance" being projected at 7.5% times "No mos: termination to normal retirement."   (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 4 at HW0019508.)

186. As a result of the September 1995 presentations, a focus group was

convened "to review the issues raised during recent employee meetings concerning the Secured Benefit Account."  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 8 (9/27/95 Email from Craig Chapman to Focus Group Members).)

187. The focus group's charter was to "(1) [c]ommunicate employee's [*sic*] issues and anger to management (Corporate HR and Division Management) regarding the SBA account and the retirement plan; [and] (2) Assist HR in drafting of a communications plan on the SBA and retirement plan to employees and submit to a new focus group to insure understanding." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 12 (SBA Focus Group Agenda for 10/17/95); Schafer Dep., Tab 45, at 84:23-85:15; Beschembossel Dep., Tab 58, at 106:25-108:2; Blackmore Dep., Tab 54, at 151:13-152:1.)

188. The focus group was comprised of long-time engineers and machinists who were "representative of different areas within the organization so that [the company] had diversity of perspective."  (Chapman Dep., Tab 52, at 239:10-14; *see also* Hertzler Dep., Tab 65, at 86:20-22; Schafer Dep., Tab 45, at 59:17-60:2.)

189. Many of the selected focus group members acted in a supervisory capacity and were well known around the Phoenix plant, (Hertzler Dep., Tab 65, at 12:17-22, 19:4-6; Blackmore Dep., Tab 54, at 28:19-25; Beschembossel Dep., Tab 58, at 44:25-45:4), so they could act as "ambassadors" between management and employees.  (Blackmore Dep., Tab 54, at 28:19-25, 136:20-137:3.)

190. It was "common knowledge [that] the focus group was occurring." (Chapman Dep., Tab 52, at 87:20-88:2.)

191. The focus group members talked to their colleagues, asked what their concerns were, and brought those concerns back to the focus group

44

meetings for discussion. (Blackmore Dep., Tab 54, at 149:4-22; Schafer Dep., Tab 45, at 77:23-78:4.)

192. The focus group conveyed to the facilitators that "[t]he general employee perception is that the SBA account has been manipulated and misrepresented to the employees for the benefit of the company," and "[t]here is a perception of an unfairness in the offset calculation for those who retire before age 65. 7 1/2 % used in the offset calculation is not in tune with today's interest rates." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 13 (Original Comments from the Focus Group); Beschembossel Dep., Tab 58, at 109:5-110:12.)

193. The focus group resolved to go to the company with a request for redress of the perceived "problem" regarding the SBA. (Hertzler Dep., Tab 65, at 119:19-121:11; Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 (Cover Memo and 10/25/95 Focus Group Letter to Dan Burnham) at HW0019561 (noting in the cover memo that the focus "group felt a communication to senior management was appropriate.").)

194. The focus group formally lodged its request that the company "re-evaluate" its SBA obligations in a letter dated October 25, 1995. (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019563.)

195. The letter was sent to Daniel P. Burnham, then President of AlliedSignal Aerospace and a senior officer with decision-making authority for the company. (Chapman Dep., Tab 52, at 240:23-241:2; Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019562.)

196. The focus group explained that "we have talked extensively with our co-workers and therefore firmly believe that the contents of this letter represent the views of the majority of Engines employees with SBA accounts." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at

45

HW0019562.)

197. The focus group's letter referred on multiple occasions to general "employee perceptions" and employees' beliefs about the SBA. (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019562-63.)

198. The focus group conveyed the "considerable anger and ill feelings toward the company," a sentiment it understood from the generalized mistrust and anger that was widespread throughout the plant about the issues identified in the letter to Mr. Burnham.  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019562; Hertzler Dep., Tab 65, at 133:10-20; 135:5-10.)

199. Specifically as to the SBA calculation, the letter to Mr. Burnham conveyed the general employee population's "belief that the offset calculation for those who retire before age 65 is unfair.  The 7.5 percent amount used in the offset calculation does not reflect today's interest rates.  Therefore, the SBA surplus balance should be treated with the same rules as the basic balance, at a 3.5 percent interest rate in the offset calculation."  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019563.)

200. The focus group closed its letter to Mr. Burnham by asking that the company stop offsetting the SBA surplus balance against retirement benefits: "In closing, we recommend that the company re-evaluate its obligations to employees with respect to SBA accounts by re-examining the policy of offsetting retirement with SBA funds.  Growth in the SBA account since December 31, 1983, should be allocated to SBA employees without being used as part of the offset calculation."  (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 16 at HW0019563) (emphasis in original).)

201. Mr. Burnham responded to the focus group letter on December 11, 1995,

and stated that, "[h]aving re-evaluated our original plan and our obligation to employees with respect to SBA accounts, we do not plan to alter existing policies or to change the way the offset is calculated." (Doc. 188, June 30, 2006 Declaration of Craig Chapman, Tab 48, at Ex. 17 at HW0019549.)

202. The focus group termed Mr. Burnham's response to their letter the "blow-off document," (Hertzler Dep., Tab 65, at 126:3-16) because the company had rejected the focus group's request to abandon or change the way the SBA offset was calculated. (*Id.* at 145:16-21; Schafer Dep., Tab 45, at 63:23-64:3.)

203. One focus group member, Leroy Schafer, said the focus group "figured we were screwed at that time." (Schafer Dep., Tab 45, at 64:1-3.)

204. Another focus group member, Mr. Herztler, said the focus group understood that Mr. Burnham was saying "thanks for your efforts, but we're going to go proceed as we were." (Hertzler Dep., Tab 65, at 126:17-20.)

205. Human Resources put no restrictions on the circulation of Mr. Burnham's response to the focus group's letter. (Chapman Dep., Tab 52, at 245:13-15.)

206. Mr. Burnham's response to the focus group's letter was eventually "going around" the plant and communicated to various employee groups. (Payne Dep., Tab 44, at 171:18-172:14; *see also* Chapman Dep., Tab 52, at 245:23-246:9.)

207. Upon hearing "from a high enough level" that the company was not going to "change the formula relative to the SBA offset," the "clamor" over the 7.5% projection-forward interest rate died down. (Chapman Dep., Tab 52, at 246:10-247:22.)

## IV.   LITIGATION HISTORY.

### A.   Administrative Claims Process.

208. Plaintiffs initiated an administrative claims process by submitting claims in

47

a letter dated July 26, 2002 to the Plan Administrators.  (Marcotte Dep. Ex. 1, Tab 3, at HW0036535.)

209. As of July 26, 2002, Brian Marcotte was the Plan Administrator, and Kathleen Mathis had the authority to decide claims under the Honeywell Earnings Retirement Plan.  (Marcotte Dep., Tab 2, at 14:12-18, 113:12-114:10; 119:10-120:15; Marcotte Dep. Ex. 5, attached at Tab 66, at HW 0012270.)

210. The administrative claims included, *inter alia*, claims of a cutback in accrued benefits in violation of ERISA based on the application of the Signal Retirement Plan's interest rates associated with the calculation of the pension offset (*i.e.*, the projection forward rate increase from 3.5% to 7.5%) and the alleged introduction of a Social Security offset for pre-1984 service. (Marcotte Dep. Ex. 1, Tab 3, at HW0036546-50.)

211. On behalf of the Honeywell Earnings Retirement Plan, Ms. Mathis denied Plaintiffs' claims on January, 24 2003.  (Marcotte Dep. Ex. 1, Tab 3, at HW0036535.)

212. Plaintiffs appealed the claim denial in a letter dated July 1, 2003, reasserting both the SBA offset and Social Security offset claims they had originally asserted.  (Marcotte Dep. Ex. 1, Tab 3, at HW0036535, 36546-50.)

213. On October 29, 2003, Mr. Marcotte, acting on behalf of the Honeywell Earnings Retirement Plan, denied that appeal as to all claims except Plaintiffs' claim involving administrative fees.  (Marcotte Dep. Ex. 1, Tab 3, at HW 0036535-557.)

214. As Mr. Marcotte explained, a reduction in accrued benefits did not occur at least because the Signal Retirement Plan's savings clause precluded such a result:  "[T]he Signal Retirement Plan expressly provided that the accrued benefit as of December 31, 1983, of any participant in the plan who was a

participant in any plan that merged with the Signal Retirement Plan on January 1, 1984, could not be less than the participant's accrued benefit determined under the terms of the other plan as of December 31, 1983. Thus, under the terms of the Signal Retirement Plan, it was impossible for a participant to receive an annual benefit beginning at normal retirement age that was less than the annual benefit beginning at the same age that he or she was entitled to receive under the terms of the Garrett Retirement Plan as in effect on December 31, 1983.   This provision fully satisfied the requirements of the anti-cutback rule."   (Marcotte Dep. Ex. 1, Tab 3, at HW0036545.)

215. Mr. Marcotte also denied Plaintiffs' claims for the alternative reason that "the different method used to calculate the offset under the Signal Retirement Plan was adopted as part of a new set of benefit formulas and benefit payment provisions that were more generous than those provided under the Garrett Retirement Plan. . . . Rather than reducing accrued benefits, the amendment you complain about actually *increased* your clients' accrued benefits, in many cases by a substantial margin."  (Marcotte Dep. Ex. 1, Tab 3, at HW0036545-46) (emphasis in original.)

**B.    Tolling Agreement.**

216.  On July 7, 2003, a tolling agreement was entered into under which the parties agreed to toll the applicable statute of limitations from "January 24, 2003 … until 60 days after the Plan administrator renders a decision on the administrative appeal of the claims asserted by the Former Garrett Employees."   (Doc. 167, June 12, 2006 Declaration of Susan Martin, attached at Tab 67, at Ex. A at ¶ 3.)

217.  On December 23, 2003, the parties agreed to extend the tolling agreement until March 1, 2004.  (Doc. 167, June 12, 2006 Declaration of Susan Martin, Tab 67, at ¶ 7.)

1    Respectfully submitted this 21st day of September, 2010.

2                                    OSBORN MALEDON

3

4                        By:    s/David B. Rosenbaum

5                                David B. Rosenbaum
                                 Dawn L. Dauphine
6                                Osborn Maledon, P.A.
                                 2929 North Central Avenue, Suite 2100
7                                Phoenix, AZ   85012
                                 Michael L. Banks
8                                MORGAN, LEWIS & BOCKIUS LLP
                                 1701 Market Street
9                                Philadelphia, PA   19103

10                               Howard Shapiro
                                 Robert Rachal
11                               PROSKAUER ROSE LLP
                                 650 Poydras Street, Suite 1800
12                               New Orleans, LA  70130-6146

13                               Amy Covert
                                 PROSKAUER ROSE LLP
14                               One Newark Center, 18th Floor
                                 Newark, NJ  07102

15                               Christopher Landau, P.C.
                                 Craig S. Primis, P.C.
16                               Abigail Diaz-Pedrosa
                                 KIRKLAND & ELLIS LLP
17                               655 Fifteenth Street, N.W.
                                 Washington, DC  20005

18                               *Attorneys for Defendants*

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I do certify that on September 21, 2010, I electronically transmitted the

3

attached document to the Clerk's Office using the CM/ECF System for filing and

4

transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

5

6

/s/Kelly Dourlein

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1