David B. Rosenbaum, Atty. No. 009819
Dawn L. Dauphine, Atty. No. 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ 85012-2794
Telephone: (602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Michael L. Banks, *Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
mbanks@morganlewis.com

Howard Shapiro, *Pro Hac Vice*
Robert W. Rachal, *Pro Hac Vice*
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA 70130
Telephone: (504) 310-4088
howshapiro@proskauer.com
rrachal@proskauer.com

Amy Covert, *Pro Hac Vice*
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, NJ 07102
Telephone: (973) 274-3258
acovert@proskauer.com

Christopher Landau, P.C., *Pro Hac Vice*
Craig S. Primis, P.C., *Pro Hac Vice*
Abigail Diaz-Pedrosa, *Pro Hac Vice*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
Telephone: (202) 879-5000
clandau@kirkland.com
cprimis@kirkland.com
adiaz-pedrosa@kirkland.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Allen, Richard Dippold, Melvin Jones, Donald McCarty, Richard Scates and Walter G. West, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Honeywell Retirement Earnings Plan, Honeywell Secured Benefit Plan, Plan Administrator of Honeywell Retirement Earnings Plan, and Plan Administrator of Honeywell Secured Benefit Plan,<br><br>Defendants. | No. CV04-0424 PHX ROS<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## I.      INTRODUCTION.

Plaintiffs' motion is less a motion for summary judgment than a "prebuttal" to Defendants' summary judgment motion.  *See* Doc. 678.  It is a motion constructed almost entirely upon purported "facts" that Defendants have repeatedly and vigorously disputed.  Knowing full well that such a motion cannot satisfy the standards for summary judgment, and that there is no basis to resolve this case conclusively in Plaintiffs' favor, Plaintiffs have merely anticipated Defendants' arguments and gratuitously used their motion to file the equivalent of a second opposition brief.

Defendants' summary judgment motion, *see* Doc. 676, demonstrates that the Signal Plan language (in particular, the savings clause) requires judgment as a matter of law in Defendants' favor, and Plaintiffs' own experts have admitted that 98% of all plan participants received a benefit upon retirement under the Signal Plan that was greater than their accrued benefit determined under the Garrett Plan as of December 31, 1983.  There is no serious argument on this record that ***Plaintiffs*** could win what is left of this case as a matter of law, and their request for summary judgment should be denied.

## II.     ARGUMENT.

Plaintiffs' briefing strategy is not an uncommon one:  throw every conceivable argument (and even some inconceivable ones) against the wall to create enough confusion to keep the case alive and get to trial.  In a last-ditch effort to salvage a case predicated on a now-rejected legal theory, Plaintiffs lay out an implausible and muddled history of the Signal Plan, with participants lurching from the 1976 Signal Plan to the May 1984 Summary Plan Description ("SPD") to a Signal Plan executed in early 1985 and made effective January 1, 1984.  *See, e.g.*, Doc. 678 at 4-7.

With each twist, Plaintiffs claim their benefits were somehow cut back, *see, e.g.*, *id.* at 8-16, notwithstanding the fact that the relevant Signal Plan included a savings clause that ensured that no participant's accrued benefit ***could*** decrease.  *See* Doc. 676 at 2-4.  And as explained below, the Signal Plan history is neither complicated nor sinister.  *See infra* section III.B.3(ii).  What is more, Plaintiffs are now forced to exhume, in

1

1   support of virtually every position they take on summary judgment, arguments that are no

2   longer part of this case and that are directly inconsistent with other positions Plaintiffs

3   have taken.    In the end, none of these arguments overcome the conclusion that

4   Defendants are entitled to judgment as a matter of law.

### A. Plaintiffs Have No Plausible Argument That The Signal Plan's Savings Clause Failed To Prevent A Cutback In Accrued Benefits.

6   The Signal Plan's unambiguous terms guaranteed that no Garrett Plan participant

7   would receive less than the benefits he or she had accrued under the Garrett Plan.  *See*

8   Doc. 676 at 2-4.    Plaintiffs argue, however, that the Signal Plan's savings clause

9   provision should be interpreted ***less generously*** than its terms require, and than the Plan

10  Administrator has reasonably interpreted it.  *See id.* at 4-6.  Defendants address each of

11  Plaintiffs' unpersuasive arguments below.

### 1. Plaintiffs' Textual Arguments Rest On Tortured Readings Of The Signal Plan's Plain Language.

13  Plaintiffs advance six tortured and equally flawed readings of the Signal Plan's

14  savings clause provision, section 4.10(c)(ii).  *See* Doc. 678 at 8-14.  All are without merit.

### *(i)    The Savings Clause Applies To The Garrett Plan.*

16  Plaintiffs contend that the savings clause does not, by its terms, even apply to

17  former Garrett Plan participants.  They contend that section 4.10(c)(ii) only applies to

18  plans that merged with the Signal Plan "as of January 1, 1984," and that the Garrett Plan

19  merged with the Signal Plan on December 31, 1983.  *Id.* at 14.  Plaintiffs are wrong.

20  To begin, Plaintiffs again conveniently misquote section 4.10(c)(ii).[1]  That section

21  applies to plans that merged with the Signal Plan "***effective*** January 1, 1984," not "as of"

22  January 1, 1984.  *Compare* DSOF ¶ 54 *with* Doc. 678 at 14.  Because the Garrett Plan

23  merged "effective January 1, 1984," it is plainly covered by the savings clause.

24  The Garrett-Signal Plan merger did not occur—as Plaintiffs suggest—on

25  December 31, 1983.  Instead, it was effectuated via a logical, two-step process: first, the

26  Garrett Plan was "turned off," and second, the amended and restated Signal Plan was

---

[1] Plaintiffs previously misquoted this same provision to the Court.  *See* Doc. 361 at 16; Doc. 368 at 8 (Defendants advising the Court of Plaintiffs' identical prior misquote).

"turned on" for former Garrett Plan participants.  *See* DSAF ¶¶ 1-3.[2]  Amendment IX to the Garrett Plan accomplished step one, providing that benefit accruals under that plan would end on December 31, 1983, after which time all benefits were to be paid "under the Signal Retirement Plan solely in accordance with the provisions of the Signal Retirement Plan."  DSOF ¶¶ 22-23.    To accomplish step two, as Plaintiffs have acknowledged, "the Signal Retirement Plan was amended effective January 1, 1984 to admit Garrett Retirement Plan participants for the first time[.]"  Doc. 361 at 4-5; *see also* DSOF ¶¶ 25-26, *Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1146 (D. Ariz. 2005).   Under this customary sequencing, the merger was not effective until January 1, 1984—the date former Garrett Plan participants became participants in the Signal Plan.  *See* DSOF ¶¶ 25-26, DSAF ¶ 4.   Former Garrett Plan participants are therefore indisputably within the scope of section 4.10(c)(ii).

**(ii)    *Savings Clause Protection Is Not Limited To 12/31/83.***

Plaintiffs also claim that section 4.10(c)(ii) only protects accrued benefits on one day—December 31, 1983.   *See* Doc. 678 at 13.   Under such a reading, section 4.10(c)(ii)'s protections would be ephemeral, disappearing on midnight before the plan merger became effective.   The Court should not adopt this baseless and nonsensical textual interpretation.  *See, e.g.*, *Bond v. Cerner Corp.*, 309 F.3d 1064, 1068 (8th Cir. 2002) (rejecting plan interpretation leading to absurd result); *Allen*, 382 F. Supp. 2d at 1162 ("The terms of the plan should be interpreted 'in an ordinary and popular sense as would a [person] of average intelligence and experience.'") (citation omitted).

Plaintiffs argue that the savings clause operated for a single day by disingenuously isolating section 4.10(c)(ii)'s reference to December 31, 1983 from its proper context. *See* Doc. 678 at 13-14.   Section 4.10(c)(ii) ensures that a participant's Normal Retirement Benefit under the Signal Plan, as determined under section 4.2, is never less than his or

---

[2]  In connection with this opposition, Defendants are submitting their responses to Plaintiffs' Statement of Facts ("DR-PSOF" and "PSOF," respectively), as well as Defendants' Statement of Additional Facts  ("DSAF").  Citations to the "DSOF" are citations to Doc. 677.

her "Accrued Benefit" under the Garrett Plan.  DSOF ¶¶ 51-54.  Section 4.10(c)(ii)

explicitly designates December 31, 1983—the date the Garrett Plan went out of

functional existence—as the date as of which the protected Garrett "Accrued Benefit"

should be measured.  DSOF ¶ 54.  Thus, section 4.10(c)(ii)'s references to the "'Accrued

Benefit' *as of December 31, 1983*. . . ," DSOF ¶ 54 (emphasis added), are merely

defining what is protected under the savings clause, not acting as a temporal limitation

thereon.

    Moreover, section 4.10(c)(ii) must be read in connection with section 4.2, which

provides that a "Participant who retires on or after his Normal Retirement Date shall

receive a Normal Retirement Benefit which shall not be less than the Participant's

Accrued Benefit provided in Section 4.10(c)."  *See* DSOF ¶¶ 53-54; *see also Bond*, 309

F.3d at 1067-68 (construing ERISA plan by reading each provision "consistently with the

others and as part of an *integrated whole*.") (emphasis in original, citation omitted).

Section 4.2 thus provides, *without temporal limitation*, that Signal Plan benefits shall

never be less than the minimum protected benefit set forth in section 4.10(c)(ii), a reading

that even Plaintiffs' expert has said is reasonable.  *See* DSOF ¶¶ 56-57.  The Signal

Plan's structure therefore ensures that the savings clause applies to former Garrett Plan

participants at any point from the January 1, 1984 effective date on.[3]

### (iii)    The Savings Clause Is Not Limited To Vested And Retirement-Eligible Participants.

    Plaintiffs alternatively argue that section 4.10(c)(ii) "excludes all non-vested and

pre-age 55 Garrett employees[.]"  Doc. 678 at 10.  Again, Plaintiffs concoct an argument

---

[3]  Plaintiffs previously argued that the "preferred plan interpretation is [the] one that renders the plan legal," and that the Signal Plan requires that it be "interpreted, administered, and enforced in accordance with the Internal Revenue Code and ERISA" to protect the rights of participants.  Doc. 524 at 18-19.  Defendants agree, *see* DSOF ¶ 48, and so does the Plan Administrator, who recognized the relationship between sections 4.2 and 4.10(c)(ii) to resolve any arguable ambiguities in the Signal Plan in a manner that is *more* favorable to participants than Plaintiffs now advocate.  *See* Doc. 676 at 4-6.  The Plan Administrator's reasonable interpretation, which Plaintiffs' expert has acknowledged, is entitled to deference.  *See id.*

1    with no basis in the text of the Signal Plan.

2        Plaintiffs' argument that these participants are excluded from the savings clause

3    hinges on a misreading of section 4.10(c)(ii) that focuses exclusively on the second part

4    of the savings clause, while ignoring the first part.  Plaintiffs seize on the language of that

5    second part, which refers to "Participants eligible to commence benefits," and wrongly

6    suggest that all of section 4.10(c)(ii) is "***expressly*** limited" to employees eligible to

7    commence benefits as of December 31, 1983.  Doc. 678 at 11 (emphasis added).

8        In making this argument, Plaintiffs completely ignore the first part of section

9    4.10(c)(ii), which defines the scope of the saving clause and has no such limiting

10    language.    Instead, the first part establishes the broad and over-arching protection

11    afforded by the savings clause:  that the benefit under the Signal Plan shall not be less

12    than the Garrett Plan "'Accrued Benefit' as of December 31, 1983" as "determined under

13    the terms of" that Garrett Plan.  DSOF ¶ 54.  Then, as made clear by section 4.10(c)(ii)'s

14    grammar and punctuation, the second part contemplates ***additional*** protections for a

15    narrower group of participants.  *See id.*; *see also Allen*, 382 F. Supp. 2d at 1165-66

16    (noting this relationship between the two parts).  There is no justification for violating

17    basic principles of plan interpretation by ignoring these textual markers so as to

18    effectively delete seven lines of the Signal Plan.  *See, e.g.*, *Carr v. First Nationwide*

19    *Bank*, 816 F. Supp. 1476, 1493 (N.D. Cal. 1993) ("[T]he plan should be construed as a

20    whole, and the specific language of each provision should be interpreted in the context of

21    the whole. . . so as to render none nugatory and to avoid illusory promises.").

22        In advancing their reading, Plaintiffs inexplicably rely on *French v. BP Corp.*

23    *North America, Inc.*  *See* Doc. 678 at 11-12.  *French*, however, actually supports

24    Defendants' position.  The *French* Court addressed language very similar to the savings

25    clause language in this case, and held that, "[b]ecause the BP Plan provided '[i]n no event

26    shall the benefits payable under this Plan . . . be less than the Actuarial Equivalent of the

27    benefits such Participant would have received under the Prior Plan, Plaintiff's prior

28    accrued benefits ***were protected*** from impermissible reduction or elimination."  2010 WL

2219337, at *11 (E.D. Ky. May 28, 2010) (citation omitted and emphasis added). As in *French*, the Signal Plan's savings clause requires the dismissal of Plaintiffs' remaining claims here.[4]

The other authority Plaintiffs cite—Revenue Ruling 81-12—likewise adds nothing to their argument. *See* Doc. 678 at 11-12. That ruling simply notes that (1) a cutback under § 204(g) can only be effected by a plan amendment; and (2) plan amendments can be drafted to prevent a reduction in accrued benefits by, for example, using a savings clause. *See* Rev. Rul. 81-12, 1981-1C.B. 228 (1981). Defendants followed this very safe harbor practice. *See, e.g.*, Doc. 676 at 3-4.

Finally, this Court has already explained the additional protection the second part of section 4.10(c)(ii) provided, holding that the second portion of section 4.10(c)(ii): (1) "unambiguously refers to the Garrett Retirement Plan's retirement-age conversion factors," and (2) provides additional protections not set forth in the first prong. *Allen*, 382 F. Supp. 2d at 1165-66. The Court was not persuaded by "Plaintiffs' attempt to read something else into § 4.10(c)(ii)," and further noted that "the Garrett Retirement Plan and Signal Retirement Plan use the same interest conversion factor" to determine "how a participant's [SBA] is actuarially converted into an annuity[.]" *Id.* Plaintiffs recycled argument is as unpersuasive today as it was five years ago.

### (iv)    *The Savings Clause Protects Early Retirement Benefits.*

Plaintiffs argue that section 4.10(c)(ii) is otherwise limited because it fails to protect early retirement benefits. *See, e.g.*, Doc. 678 at 12. As a threshold matter, Plaintiffs have already brought and lost a claim relating to early retirement benefits under the Signal Plan, *see Allen*, 382 F. Supp. 2d at 1166, and they cannot resuscitate it now. Following the Partial Settlement Agreement ("PSA"), only two narrowly-defined claims remain, neither of which encompasses early retirement benefits. *See* DSAF ¶¶ 83-87.

---

[4] Plaintiffs rely on inapposite *dicta* from the *French* decision. *See* Doc. 678 at 11. The *French* defendants alternatively argued that a "greater of" provision gave additional protections to participants who had reached age 50. *French*, 2010 WL 2219337, at *14 n.19. The provision did not apply to French, so the court did not consider it. *See id.*

1    Defendants have moved to strike inadmissible evidence offered by Plaintiffs, *see id.* at ¶¶

2    53-101, and have separately moved to enforce the PSA.  *See* Defendants' Motion To

3    Enforce The PSA ("PSA Motion").

4           In any event, Plaintiffs' argument fails on the merits.  As part of the Signal Plan

5    amendments formally executed in February 1985, section 4.10(c)(ii) unambiguously

6    protected, without limitation, a participant's "'Accrued Benefit' as of December 31,

7    1983."  DSOF ¶ 54; *see also* DR-PSOF ¶¶ 36-37.  Before the Signal Plan amendments

8    were executed, the Retirement Equity Act of 1984 ("REA") was enacted to provide that,

9    effective July 1, 1984, a protected "Accrued Benefit" included early retirement benefits,

10   retirement-type subsidies and optional forms of benefits.  *See* Doc. 678 at 10; *see also*

11   *Allen*, 382 F. Supp. 2d at 1151, 1155.  As Plaintiffs' expert has acknowledged, because

12   the Signal Plan was signed after REA's effective date, section 4.10(c)(ii)'s protection of

13   "Accrued Benefits" by definition included protection of early retirement and optional

14   forms of benefits.  *See, e.g.*, DSAF ¶ 5; DR-PSOF ¶¶ 36, 85.  Therefore, even if early

15   retirement benefits were at issue in this case—and they are not—the Signal Plan's

16   savings clause unequivocally protects them.  *See Allen*, 382 F. Supp. 2d at 1155

17   (explaining that early retirement benefits and retirement-type subsidies "are entitled to

18   the *same* protection from reduction by amendment as other benefits, not more.")

19   (emphasis in original).[5]

20                  *(v)    Section 4.10(c)(ii) Is Consistent With Section 4.10(c)(i).*

21          Plaintiffs wrongly contend that section 4.10(c)(ii) cannot be reconciled with

22   section 4.10(c)(i), and therefore cannot protect Garrett participants' accrued benefits.  *See*

23   Doc. 678 at 12-13.  Those subsections, however, apply to different participants and in

24   different circumstances.  Accordingly, they use different language to provide different

25   protections, and none of those differences have any bearing on the scope of section

26   4.10(c)(ii).

27   ----

28   [5]  The Signal Plan's actuary also confirmed that he applied the Garrett early
     commencement factors to calculate the Garrett "Accrued Benefit."  *See* DR-PSOF ¶ 85.

Section 4.10(c)(i) applies to participants under the pre-1984 version of the Signal Plan, *see* PSOF ¶ 47, and the Garrett-Signal Plan merger did not directly impact the calculation of their benefits. *Compare, e.g.*, Doc. 686, at Ex. T, Ex. 2, § 4.2 *with* DSOF ¶ 28. Because the Signal Plan continued to exist after January 1, 1984, and because Signal Plan participants were not accruing benefits under a new plan formula, their protected "Accrued Benefit" did not need to be specifically measured under plan terms in existence as of December 31, 1983. Section 4.10(c)(ii), on the other hand, addresses participants under the Garrett merged-in plan that ceased to exist as of December 31, 1983. *See* DSOF ¶ 54. Because former Garrett Plan participants became subject to new benefit formulas, the Signal Plan protected accrued benefits under the Garrett Plan's terms as they existed on December 31, 1983—the date that plan ceased to exist. *See id.* The Signal Plan protected the accrued benefits under other merged-in plans the same way. *See* DSAF ¶ 6. Plaintiffs' argument entirely misses the point, and therefore fails.

### *(vi)    The 1993 Signal Plan Protects Garrett Accrued Benefits.*

Plaintiffs contend that "from 1993 forward, there was absolutely no plan provision protecting employees' accrued benefits as of 12/31/83 under the Garrett Plan." Doc. 678 at 14. This argument alleges a deficiency in the terms of the 1993 Signal Plan, but claims relating to that plan are not at issue in this litigation. Instead, the remaining claims are limited to two specific claims relating to the "Signal Retirement Plan" as "amended and restated effective January 1, 1984 with amendments adopted or effective before January 1, 1993." DSAF ¶¶ 65-66. Because Plaintiffs are foreclosed from advancing this argument, the Court should ignore it on that ground alone. *See id.* at ¶¶ 80-82; *see also* PSA Motion at Section III.B.

This argument fails substantively as well. The 1993 Signal Plan explicitly stated that no participant's "monthly normal retirement benefit . . . shall be less than . . . the [participant's] Accrued Benefit determined as of December 31, 1992." DSAF ¶ 7. This protected the accrued benefit for *all* periods prior to December 31, 1992, including the Garrett Plan participants' December 31, 1983 accrued benefits. *See id.*

1    Accordingly, each of Plaintiffs' scattershot attempts to misconstrue the Signal

2    Plan's savings clause language fails, and the clear terms of section 4.10(c)(ii) should

3    govern resolution the of the two remaining claims.  *See* Doc. 676 at 2-4.

        **2.    Plaintiffs' Extrinsic "Evidence" Does Not Nullify The Signal**
4            **Plan's Savings Clause.**

5    To the extent there is any ambiguity in section 4.10(c)(ii), the Court should defer

6    to the Plan Administrator's reasonable interpretation of those terms.  *See id.* at 4-6.

7    Plaintiffs do not argue that the savings clause language is ambiguous, but they point to

8    extrinsic "evidence" to challenge the plain language of the clause anyway.  *See* Doc. 678

9    at 14.  If extrinsic evidence is considered, however, it supports Defendants' application of

10   the Signal Plan language, *see, e.g.*, DSOF ¶¶ 59-63, and each "compelling" document

11   Plaintiffs rely on actually contradicts their position.  *See* Doc. 678 at 14-16.

12   For example, Plaintiffs claim that the May 1984 SPD "expressly excludes the

13   offset, early retirement benefits and non-vested benefits from the definition of 'Accrued

14   Retirement Benefits,'" which they argue "establishes" that the Signal Plan "was never

15   intended" to protect accrued benefits under the Garrett Plan.  *Id.* at 14.  But the May 1984

16   SPD explicitly states that its definitions, such as its definition of "Accrued Retirement

17   Benefits" that Plaintiffs cite, are "general in nature and are not intended to be legal

18   definitions to be applied to the formal text of the retirement plan."  DR-PSOF ¶ 35.  That

19   same SPD explains that if there is a conflict between the wording of the SPD and the

20   "legal Plan Document, the legal Plan Document will govern."  *Id.*  That "legal Plan

21   Document"—the Signal Plan—defined "Accrued Benefit" without limitation, *see* DSOF

22   ¶ 54, thereby including within its scope "the offset, early retirement benefits and non-

23   vested benefits" Plaintiffs claim the May 1984 SPD failed to protect.  *See* Doc. 678 at 14.

24   As this Court has already noted, to the extent the plan is more favorable than the SPD, the

25   plan document governs.  *See Allen*, 382 F. Supp. 2d at 1162.[6]

---

26   [6] Additionally, this Court previously held that the May 1984 "adequately disclosed the

27   [SBA] offset," *Allen*, 382 F. Supp. 2d at 1169, and was "'sufficiently accurate and
     comprehensive' to inform participants of their rights and obligations under the Plan."  *Id.*

28   at 1170 (quoting 29 U.S.C. § 1022(a).).

1    Plaintiffs similarly argue that "only the 'gross benefit' prior to the SBA offset was

2    ever calculated or considered" before Plaintiffs brought their claims.  *See* Doc. 678 at 14-

3    15.  Historically, even if only the "gross benefit" prior to the SBA Offset had been

4    calculated, that prior practice does not mean the Signal Plan failed to protect Garrett Plan

5    participants' accrued benefits.  Instead, it at most suggests that (1) Signal performed a

6    calculation that was intended to ensure that former Garrett Plan participants received at

7    least as good a benefit under the Signal Plan as their Garrett Plan accrued benefit, but (2)

8    mistakes may have been made in performing that calculation.  *See* DSOF ¶¶ 51-62, 80-

9    84; DR-PSOF ¶¶ 86-87; *see also Conkright v. Frommert*, 130 S.Ct. 1640, 1644 (2010)

10   ("People make mistakes.  Even administrators of ERISA plans. . . . [ERISA]  is 'an

11   enormously complex and detailed statute,' and the plans that administrators must

12   construe can be lengthy and complicated.") (internal quotation and citation omitted).

13   Even if the Court accepts Plaintiffs' characterization of it, the structure of the benefit

14   calculation worksheets is actually further evidence of that protective intent, even if that

15   intent may have been frustrated by a mistaken application.  *See* Doc. 678 at 15; DR-

16   PSOF ¶ 91.[7]

17   At most, Plaintiffs' arguments confirm the obvious:  that the Plan Administrator

18   may have made a small number of mistakes in applying the savings clause, not that the

19   savings clause was facially ineffective in protecting accrued benefits.  Even Plaintiffs'

20   expert admits that a "failure to operate the plan in accordance with its terms," such as the

21   failure to properly apply a plan's savings clause in performing a routine benefit

22   calculation, are operational mistakes and not cutbacks in accrued benefits.  DSOF ¶ 84;

23   *see also* Doc 676 at 3-4, 8-9 (explaining that operational errors in plan administration

24

25   [7] Plaintiffs' remaining extrinsic "evidence" arguments are even more strained.  For
     example, it is not true (nor would it be relevant if true) that Defendants' initial response

26   to Plaintiffs' administrative claim in 2003 "ma[de] no mention of § 4.10(c)(ii)."  Doc.
     678 at 15.  The denial letter noted that the Signal Plan "retained the benefits accrued

27   under the prior Garrett Retirement Plan," and the letter's author relied on the savings
     clause provision to make her decision.  *See* DR-PSOF ¶ 92.  The Plan Administrator also

28   specifically cited the savings clause in denying the administrative appeal.  DSOF ¶ 214.

1   cannot cause a violation of ERISA § 204(g)).  Here, those mistakes affected no more than
2   2% of Plaintiffs, the vast majority of whom had not started receiving benefits.  *See* DSOF
3   ¶ 82.  Those errors have been corrected at a total cost of approximately $68,000.  *Id.*

4        Plaintiffs' attempts to identify "evidence" from "what [Defendants] told the
5   employees" about the Signal Plan are equally unavailing.  *See* Doc. 678 at 15.
6   Defendants repeatedly told employees that (1) they were becoming participants in the
7   Signal Plan; (2) their benefits would be paid under that Signal Plan; and (3) they would
8   receive the greater of their "old Garrett" benefit or their "new Signal" benefit.  *See* DSOF
9   ¶¶ 62-64, 107-110; DR-PSOF ¶¶ 75-79.  While the provision of a "greater of" the Signal
10  or the Garrett benefit necessarily meant that some form of "wear away" was possible, *see*
11  *infra* section II.B.2(ii), the savings clause prevented participants from receiving anything
12  less than their Garrett accrued benefit.  *See* Doc. 676 at 2-4.  Plaintiffs' May 1984 SPD
13  argument, *see* Doc. 678 at 16, fails for at least these reasons.[8]

14       Plaintiffs are desperate to vitiate the Signal Plan's savings clause, and they have
15  advanced more than a dozen arguments to weaken its application.  None of those
16  arguments diminishes the strength of Defendants' summary judgment position, much less
17  establishes that Plaintiffs are entitled to summary judgment.  The Signal Plan
18  amendments effective January 1, 1984 do not cause a cutback—they prohibit one.

19       **B.    Plaintiffs Have No Evidence Of A Cutback.**
20       Even assuming the savings clause did not apply, Plaintiffs cannot prove as a
21  matter of law that their benefits were cut back.  The arguments they advance to support a
22  cutback are based on legal errors and blatant factual misrepresentations.

23            **1.    Plaintiffs Wrongly State That Defendants Conceded A Cutback.**
24       Contrary to Plaintiffs' repeated representations, *see, e.g.*, Doc 678 at 17,
25  Defendants have never conceded the existence of a cutback, nor have they conceded that
26  the comparison of benefits for purposes of the anti-cutback rule is made solely at the time

27  ───────────────
28  [8] This May 1984 SPD argument also fails at least because Plaintiffs' claims related to that
    SPD are barred and released.  *See* DSAF ¶¶ 88-97; PSA Motion at Section III.D.

1    the amendment is adopted.    Moreover, Defendants absolutely **do** dispute Plaintiffs'

2    contention that "71% of Garrett Plan participants suffered a reduction in their accrued

3    benefits immediately after the amendments," *see id.* at 1, and Plaintiffs' statements to the

4    contrary are false. *See id.* at 7-8, 19.  Defendants challenged both the December 31, 1983

5    "lock in" theory and the "hypothetical termination" theory with every one of Plaintiffs'

6    experts, *see* DSAF ¶ 8, Defendants' experts disputed both theories, *see* DSAF ¶ 9,

7    Defendants contested them in their summary judgment papers, *see* Doc. 676 at 12-14;

8    DSOF ¶¶ 85-89, and do so again here.

9         As Defendants have maintained, consistent with the law and the relevant Plan

10   provisions, the correct calculation for determining whether a cutback occurred compares

11   the Garrett Plan protected benefit properly calculated as of December 31, 1983 (but using

12   the actual SBA account balance at retirement or termination as required by the Plan

13   terms) to the actual benefit at retirement under the amended Signal Plan. *See, e.g.*, Doc.

14   676 at 7-8, 12-14.  This calculation confirms that there was no reduction in benefits for at

15   least 98% of the class at the time of retirement. *See id.* at 8.  Moreover, because any

16   operational error in calculating the protected benefit for the remaining 2% (who were

17   protected by the savings clause) has already been or soon will be corrected, no class

18   member has suffered ***any*** actionable reduction in accrued benefits. *See id.* at 8-9.  In fact,

19   90 of the 115 operational errors Defendants have identified were participants who were

20   not yet in pay status; when they do retire, they will receive a payment at least equal to

21   their Garrett accrued benefit. *See* DSOF ¶ 83.

22         **2.    Plaintiffs Fail To Properly Calculate Accrued Benefits.**

23         As Defendants have explained, *see* Doc. 676 at 12-14, Plaintiffs' cutback

24   calculations are wrong because they wholly ignore ERISA's mandate that accrued

25   benefits be "determined under the plan." 29 U.S.C. § 1002(23)(A) (emphasis added); *see*

26   *also Shaw v. Int'l Ass'n of Machinists and Aerospace Workers Pension Plan*, 750 F.2d

27   1458, 1465-66 (9th Cir. 1985) (". . . the material available for interpreting ERISA's

28   definition of 'accrual' always refers to the terms of the pension plan itself.  It is those

terms that raise the 'anticipat[ion of] retirement benefits' that Congress sought to protect and the 'promised . . . defined pension benefit' that the Supreme Court has sought to protect.") (alteration in original).  To determine the accrued benefit, therefore, one must follow this Court's admonition: "(1) read the plan; (2) read the plan; (3) read the plan." Doc. 555 at 1.  Both the Garrett and Signal Plans specify that the net accrued benefit must be calculated at the earlier of the date on which the participant terminates employment or retires, because that date is the starting point for calculating the SBA Offset.  DSOF ¶¶ 9-11, 37-44; *see also Allen*, 382 F. Supp. 2d at 1144-45.  Thus, as Plaintiffs admit, the amount of the SBA Offset (and, hence, a participant's accrued benefit), cannot be determined until a participant terminates employment.[10]  *See* DSOF ¶ 11, 43-44.

### (i)    *Plaintiffs' "Lock-In" Theory Is Baseless And Dangerous.*

In view of ERISA's mandate and the relevant plan terms, Plaintiffs first err by relying on a "lock-in" theory to identify a cutback.  Under that theory, Plaintiffs "lock in" the ***net*** (*i.e.*, post-offset) protected Garrett Plan accrued benefit using the SBA balance as it existed at December 31, 1983—the date of the plan merger—to calculate the offset. *See* Doc. 676 at 13-14.  That approach clearly violates the relevant Garrett Plan terms.

The Garrett Plan terms mandated that any offset had to be calculated at the time of the participant's retirement or termination.  *See* DSOF ¶¶ 9-11.  Because the Garrett Plan accrued benefit must be calculated using all of the plan's relevant terms (with the exception of service and compensation, *see* Rev. Rul. 81-12), there was no way to determine, on December 31, 1983, how the offset would be calculated for employees who remained in active service.  Therefore, the only rational way to determine the protected Garrett Plan benefit as of December 31, 1983 is to fix the known "floor" benefit as of that date and then apply the offset (if applicable) based on the actual SBA balance at retirement or termination, using (if relevant) the interest rate projection methodology set

---

[10] These plan terms are compelled by ERISA's requirement that a defined benefit plan in a floor-offset arrangement provide a fixed "determination date" for the offset so as to preclude a discretionary determination by the employer.  *See* Rev. Rul. 76-259, 1976-2 C.B. 111 (1976); *see also* Doc. 23 at 12 n.12.  Thus, unlike pay and service, the SBA balance cannot be arbitrarily frozen, as Plaintiffs contend.  *See* Doc. 678 at 19-20.

1    forth in the Garrett Plan (i.e., 3.5% from termination until normal retirement date).  *See,*

2    *e.g.*, DSOF ¶ 58.

3         The fact that the dollar amount of the protected accrued benefit under the Garrett

4    Plan could not be fixed on December 31, 1983 is not surprising.  A floor-offset plan

5    necessarily includes a "dynamic" offset that cannot be fixed as of any randomly selected

6    date; instead, it can only be determined at the time of a participant's actual retirement or

7    termination.  In fact, this scenario is not unique to floor-offset plans.  *See, e.g.*, *Alessi v.*

8    *Raybestos-Manhattan, Inc.*, 451 U.S. 504, 508-09 (1981); *Williams v. Caterpillar, Inc.*,

9    944 F. 2d 658 (9th Cir. 1991); *Shaw*, 750 F.2d 1458; *Bonovich v. Knights of Columbus*,

10   963 F. Supp. 143 (D. Conn. 1997); *Vintilla v. U.S. Steel Corp. Plan for Employee*

11   *Pension Benefits*, 606 F. Supp. 640 (W.D. Pa. 1985).  Thus, notwithstanding Plaintiffs'

12   efforts to obfuscate this point, it is neither unusual nor inappropriate to delay the

13   determination of the protected Garrett Plan benefit as of December 31, 1983 until a

14   participant's actual date of retirement or termination.

15        Plaintiffs' theory that the SBA Offset should be "locked in" based on the defined

16   contribution plan account value at December 31, 1983, *see* Doc. 678 at 21-22, would

17   expose plan participants to the very risk of investment loss that Plaintiffs have otherwise

18   recognized as "litter[ing]" the history of ERISA, to potentially devastating impact.  *See*

19   Doc. 51 at 6 n.3.  Suppose, as in our case, that a defined benefit plan in a floor-offset

20   arrangement set the date for determining the offset as a participant's date of termination.

21   Assume further that the employer decided to freeze all accruals under the defined benefit

22   plan, at a time when a participant's accrued "floor" benefit was less than the value of his

23   defined contribution account balance at his date of termination.  If this participant retired

24   on the date of the freeze and began receiving benefits immediately, benefits would be

25   exclusively paid from the defined contribution plan.

26        If that same employee instead continued working and his defined contribution

27   account declined precipitously in value (not a far-fetched scenario), properly calculating

28   the offset using his actual account balance at termination would result in a much lower

offset, with any amount below the floor benefit being made up by the defined benefit plan. But had the plan instead "locked in" the value of the defined contribution plan account (and hence the amount of the offset) on the date of the freeze, as Plaintiffs suggest is appropriate, the participant would be severely harmed because he would only be entitled to receive his defined contribution plan account, even though the benefit that could be provided by the defined contribution plan had declined dramatically. In short, Plaintiffs' theory of determining the protected accrued benefit in a floor-offset arrangement by locking in the value of the defined contribution account on the date the defined benefit plan is frozen totally upends the fundamental nature of a floor-offset arrangement and eviscerates the very protection it is specifically designed to provide.

Sensing the absurdity of their position, Plaintiffs now argue that such a draconian result can be avoided by calculating the net accrued benefit in the defined benefit plan by using the lesser of the locked-in value of the defined contribution plan on the date of the amendment, or the actual value of the defined contribution plan on the date of the participant's termination. *See, e.g.*, Doc. 678 at 16-22. Plaintiffs' one-way ratchet finds no support in the text of the statute, and neither Plaintiffs nor their experts point to any controlling authority that supports either their "lock-in" theory or their "heads I win, tails you lose" approach. *See, e.g.*, DR-PSOF ¶ 99, Doc. 678 at 20 (citing cases that are all inapposite, as none involves a floor-offset arrangement).

### (ii) *Plaintiffs' Hypothetical Termination Theory Contradicts The Law And Facts Of The Case.*

Plaintiffs next err by applying a "hypothetical termination" theory to calculate the Signal Plan accrued benefit as if all of the class members terminated employment on January 1, 1984. *See* Doc. 676 at 12-13. But the Signal Plan provides that a participant's accrued benefit is determined at the earlier of actual termination or retirement, based on all service and compensation through such date, and with an offset (if applicable) based on the participant's SBA balance on that date. *See* DSOF ¶¶ 43-44. There is no authority even suggesting that, to determine whether a cutback occurred, it would ever be appropriate to calculate a hypothetical accrued benefit determined using an offset that

1    cannot yet be calculated under the terms of the plan.

2        Nevertheless, Plaintiffs continue to insist that a hypothetical termination date
3    under the Signal Plan—January 1, 1984—is the appropriate date for measuring the Signal
4    accrued benefit.  *See* Doc. 678 at 18-22.  In reality, only one participant actually retired
5    on January 1, 1984, and his benefits ***improved*** under the Signal Plan.  *See* DSOF ¶ 88.
6    Thus, while Plaintiffs accuse ***Defendants*** of using "made up" numbers, Doc. 678 at 21,
7    their hypothetical termination theory rests entirely on calculations of accrued benefit
8    "reductions" that never actually occurred.  *See* Doc. 676 at 12-13.

9        That the anti-cutback rule protects a participant's actual accrued benefit at
10   termination under the post-amendment plan, not a hypothetical benefit, is borne out by
11   the IRS's approval of "wearaway" to comply with the anti-cutback rule.  *See* Rev. Rul.
12   81-12.  "Wearaway" is a phenomenon whereby an actively-employed plan participant's
13   post-amendment accrued benefit may be initially less than the value of his pre-
14   amendment protected benefit, but eventually grows to exceed such pre-amendment
15   protected accrued benefit.  During this "wearaway" period, participants' pre-amendment
16   protected accrued benefits are typically preserved via a savings clause, like that found in
17   section 4.10(c)(ii) of the Signal Plan.  *See* DSOF ¶ 54.  Once the post-amendment
18   accrued benefit exceeds the pre-amendment protected accrued benefit, the protection
19   afforded by the anti-cutback rule has "worn away," ***meaning it is no longer applicable***.
20   Were Plaintiffs' hypothetical measure correct, nothing could ever "wearaway."

21       The Court should reject Plaintiffs' attempts to manufacture an unlawful cutback
22   by locking in the offset amount or using hypothetical termination dates.  The purpose of
23   the anti-cutback rule is not to provide participants with a hypothetical benefit.  Rather, it
24   was enacted "to ensure that 'if a worker has been promised a defined pension benefit
25   upon retirement . . . he actually will receive it.'"  *Alessi*, 451 U.S. at 510 (quotation
26   omitted).  But even if the Court were to accept either of Plaintiffs' theories, it would have
27   to apply all of the Signal Plan's terms effective January 1, 1984, including the savings
28   clause.  Because that provision precludes a finding that a prohibited cutback occurred,

1   Plaintiffs have gotten the protection that ERISA § 204(g) affords. Any quarrel a

2   participant may have with Defendants' method of determining his or her protected

3   Garrett Plan benefit goes solely to whether an operational error has occurred in

4   calculating that benefit—and to the extent such an error has occurred, Defendants have

5   already agreed that such errors should be corrected (and in fact, have been corrected).

6   Accordingly, any avenue Plaintiffs try to take to prove that a cutback occurred meets a

7   dead end.

**3.      The Signal Plan Amendments Became Effective Simultaneously.**

8   For the first time in the long history of this case, Plaintiffs now allege that three

9   different "plans" covered former Garrett Retirement Plan participants over a 13-month

10  span from January 1, 1984 through February 4, 1985:

- First, Plaintiffs contend that Garrett Plan participants became part of the "1976 Signal Plan" on January 1, 1984, which purportedly effected the cutback alleged in the Social Security Offset Claim. *See* Doc. 678 at 5.

- Plaintiffs then argue that a May 1984 SPD was "the only plan document specifically addressed to Garrett employees" prior to February 1985. *Id.* at 6. According to Plaintiffs, this "plan document" did not include "several major cutbacks including the SBA offset changes[.]" *Id.* at 5-6.

- Finally, Plaintiffs argue that the former Garrett Plan participants became subject to the terms of the 1984 Signal Plan with the formal "adoption of the Signal Plan on February 4, 1985." According to Plaintiffs, as of that date, "for the first time a plan document amended the interest rates used to calculate the SBA offset and contained other benefit reductions." *Id.* at 6.

19  This tortured "history" of the Signal Plan amendments is pure fiction.[9]

**(i)      Plaintiffs' Arguments Are Barred By The Partial Settlement Agreement.**

22  As a threshold matter, the PSA bars Plaintiffs' claim under the 1976 Signal Plan.

23  *See* DSAF ¶¶ 77-79; *see also* PSA Motion at Section III.A. The only Signal Plan at issue

24  in this case is the one amended and restated effective January 1, 1984. DSAF ¶ 66. All

25  claims under other plans have been released. Thus, Plaintiffs cannot argue that the Social

26

27  _____

28  [9] It also contradicts versions Plaintiffs have previously advanced. For example, in their Amended Complaint, Plaintiffs contended that the January 1984 brochure—an entirely different document—"was the governing Signal Retirement Plan document" from January 1, 1984 "through on or about October 24, 1985." Doc. 47 at ¶ 46.

1    Security Offset Claim is established under the 1976 Signal Plan, or that the SBA Offset

2    Claim is established under the May 1984 SPD.  To the contrary, those arguments should

3    be ignored for the simple reason that they are barred.  *See id.* at ¶¶ 59-70, 77-79, 88-97.

4              *(ii)      The Signal Plan At Issue Was Effective January 1, 1984.*

5              Plaintiffs try to make chaos out of what was a straightforward and routine plan-

6    amendment process.  The simple—and accurate—recitation of the Garrett-Signal plan

7    merger is the logical one provided by William Coffey, the architect of the Signal

8    Retirement Plan as amended and restated effective January 1, 1984.  *See* DSOF ¶ 13.

9              By December 1983, the core elements of the amended and restated Signal

10   Retirement Plan were known, settled and documented.  DSAF ¶ 10.  Those elements

11   were communicated to the plan's actuaries and administrators and reinforced through

12   "meetings, memorandums, administration forms and factors[.]"  DSAF ¶ 11.  The Social

13   Security Offset, for example, was described quite clearly in a January 1984 brochure that

14   included multiple references to, and sample calculations based upon, a benefit formula

15   that accounted for Social Security benefits by deducting them from a participant's base

16   retirement benefit.  *See* DSOF ¶¶ 109-110, DSAF ¶ 12.  The SBA Offset was also

17   communicated to plan administrators by at least January 1984, as evidenced by a

18   memorandum prepared by Mr. Coffey that explained the split 3.5%/7.5% projection-

19   forward interest rate.  DSAF ¶ 13.  As James McLeod of Garrett confirmed, that memo

20   served the "purpose of aiding [plan administrators] in having a uniform basis for

21   calculating benefits" under the Signal Retirement Plan as amended and restated effective

22   January 1, 1984.  DSAF ¶ 14.

23             The Signal Plan's terms were thus known, settled and documented by January

24   1984.  DSAF ¶ 19.  Under Amendment IX to the Garrett Plan, former Garrett Plan

25   participants stopped accruing benefits under the Garrett Plan as of December 31, 1983.

26   DSOF ¶¶ 22-23.  Thus, from January 1, 1984 forward, any former Garrett Plan

27   participant who retired was "treated as if that [amended and restated Signal] plan was

28   already adopted and in effect."  DSAF ¶¶ 15-23.  There were no changes to these known,

18

1    settled and documented plan terms from January 1, 1984 through February 4, 1985, the

2    execution date of the Signal Plan document (which document was made retroactively

3    effective January 1, 1984).  DSAF ¶ 24.

4        In addition to the SBA and Social Security offsets, the enhancements that

5    benefitted former Garrett Retirement Plan participants under the amended and restated

6    Signal Plan were also (1) made effective January 1, 1984; and (2) formally adopted in the

7    same plan document on February 4, 1985.  DSAF ¶¶ 25-26.  Thus, and as this Court has

8    always understood, the offsets Plaintiffs challenge in this litigation were simultaneously

9    adopted and made collectively effective January 1, 1984 as part of a package that

10   included significant benefit enhancements for former Garrett Plan participants.  *See, e.g.*,

11   *Allen*, 382 F. Supp. 2d at 1146; Doc. 481 at 1, 8.

12        *(iii)    Plaintiffs' Arguments Independently Fail On Their Own Terms.*

13       The "1976 Signal Plan" claim also fails because it depends on Plaintiffs'

14   misplaced argument that "on December 5, 1985 [*sic*], the Signal Plan [*sic*] Board of

15   Directors . . . amended the definition of 'Company' in the existing Signal plan (the '1976

16   Plan')."  Doc. 678 at 5.  Signal's Board of Directors actually first resolved to "approve[]

17   the merger" of over twenty benefit plans into the Signal Plan *effective January 1, 1984*.

18   DR-PSOF ¶ 26.  For purposes of that merger, the Board then resolved to "approve[] the

19   inclusion" of the sponsors of the merging plans, including Garrett, "within the definition

20   of the term 'Company' in Section 1.12 of the Signal Plan."  *Id.*  Viewed in context, it is

21   clear that neither of these actions was intended to create any independent right to benefits

22   for Garrett Plan participants under the Signal Plan prior to an explicit amendment of the

23   Signal Plan to provide them.  Rather, the Board was merely preparing for the eventual

24   Signal Plan restatement by authorizing the inclusion of former Garrett Plan participants,

25   along with participants under other merged-in plans, under the new Signal Plan.  The

26   actual coverage of these new participants did not occur until the Signal Plan amendments

27   were executed.  This explains why the Board instructed Signal's officers to execute

28   amendments to the Signal Plan so as "to convert it into a company-wide plan covering

1   the participants *now covered by the plans being merged*[.]" *Id.* (emphasis added).

2         Plaintiffs also offer no evidence that a former Garrett Plan participant's benefit

3   was *ever* calculated under the 1976 Signal Plan.    Plaintiffs' own expert calculated

4   Plaintiffs' alleged damages by relying exclusively on the Signal Plan, as amended and

5   restated effective January 1, 1984.  DSAF ¶ 27.  And, just one page after arguing that the

6   1976 Signal Plan applied, Plaintiffs contradict themselves and say that it was the May

7   1984 SPD that applied "between the 12/83 merger amendments and adoption of the 2/85

8   Signal Plan."  Doc. 678 at 6.  Plaintiffs are simply contriving one specious theory after

9   another in an attempt to stave off summary judgment, without even pretending to

10  reconcile the inherent contradictions among them.

11        Plaintiffs' claims based on the May 1984 SPD also fail.  *Id.* at 5-6.  The May 1984

12  SPD was not the Signal Plan, did not purport to be the Signal Plan, and could not have

13  been the Signal Plan.  The May 1984 SPD itself emphasized that it was only intended to

14  provide participants with "a convenient summary of your Retirement Plan"—elsewhere

15  defined as "The Signal Companies, Inc. Retirement Plan"—and repeatedly distinguished

16  the Retirement Plan from the summary provisions contained within the May 1984 SPD.

17  DR-PSOF ¶¶ 27, 29; *see also Ludlow v. Advo-Sys., Inc. Disability Income Plan*, 2004

18  WL 2492885, at *1 n.1 (N.D. Cal. Nov. 5, 2004) (describing as "meritless" a claim that

19  the SPD was the plan).

20        As a matter of law, an SPD "is not a 'plan' within the meaning of Section

21  502(a)(1)(B)."  *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1316 (3rd Cir. 1991)

22  (Alito, J.).  Indeed, a number of ERISA provisions would be nonsensical if an SPD were

23  understood to be a document comprising the "plan."  *See, e.g.*, 29 U.S.C. § 1024(b)(2).

24  Moreover, ERISA assigns the responsibility for drafting and amending the plan and SPD

25  to different entities.  Creating and modifying the plan is a settlor (*i.e.*, an employer)

26  responsibility, *see Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007), while publishing

27  an SPD is a fiduciary function for which the plan administrator has exclusive

28  responsibility.  *See* 29 U.S.C. §§ 1021, 1022, 1024(b); *Varity Corp. v. Howe*, 516 U.S.

1    489, 502 (1996).

2    Further, an SPD cannot modify the terms of a plan unless the plan's amendment

3    provisions so allow.  *See, e.g.*, *Winterrowd v. Am. Gen. Annuity Ins.*, 321 F.3d 933, 937

4    (9th Cir. 2003) ("These amendment procedures, once set forth in a benefit plan, constrain

5    the employer from amending the plan by other means."); *see also Curtiss-Wright Corp. v.*

6    *Schoonejongen*, 514 U.S. 73, 85 (1995) ("[W]hatever level of specificity a company

7    ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level.").

8    Here, there is no question that the May 1984 SPD could not have amended the 1976

9    Signal Plan or the Signal Plan as amended and restated effective January 1, 1984, because

10   both plans provided that only the Board of Directors could amend the Plan.  DSAF ¶¶ 28-

11   29; *see also Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1161-62 (9th

12   Cir. 2001) (holding that a "Benefit Summary" could not form part of the insurance policy

13   because it had not been amended "in conformance with policy provisions.").  The cases

14   cited by Plaintiffs, *see* Doc. 678 at 23, are inapposite.  *See, e.g.*, *Pisciotta v. Teledyne*

15   *Indus.*, 91 F.3d 1326, 1329 (9th Cir. 1996) (*per curiam*) (explaining that an employer

16   must provide employees with a written SPD that describes the plan).

17   Plaintiffs' "interim plan document" claim proceeds from the erroneous assumption

18   that there was no plan document in effect between January 1, 1984 and February 4, 1985.

19   In fact, there was a plan document in effect:  the February 4, 1985 amendment and

20   restatement that was effective January 1, 1984.   It is a common and well-accepted

21   practice for plan documents to be amended retroactively, with Congress and the IRS

22   repeatedly sanctioning the practice.  *See, e.g.*, Pension Protection Act of 2006, Pub .L.

23   No. 109-280, §1107 (providing that qualified pension plans may be retroactively

24   amended); 26 C.F.R. § 1.401(b)-1 (2010) (allowing for various "remedial amendment

25   period[s]" for plan amendments to be adopted retroactively in order to comply with

26   required-law changes).[10]

27   _____

28   [10] The Signal Plan was being drafted during the remedial amendment period to comply
     with requirements of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No.

21

### 4.    Whether Viewed On A Stand-Alone Or Net Effects Basis, Both Remaining Claims Fail.

Even ignoring all of the contemporaneous benefit enhancements under the Signal Plan, the Social Security Offset Claim still fails.  Doc. 676 at 9-12.  Defendants have never conceded, because it is untrue, that "as compared to the Garrett Plan's benefit formulas, lower paid employees would be worse off under the SSI offset formula," Doc, 678 at 5, or that the Social Security Offset, when "viewed separately . . . reduced accrued benefits."  Doc. 678 at 3.  Indeed, Defendants established, with admissions by Plaintiffs' own expert Mr. Poulin, that the Social Security Offset Claim fails even without a net effects analysis because, for example, "the only difference between the Social Security integration formulas under the [Garrett and Signal Retirement] plans was one that was favorable to participants under the Signal Plan."  Doc. 676 at 12; *see also* DSOF ¶ 33.

The Social Security Offset Claim and the SBA Offset Claim also fail under the appropriate net effects analysis.  The Signal Plan offered substantial benefit enhancements to former Garrett Plan participants, such that even under Plaintiffs' calculations, at least 98% of Plaintiffs received or were scheduled to receive benefits on their date of termination that were better than their Garrett accrued benefit as of December 31, 1983.  *See* Doc. 676 at 6-8.  Any operational errors that have resulted or could result in lower benefits to the other 2% of participants are or will soon be fixed. *See id.*  Accordingly, there is no cutback under either remaining claim.

### C.    Mr. Holland's Purported Supplemental Report Should Be Stricken.

Perhaps recognizing the futility of their damages theories, *see* Doc. 676 at 14-17, late on Friday, September 17, 2010, one business day before opening summary judgment briefs were due, Plaintiffs sent Defendants an unsigned "supplemental report" from one of their actuarial experts, James Holland.  *See* DSAF ¶ 37.  That "report" should be stricken, and Plaintiffs' summary judgment arguments that rely on it should be

---

97-248, 96 Stat. 324.  *See* Notice 85-14, 1985-2 C.B. 407.  Thus, it was executed well within the statutory timeframe for retroactive application to January 1, 1984.

disregarded.  *See* LRCiv 7.2(m)(2) Motion to Strike, at DSAF ¶¶ 30-52.

Plaintiffs' rebuttal expert reports were due by July 23, 2010.  *Id.* at ¶ 34.  Expert discovery then closed on August 4, 2010, with the exception of a limited accommodation not relevant to Mr. Holland.  *Id.* at ¶ 35.  Mr. Holland's September 17th "supplemental report" is clearly untimely and should be disregarded.  *Id.* at ¶¶ 31-32; 50-52.

Mr. Holland's "report" is also improper.  Mr. Holland was offered solely as a rebuttal expert, but instead of "rebutting" either one of Defendants' experts, Mr. Holland presents three new opinions.  Each of those new opinions is based on evidence that was available to him well before the July 23, 2010 deadline for his report.  *See* DSAF ¶¶ 38-49.  Moreover, Mr. Holland's "report" makes repeated reference to supporting calculations, none of which have ever been provided to Defendants.  *Id.* at ¶¶ 40-41. Despite these improprieties, Plaintiffs have never even asked the Court to amend its scheduling order, and attempt to unilaterally inject new expert opinions into the case after the close of discovery and on the eve of summary judgment.  That maneuver is clearly improper.  *See* DSAF ¶¶ 50-52.  The Court should strike Mr. Holland's "supplemental report" and disregard the belated opinions set forth therein.

**D.      There Is No Admissible Evidence Of Damages.**

On the record properly before the Court, there is no evidence of any reduction of Plaintiffs' accrued benefits as a result of a plan amendment, and this case should be dismissed with prejudice.  Plaintiffs have apparently conceded that their original damages theory, premised on a stand-alone analysis of the Social Security and SBA Offset Claims, *see* Doc. 676 at 14-16, is no longer appropriate, as they nowhere advance it in their summary judgment papers.  Moreover, their insinuations about participants who were "actually paid less than their 12/31/83 Garrett benefits" ring hollow.  *See* Doc. 678 at 9. As noted above, even under Plaintiffs' disputed calculations, at most 260 participants were "paid less," or were scheduled to be paid less at retirement, with approximately 98% of the class receiving (or scheduled to receive) benefits at retirement that were as great, if not greater than, their Garrett accrued benefit.  DSOF ¶¶ 75-77.

Finally, contrary to Plaintiffs' assertion, Doc. 678 at 22, Defendants have never conceded that a comparison of an ongoing Garrett benefit to an actual Signal benefit demonstrates a "substantial cutback" in Plaintiffs' accrued benefits.  In fact, Defendants fundamentally disagree with the very premise of the calculations Plaintiffs' expert performed using this alternative theory.   *See* Doc. 676 at 16-17.  Defendants' expert identified multiple conceptual errors with that approach and dedicated an entire appendix of his report to detailing the numerous computational mistakes that infect the analysis.  DSOF ¶¶ 98-100; DR-PSOF ¶¶ 57-58.  Moreover, "going forward" damages cannot be recovered in this case because, as this Court has noted and as Plaintiffs themselves have argued, ERISA § 204(g) imposes no obligation to continue accruing benefits post-amendment.  *See Allen*, 382 F. Supp. 2d at 1150 (citation omitted); *see also* Doc. 678 at 19-20 n.17.  Plaintiffs' repeated attempts to manufacture a barely plausible damages theory all fail.

### E.    Plaintiffs' Alternative Remedy Requests Have No Legal Basis.

Plainly aware that they suffered no losses or reductions in benefits based on the challenged amendments, Plaintiffs now attempt to argue that there is "broad discretion" to fashion alternative remedies.  *See* Doc. 678 at 24-25.  Even if such discretion existed, it only means that this matter would have to be remanded to the Plan Administrator, who alone can fashion any such remedy.  *See, e.g.*, *Frommert*, 130 S.Ct. at 1648, Restatement (Third) of Trusts (2003)*, § 66 & comm. a & c).  More importantly, however, Plaintiffs' requested remedies are not permitted under ERISA § 204(g).

Plaintiffs assert that "[u]nder § 204(g), an amendment that reduces the accrued benefits of any participant 'remains inoperative to all participants.'"  Doc. 678 at 8.  Even if there were such an amendment here (and there is not), Plaintiffs' bold assertion has no basis in law, and the lone case they cite in support is totally inapposite.  *See id.* (citing *Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418 (9th Cir. 1988)).  Unlike this case, *Meagher* involved an amendment to a poorly-funded plan that was ***designed*** to reduce accrued benefits, and the issue was whether that

amendment had any effect where it failed to satisfy one of the statutorily-enumerated criteria for an exception to the anti-cutback rule. *Meagher*, 856 F.2d at 1420. Where the subject amendment had not received the necessary approval, the *Meagher* Court ruled that it was "simply inoperative, and the Plan must be administered without giving any effect to the amendment." *Id.* That ruling has no bearing in this case, where Defendants have not claimed such a statutory exception to ERISA § 204(g) and the Signal Plan amendments were designed to ***improve*** participants' benefits. It would be a bizarre result indeed to strip at least 98% of the class members of the benefit enhancements provided by the Signal Plan amendment under some unsupported "equitable remedy" theory.

Recognizing the substantial benefits conferred upon the overwhelming majority of class members, Plaintiffs plaintively plead for a remedy that would allow them to keep the provisions of the amendments they like, while rejecting the provisions they dislike. There is simply no authority for such a remedy. *See, e.g., Richardson v. Pension Plan of Bethlehem Steel*, 112 F.3d 982, 987-88 & n.5 (9th Cir. 1997). Moreover, such a remedy would contradict the Court's holding that "the anti-cutback provision applies to a plan amendment as a whole, not to discrete components of a plan amendment viewed in isolation." Doc. 481 at 6. Looking at "discrete components" and ignoring the "amendment as a whole" is ***exactly*** what Plaintiffs' proposed remedy seeks to do.

Similarly, Plaintiffs are not entitled to "the greater of the Garrett or Signal formulas calculated at the time of retirement," Doc. 678 at 24, as that remedy is not available under § 204(g). *Compare* ERISA § 204(g) *with* ERISA § 204(h); *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) (refusing to "adjust [ERISA's] 'carefully crafted and detailed enforcement scheme' . . .") (citation omitted).

**III.   CONCLUSION**

For the reasons stated herein, Plaintiffs' summary judgment motion should be denied, and summary judgment should be granted in Defendants' favor.

Respectfully submitted this 5th day of November, 2010.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OSBORN MALEDON

By: /s/ David B. Rosenbaum
    David B. Rosenbaum
    Dawn L. Dauphine
    OSBORN MALEDON, P.A.
    2929 North Central Avenue, Suite 2100
    Phoenix, AZ 85012-2794

    Michael L. Banks
    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, PA 19103

    Howard Shapiro
    Robert Rachal
    PROSKAUER ROSE LLP
    650 Poydras Street, Suite 1800
    New Orleans, LA 70130

    Amy Covert
    PROSKAUER ROSE LLP
    One Newark Center, 18th Floor
    Newark, NJ 07102-5211

    Christopher Landau, P.C.
    Craig S. Primis, P.C.
    Abigail Diaz-Pedrosa
    KIRKLAND & ELLIS LLP
    655 Fifteenth Street, N.W.
    Washington, DC 20005-5793

    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I do certify that on November 5, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Kelly Dourlein