David B. Rosenbaum, Atty. No. 009819
Dawn L. Dauphine, Atty. No. 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ 85012-2794
Telephone: (602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Michael L. Banks, *Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
mbanks@morganlewis.com

Howard Shapiro, *Pro Hac Vice*
Robert W. Rachal, *Pro Hac Vice*
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA 70130
Telephone: (504) 310-4088
howshapiro@proskauer.com
rrachal@proskauer.com

Amy Covert, *Pro Hac Vice*
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, NJ 07102
Telephone: (973) 274-3258
acovert@proskauer.com

Christopher Landau, P.C., *Pro Hac Vice*
Craig S. Primis, P.C., *Pro Hac Vice*
Abigail Diaz-Pedrosa, *Pro Hac Vice*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
Telephone: (202) 879-5000
clandau@kirkland.com
cprimis@kirkland.com
adiaz-pedrosa@kirkland.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Allen, Richard Dippold, Melvin Jones, Donald McCarty, Richard Scates and Walter G. West, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Honeywell Retirement Earnings Plan, Honeywell Secured Benefit Plan, Plan Administrator of Honeywell Retirement Earnings Plan, and Plan Administrator of Honeywell Secured Benefit Plan,<br><br>Defendants. | No. CV04-0424 PHX ROS<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION.

Only two narrow and carefully defined claims, specifically set forth in the Partial Settlement Agreement ("PSA"), remain in this case—the Social Security Offset Claim and the SBA Offset Claim. These claims are not about disclosure. These claims are not about a cash balance plan conversion. These claims are about changes to discrete features of a benefit formula and whether those discrete changes caused an impermissible cutback of benefits under ERISA. This Court's ruling that the Signal Plan amendments must be evaluated on the "net effect" of both positive and allegedly negative plan changes, *see* Doc. 481 at 7-8, dooms the only claims that actually remain in this case. None of Plaintiffs' numerous attempts to manufacture a plausible cutback theory can defeat summary judgment, as Plaintiffs ignore the plain language of both the Signal and Garrett Plans and the undisputed significant benefit enhancements provided under the Signal Plan.

There has been no cutback because there are no class members who, as Plaintiffs argue, "[wound] up with no pension benefits at all [or] benefits that were less than their 12/31/83 Garrett Plan benefits[.]" *See* Doc 701 at 1. Instead, as the evidence confirms, and Plaintiffs' own expert concedes, the overwhelming majority of participants (including each named Plaintiff) received or will receive a better benefit upon retirement under the Signal Plan than their December 31, 1983 accrued benefit under the Garrett Plan. In the few exceptions to that rule, the Signal Plan's savings clause ensures receipt of a retirement benefit no less than what each participant had accrued under the Garrett Plan as of December 31, 1983, and the Plan Administrator has remedied the handful of instances where the savings clause was not correctly applied. The theories Plaintiffs have advanced to rebut these fundamental propositions are invitations to error, based on legal theories that have already been rejected or released, or that simply do not fit the facts of this case. Summary judgment in favor of Defendants is therefore warranted.

## II. ARGUMENT.

Defendants agree with Plaintiffs that the only issues remaining for the Court on liability are questions of law: first, what is the relevant comparison for purposes of

determining whether a cutback occurred in the context of the Garrett and Signal Floor offset plan; and second, whether the Signal Plan's savings clause protected the accrued benefits, as of December 31, 1983, of former Garrett Plan participants.  *See* Doc. 701 at 3.  The answer to each question requires judgment in Defendants' favor.

### A. The Protected Floor-Offset Benefit Cannot Be Measured Until A Participant Terminates Or Retires.

Under both the Garrett and Signal Plans, a participant's retirement benefit is the monthly annuity she is entitled to receive under the defined benefit plan formula, less the value of any payout she receives from the defined contribution plan (*i.e.*, the SBA Offset). *See*, *e.g.*, DSOF ¶¶ 6-7, 9, 27, 37; Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Facts ("DR-PR-DSOF") ¶ 9.  Under both Plans, that net benefit cannot be calculated until the participant terminates employment or retires, because that is the date that *the Plan* says must be used to calculate the SBA Offset.  *See* Doc. 695 at 13.  Thus, consistent with all relevant authority, the correct determination of whether a cutback occurred involves a comparison of the Garrett Plan defined benefit as of December 31, 1983 less the value of the actual SBA balance at retirement or termination, to the actual benefit at retirement under the amended Signal Plan.  *See*, e.g., *id*. at 12-17.  Under that analysis, no participant suffered a reduction in accrued benefits.  Plaintiffs' own expert concedes that 98% of the class members received benefits under the Signal Plan that were at least as good as their Garrett Plan accrued benefit as of December 31, 1983.  *See id.* at 12; *see also* Doc. 676 at 8.

Plaintiffs cannot overcome the fact that a cutback is not measured on the basis of a hypothetical benefit that no plan participant will ever be paid.  On that question of law, all relevant authorities support Defendants' position.  *See*, *e.g.*, Doc. 695 at 12-21.

### 1. The Legality Of A Plan Amendment Must Be Determined Under The Terms Of The Plan.

The law mandates that an accrued benefit be calculated according to the terms of the plan.  When a plan's terms include a "dynamic" offset that cannot be fixed as of any randomly selected date, the dollar amount of the protected accrued benefit cannot be

2

1  determined until the dynamic offset amount becomes determinable. *See*, *e.g.*, *id.* at 13-14.
2  Contrary to Plaintiffs' latest line of attack, *see* Doc. 701 at 3-5, that legal reality is entirely
3  consistent with the 1977, 1988 and 2005 Treasury Regulations.

4  Nothing in the 1977, 1988 or 2005 Treasury regulations supports Plaintiffs' assertion
5  that a cutback in a floor-offset plan must be determinable on the days immediately before
6  and after the applicable amendment date. *See id.* at 4-5. In fact, the 1977 and 1988
7  regulations are silent on this point. *See* 26 C.F.R. § 1.411(d)-3(b) (1977); 26 C.F.R.
8  § 1.411(d)-3 (1988). Even assuming that the 2005 regulation applies, it does not require that
9  the precise dollar amount of a participant's accrued benefit be known **on** the dates
10 immediately prior to or after the applicable amendment date. It merely states that "[t]he
11 protection of section [204(g)] applies to a participant's entire accrued benefit under the plan
12 *as of* the applicable amendment date[.]" 26 C.F.R. § 1.411(d)-3(a)(1) (2005) (emphasis
13 added). Thus, the regulation does not require that the accrued benefit be determined **on** the
14 applicable amendment date (or "on" any other date for that matter). When Treasury wanted
15 to use the word "on," it knew how to provide accordingly. *See* 26 C.F.R. § 1.411(d)-3(a)(4)
16 – Ex. 4(i)(B) (stating a participant's balance "on" the applicable amendment date).[1]

17 Defendants do not dispute that the accrued benefit under the Garrett Plan can and
18 should be determined "as of" December 31, 1983. However, to determine the amount of a
19 participant's accrued benefit, **all features** of the benefit formula must be considered. *See*
20 *Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1150-51 (D. Ariz. 2005); *see*
21 *also*, *e.g.*, Doc. 676 at 9-14; Doc 695 at 12-17. The Garrett Plan required that one of those
22 features — the offset — be determined using the amount that a participant could have
23 transferred into the Garrett Plan from the Severance Plan upon her termination or retirement.
24 *See*, *e.g.*, DSOF ¶¶ 9-11; DR-PR-DSOF ¶¶ 9, 11, 34. As one court aptly explained in
25 describing a similar offset arrangement, the "deduction [for plaintiffs'] severance benefits is

---

[1] Plaintiffs' reliance on the examples in the 2005 Treasury regulation, Doc. 701 at 5, is also misplaced because those examples address a traditional defined benefit plan; the examples do not address a floor-offset plan, or any other plan with a dynamic integration or offset. 26 C.F.R. § 1.411(d)-3 (2005).

3

itself [a] part of the formula for determining the amount of their pension payments[]" and "under the terms of the plan, the amount of pension to which plaintiffs are entitled is not fixed until the setoff is made." *See Vintilla v. U.S. Steel Corp. Plan for Emp. Pension Benefits*, 606 F. Supp. 640, 643-44 (W.D. Pa. 1985); *see also Williams v. Caterpillar, Inc.*, 944 F.2d 658, 664 (9th Cir. 1991) (citing and quoting *Vintilla*); *Allen*, 382 F. Supp. 2d at 1144-45; Doc. 695 at 13-15.

Thus, while participants' accrued benefits can be determined "as of" December 31, 1983, by using the Garrett Plan formula on that date (and compensation and service as of that date, *see*, *e.g.*, Doc. 676 at 7-8, 12-14; Doc. 695 at 12, 13 (citing Rev. Rul. 81-12)), the precise dollar amount of each participant's accrued benefit "as of" December 31, 1983 cannot be calculated until the date of the participant's termination or retirement because the Garrett Plan mandates that the offset, if any, is determined using the SBA balance on that date. *See* DSOF ¶¶ 10-11, 38; DR-PSOF ¶ 9; DR-PR-PSOF ¶¶ 11. There is simply no authority to support Plaintiffs' contention that the SBA balance ***on*** December 31, 1983 must be used to determine the protected accrued benefit ***as of*** that date. *See* Doc. 695 at 13-15. This is neither surprising nor "unfair," as Plaintiffs suggest. *See* Doc. 701 at 6. If the Garrett Plan had merely been frozen on December 31, 1983 and participants never entered the Signal Plan, future retirees would have only been entitled to receive their Garrett Plan benefit based on compensation and service as of December 31, 1983 (the accrual freeze), offset by the value of their SBA on the date of termination or retirement. Plaintiffs should not receive a windfall because they were actually allowed to continue accruing benefits under the Signal Plan.

Similarly, neither the regulations nor the purported "wealth of case law" (which Plaintiffs conspicuously fail to cite, *see* Doc. 701 at 4), support Plaintiffs' contention that a § 204(g) violation must be determined on the date immediately after the amendment, regardless of whether any participant commenced their benefit on that date.[2] To the contrary,

---

[2] The lone case Plaintiffs rely on, *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2005), is inapposite. *Heinz* addressed whether a new condition may be imposed on

4

and as Plaintiffs admit, there is no authority that suggests that, in determining whether a cutback has occurred, the protected accrued benefit must be compared to a hypothetical accrued benefit based on the application of an offset that cannot yet be calculated. *See* DR-PSOF ¶ 99; DR-PSOF ¶ 34; DR-PR-DSOF, Section II, ¶¶ 1-20.  Indeed, the regulations are silent as to when the comparison must be made.  As noted above, the 2005 regulation states that § 204(g) protection "applies ***to*** a participant's entire accrued benefit under the plan as of the applicable amendment date[.]"  26 C.F.R. § 1.411(d)-3(a)(1) (emphasis added).  This defines ***what*** is protected; it does not define ***when*** the comparison or determination is made.

While the regulations are silent as to when to determine if a cutback occurs in a nontraditional defined benefit plan (*e.g.*, a floor offset plan), the case law is not.  And the cases make clear that § 204(g) is concerned with the ***actual*** benefit received, not a hypothetical benefit.  *See*, *e.g.*, *Sunder v. U.S. Bancorp Pension Plan*, 586 F.3d 593, 600 (8th Cir. 2009) (because the plan "guarantee[d] that a participant's ***final*** distribution in the [plan] 'shall not be less than' the accrued benefit in the [prior plan] . . . the plan conversion and opening balance in the new plan did not decrease accrued benefits, regardless of how the opening balance was calculated") (emphasis added); *id.* at 601 (citing a General Accounting Office report stating that "current federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not ***receive*** less than the present value of prior accrued benefits if they separate from the employer") (emphasis added).[3]  Indeed, this Court has already recognized that the anti-cutback rule protects the benefit a participant receives.  *Allen*, 382 F. Supp. 2d at 1151 (noting that participants are "concerned with" what they receive "when [they] attain[]

---

receipt of monthly pension benefits, ***not*** the proper timing for determining whether a reduction in a participant's accrued benefit had occurred.  *Id.* at 746.

[3] *See also Register v. PNC Fin. Servs. Group, Inc.*, No. 04-CV-6097, 2005 WL 3120268, at *3 (E.D. Pa. Nov. 21, 2005) ("At no point can the participant ***receive*** less than his accrued benefit at the time the plan was changed.") (emphasis added); *Saxton v. Cent. Pa. Teamsters Pension Fund*, No. Civ.A. 02-CV-986, 2003 WL 22952101, at *14 (E.D. Pa. Dec. 9, 2003); *Corcoran v. Bell Atl. Corp.*, No. Civ.A. 97-510, 1997 WL 602859, at *4 (E.D. Pa. Sept. 23, 1997).

normal retirement age"). This makes sense. ERISA § 204(g) is not intended to provide participants with a windfall. *Sunder*, 586 F.3d at 600 (rejecting plaintiffs' assertions because it would have given them "a windfall that ERISA did not require"). Here, there was no ***actual*** cutback in protected accrued benefits. *See* Doc. 676 at 13.

### B.   The Signal Plan's Savings Clause Protected Garrett Accrued Benefits.

There is no trial-worthy issue as to whether the Signal Plan's savings clause protected Garrett Plan participants' December 31, 1983 accrued benefits. While Plaintiffs apparently now concede that the Signal Plan "promised to protect" their accrued benefits (though according to Plaintiffs, that promise was "accidental," *see* Doc. 701 at 3 n.3), they now advance additional arguments that the savings clause says or does something other than what its plain language actually provides.[4]

#### 1.   Plaintiffs' Wear-Away Argument Is Irrelevant And Wrong.

Apparently recognizing the futility of their position, Plaintiffs now attempt to morph the two Remaining Claims into something else by challenging wear-away. *See* Doc. 701 at 1, 12-13; *see also* Doc. 695 at 16 (explaining wear-away). Contrary to Plaintiffs' assertions, wear-away has been specifically permitted by the IRS and the courts. *See*, *e.g.*, DAN M. MCGILL, FUNDAMENTALS OF PRIVATE PENSIONS, pp. 391-92 (Kyle N. Brown et al. eds., 9th ed. 2010) (explaining that wear-away has been approved by the IRS since 1981); *Sunder*, 586 F.3d at 600-01; *Hurlic v. S. Cal. Gas. Co.*, 539 F.3d 1024, 1035 (9th Cir. 2008). Moreover, Plaintiffs' assertion that the Pension Protection Act of 2006 ("PPA") "outlawed" wear-away is simply untrue. The PPA amended ERISA to, *inter alia*, establish new minimum standards for ***future*** hybrid (*i.e.*, cash balance) plans. 75 Fed. Reg. 64,197 (proposed Oct. 19, 2010). Thus, the PPA does not apply to this case.

#### 2.   The Signal Plan's Savings Clause Comports With IRS Regulations.

The Signal Plan's savings clause is proper under every authority—applicable or otherwise—that Plaintiffs have drummed up. *See*, *e.g.*, Doc. 695 at 5-6. Undeterred,

---

[4] Defendants previously explained why Plaintiffs' earlier advanced arguments fail. *See* Docs. 695 at 2-11 and 676 at 2-3.

6

Plaintiffs now insist that the savings clause "falls far short of the guaranteed protection the IRS regulations require" and that other courts have approved. *See* Doc. 701 at 13-14. Again, Plaintiffs are wrong.

First, the IRS does not require a savings provision to have any particular language. *See* Doc. 695 at 6. Nor does any authority require that a plan specifically use the words "greater of" when comparing pre- and post-amendment benefits, as Plaintiffs contend. In support of their contention that the Signal Plan "falls short," Plaintiffs rely on a mere excerpt from the plan in *Sunder*. *See* Doc. 701 at 13 and Ex. 1. A review of the entire plan, however, demonstrates that the plan provisions the *Sunder* court relied upon in upholding the savings clause language are remarkably similar to the relevant provisions in the Signal Plan. *Sunder,* 586 F.3d 593 found at Doc. 18-1, at Plan Section 2.1(a) and Appendices C and D, available at Doc. 4:05-cv-01153 (E.D. Mo.). Consistent with the language at issue in *Sunder* and the other cases cited by Plaintiffs, the Signal Plan's savings clause unequivocally protected Garrett participants' accrued benefits. *See*, *e.g.*, Doc. 676 at 3-4 (explaining why *Sunder* and *Brody* support Defendants' reading of the savings clause); Doc. 695 at 5-6 (explaining why Plaintiffs' reliance on *French* is misplaced). Plaintiffs have given this Court no reason to ignore the Signal Plan's savings clause.[5]

**C.    No Signal Plan Amendment Effected A Cutback.**

Because the terms of the Signal Plan – properly applied – guarantee that there can be no cutback in accrued benefits, there can be no violation of ERISA § 204(g). *See*, *e.g.*, Doc. 676 at 3. In response, Plaintiffs return to their misplaced arguments that: (1) the Signal Plan amendments were not simultaneously adopted; and (2) the erroneous application of the Signal Plan's savings clause could be equated to a "plan amendment." *See* Doc. 701 at 7-10. As previously explained, the challenged amendments were adopted simultaneously, *see* Doc. 695 at 18-20, and any argument by Plaintiffs that depends on a contrary understanding

---

[5] The lone new case Plaintiffs cite, *Humphrey*, supports Defendants as well, for it is ***Plaintiffs*** who would have this Court ignore plan language in applying the savings clause under their reading. *Compare* Doc. 701 at 13-14 *with*, *e.g.*, Doc. 695 at 4-5.

7

necessarily fails. *See*, *e.g.*, Doc. 701 at 8.

As to Plaintiffs' alternative argument, Defendants have acknowledged — and already remedied — the limited operational errors in which the administrator did not properly apply the savings clause to protect the Garrett accrued benefit. *See*, *e.g.*, Doc. 695 at 10-11. Even by Plaintiffs' generous count, those errors affected, at most, 260 participants and none of the named Plaintiffs. *See*, *e.g.*, Doc. 676 at 8. Plaintiffs' contention that "ERISA does not insulate the ***application*** of a plan amendment," Doc. 701 at 8 (emphasis is added), is both incorrect and directly foreclosed by binding Ninth Circuit precedent that Defendants have presented, *see* Doc. 676 at 3, and Plaintiffs have failed to rebut. *See* Doc. 701 at 8-9. The cases Plaintiffs cite for the proposition that operational errors could themselves cause a § 204(g) violation, *see id.* at 8, are inapposite.[6] Thus, Plaintiffs' argument that "[i]t makes no legal difference if Defendants' allegedly protective language was drafted and ignored . . . or whether nothing in the plan purported to insulate the unlawful benefit reductions in the first place," Doc. 701 at 9, is fundamentally wrong. Instead, the difference between an amendment that causes a cutback and the misapplication of an otherwise valid amendment is dispositive. *See*, *e.g.*, Doc. 676 at 2-4; Doc. 695 at 9-12.[7]

### D. Plaintiffs Cannot Prove They Are Entitled To Any Remedy.

Plaintiffs are still unable to present any admissible evidence of injury. This is not surprising, given the absence of a cutback and the significant benefit enhancements afforded under the Signal Plan to the vast majority of Plaintiffs. *See Allen*, 382 F. Supp. 2d at 1150-51 ("It is difficult to understand what injustice or harm results when the upside of a post-

---

[6] *See Helms v. Local 705 Int'l. Bhd. of Teamsters Pension Plan*, No. 97-4788, 1999 WL 965230, at *16 (N.D. Ill. Sept. 30, 1999) (no savings clause that could have been applied to ensure that the participant received a benefit at retirement that was at least as good as his accrued benefit under a pre-amended plan); *Devito v. Pension of Local 819 I.B.T. Pension Fund*, 975 F. Supp. 258, 269-70 (S.D.N.Y. 1997) (no application of a savings clause at all).

[7] The rest of Plaintiffs' argument, *see* Doc. 701 at 9, is either irrelevant to the two Remaining Claims, is wrong, and/or has previously been responded to by Defendants. *See*, *e.g.*, DR-PSOF ¶¶ 23, 26, 45, 48, 54-59, 61-62, 115; DR-PSAF ¶ 3.

8

1  amendment benefit formula outweighs or equals the downside."). Plaintiffs' various
2  attempts to argue that, Class members were nevertheless injured all fail.

3  First, Plaintiffs try to frame their damages analysis as one relating to "protect[ing] the
4  reasonable expectations of employees." Doc. 701 at 10. Accordingly, they try to reposition
5  this case as one of inadequate disclosure. *See id.* at 1-2, 9. But this Court has already
6  considered and resolved (in Defendants' favor) Plaintiffs' previously advanced disclosure
7  claims. *See Allen*, 382 F. Supp. 2d at 1170-71. That claim and any additional disclosure
8  claims Plaintiffs may have had were released under the PSA, and cannot be resurrected now.
9  *See*, *e.g.*, Doc. 697 at 2, 7-8.

10  Even if an argument relating to Defendants' disclosures bore on the two Remaining
11  Claims, Plaintiffs' claim that "Garrett employees were hoodwinked," *see* Doc. 701 at 2, is
12  pure hyperbole. The record demonstrates the thoroughness of Defendants' communications
13  commencing by at least 1984. *See*, *e.g.*, DSOF ¶¶ 107-85; DR-PSOF ¶ 14. And Plaintiffs'
14  allegations that participants were told they would "get the better" of the Garrett and Signal
15  Plans formulas at retirement, *see* Doc. 701 at 10, is simply wrong. Rather, the evidence
16  plainly establishes that participants were told they would get the better of the Signal Plan's
17  minimum benefit or Social Security Offset formulas, *see*, *e.g.*, DR-PSOF ¶ 75, while the
18  savings clause separately guaranteed that if those Signal formulas yielded a lower benefit
19  than their Garrett accrued benefit as of December 31, 1983, they would receive the latter.
20  *See* DSOF Tab 43 at 905-Bielert-00181 (Q&A 48).

21  Second, Plaintiffs' attempt to manufacture injury by claiming that the Severance Plan
22  "surplus was being reverted back to the company," Doc. 701 at 2, is both a blatant
23  misrepresentation and irrelevant to the two Remaining Claims. There is no evidence that *any*
24  plan assets from *any* Signal or Garrett plan ever reverted back to the Company or were used
25  for any purpose other than to pay benefits under the plans. Moreover, Plaintiffs' insinuation
26  that using the SBA to help fund Signal Plan benefits was illegal or improper is belied by the
27  myriad cases explaining the advantages of similar offset arrangements to the one here. *See*,
28  *e.g.*, *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 514-16 (1981) (holding that offsets

9

for other income streams are permitted under ERISA and that "Congress was well aware" that offsets would "reduce the cost of pension plans to employers); *Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 190 (7th Cir. 1991) (holding that Congress and the courts have specifically approved offsets "to promote a system of private pensions by giving employers avenues for reducing the cost of their pension obligations").[8]

Third, Plaintiffs' contention that the Signal Plan amendment should be nullified as to all participants, even if it impermissibly cuts back the benefit of only one or a few participants, *see* Doc. 701 at 7, 10, has no legal basis. *See* Doc. 695 at 24-25 (explaining why *Meagher* is inapplicable). In fact, applying that theory would deny thousands of participants hundreds of millions of dollars in benefit enhancements.

Fourth, Plaintiffs' assertion that 61% of retirees and 80% of deferred vesteds "would have fared much better if the Garrett Plan had continued unchanged," Doc. 701 at 10, is predicated on a mischaracterization of the Garrett Plan formulas and is nevertheless irrelevant because Defendants had no obligation to continue the Garrett Plan. *See*, *e.g.*, Doc. 676 at 16-17; Doc. 695 at 24; DR-PR-DSOF, Section II at ¶¶ 1-20. It is undisputed that the Garrett Plan ceased all benefit accruals as of December 31, 1983, *see*, *e.g.*, DSOF 99, and ERISA § 204(g) imposes no obligation to continue accruing such benefits. *Allen*, 382 F. Supp. 2d at 1150. Moreover, even if the Court were to "unfreeze" the Garrett Plan as Plaintiffs suggest, Plaintiffs' damages model is fatally flawed because it determines the Garrett offset based on a hypothetical account balance, calculated assuming 3.53% annual earnings from December 31, 1983 until a participant's retirement or termination. *See*, *e.g.*, Doc. 701 at 10. Not only has that argument been rejected by this Court, *see Allen*, 382 F. Supp. 2d at 1165-66, and released under the PSA, *see* Doc. 697 at 9, but the SBA was actually invested in a guaranteed contract that earned 12.3% per annum for 25 years

---

[8] *See also Holliday v. Xerox Corp.*, 732 F.2d 548, 550-52 (6th Cir. 1984); *Bonovich v. Knights of Columbia*, 963 F. Supp. 143, 146 (D. Conn. 1997), *aff'd*, 146 F.3d 57 (2d Cir. 1998); *Vintilla*, 606 F. Supp. at 643. Additionally, as these cases make clear, it is irrelevant whether the Severance Plan was a defined contribution plan; the law permits integration of offsets with other types of plans or benefits. *See id.*

commencing January 1, 1984, as Plaintiffs' expert has admitted. *See*, *e.g.*, DSOF ¶ 100; PR-DSOF ¶¶ 57-58; DR-PR-DSOF ¶ 34.

Fifth, while Plaintiffs make sweeping statements about the "case law abound[ing]" with various principles and as setting forth "established remedies" under ERISA, they do not cite to a single authority for those pronouncements. *See* Doc. 701 at 10. And finally, Plaintiffs fail to recognize that the standing problem they face has nothing to do with class certification. *See id.* at 11. The named Plaintiffs have not established that they have any damages. That means the claims fail as a matter of law for the class, not because the class representatives are atypical, but precisely because their lack of damages *is* typical of the rest of the class. *See* Doc. 676 at 8, 12-13.

### E. The Plan Administrator's Interpretation Is Entitled to Deference.

As the Supreme Court recently reaffirmed, courts must defer to plan fiduciaries in interpreting plan terms where, as here, the plan documents give those fiduciaries interpretive discretion. *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010). Plaintiffs do not dispute that the Signal Plan confers broad discretion on the Plan Administrator to interpret and administer the Plan. *See* DSOF ¶¶ 47, 50; *see also* Doc. 545 at 2; Doc. 539 at 2; DR-PR-DSOF ¶ 209. Nevertheless, Plaintiffs ask this Court to act as a "substitute trustee," *cf. Conkright*, 130 S. Ct at 1648 (citation omitted), and to engage in an inappropriate *de novo* review of the meaning of the savings clause. Each of Plaintiffs' four arguments fails.

First, Plaintiffs argue that deferential review is improper on questions of law. But the Plan Administrator here was not deciding a question of law; he was simply applying the Signal Plan's terms to the facts of Plaintiffs' claims. Applying those terms, he concluded that a cutback in benefits could not have occurred because of the Signal Plan's savings clause language, as well as other Plan terms. *See*, *e.g.*, DSOF ¶¶ 213-15.

Second, Plaintiffs argue that a 2002 memorandum written more than 18 years after the Signal Plan's January 1, 1984 effective date somehow limits the discretion afforded by the Signal Plan. Doc. 701 at 16. Not so. The memorandum addressed only the Plan Administrator's authority to incur major liabilities for ***the Corporation***, not for ***the Plan***. *See*

DSOF ¶ 209; DR-PR-DSOF ¶ 209. Indeed, Plaintiffs cite no authority for their claim that this memorandum on the one hand eliminated the Plan Administrator's discretion, while on the other granted him the broad authority "to administer and interpret any Pension Benefit Plan and Welfare Benefit Plan." In fact, the Plan Administrator's interpretation bound the Plan to a construction of the savings clause that is ***more generous*** to Plaintiffs than the interpretation they themselves advance. *See*, *e.g.*, PR-DSOF ¶¶ 215.

Third, Plaintiffs contend that deference is necessarily inappropriate due to an alleged conflict of interest—namely, that the cost of granting Plaintiffs' appeal would subject the Company to millions of dollars in increased benefits obligations. *See* Doc. 701 at 16. But the Supreme Court has rejected the argument that a potential conflict precludes deference. *See Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008). Additionally, Plaintiffs offer no evidence that the Plan Administrator's awareness of potential costs tainted the decision-making process. *See* DR-PSAF ¶ 11. Without such evidence, there is no basis on which to reject a deferential standard of review. *See*, *e.g.*, *id.*; *Anderson v. Suburban Teamsters of No. Ill.*, 588 F.3d 641, 648 (9th Cir. 2009).

Finally, Plaintiffs contend that the administrative process was inadequate or tainted by "incompetence and/or bad faith." Doc. 701 at 16-17. But a fiduciary's decision need not be flawless, just reasonable, *see Conkright*, 130 S. Ct. at 1651, and all the evidence demonstrates the reasonableness of the administrative claims process. The Plan Administrator independently reviewed Plaintiffs' claim and appeal and consulted with an actuarial professional, who advised him that none of the participants' accrued benefits could have been decreased by the amendment due to the Signal Plan's "failsafe" provision. *See*, *e.g.*, DR-PSOF ¶ 110; DR-PSAF ¶¶ 2-6; Reply to PR-DSOF ¶¶ 213-15; *see also Davis v. UNUM Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006). Plaintiffs have thus provided no evidence of any errors that would make deference inappropriate.

### F. Plaintiffs' Remaining Claims Are Time-Barred.

Plaintiffs knew or should have known the facts underlying their two Remaining Claims well outside any conceivable limitations period began. *See* Doc. 676 at 17-25.

### 1. Plaintiffs' Claims Accrued Before October 2003.

Plaintiffs argue that their Remaining Claims did not accrue "until October 2003 when the Plan denied the claims." *See* Doc. 701 at 21. Plaintiffs are wrong. Where, as here, a class-wide claim challenges a broadly applicable plan amendment, a clear repudiation for purposes of claim accrual occurs as soon as plaintiffs knew or should have known of the allegedly offending plan terms. *See*, *e.g.*, *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331-32 (9th Cir. 1996) (*per curiam*); *see also* Doc. 676 at 18-19. Plaintiffs fail to even cite, much less address, recent authority confirming that the accrual of an ERISA class action claim "turns on when [class] members ***knew of*** [the defendant's] change in benefits, not when they ***felt*** its effects." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 410 (6th Cir. 2010) (*per curiam*) (emphasis in original); *see also* Doc. 676 at 18-19.

None of the cases Plaintiffs cite supports their position that accrual depends on a formal claim denial. *See* Doc. 701 at 21-23. Some unequivocally reject Plaintiffs' argument. *See*, *e.g.*, *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1031 (9th Cir. 2006). Others are inapposite because, for example, they address a lone participant's claim challenging how plan terms were applied in denying a particular request for benefits. *See*, *e.g.*, *Price v. Provident Life & Accident, Ins. Co.*, 2 F.3d 986, 987-88 (9th Cir. 1993). The remaining cases explain why Defendants' position is correct as a matter of policy. *See*, *e.g.*, *Romero v. Allstate Corp.*, 404 F.3d 212, 223 (3d Cir. 2005).

Plaintiffs also largely ignore the very brochure and SPDs that disclosed the facts underlying Plaintiffs' Remaining Claims. *Compare* Doc. 701 at 22 *with* Doc. 676 at 19-25.[9] Instead they focus on early retirement benefit claims they have already released, or on Defendants' disclosures that, in any event, did not disguise that there was a change in the projection-forward interest rate under the Signal Plan's SBA Offset, or that the Signal Plan's

---

[9] Their only response is to say that the Court found that evidence "unpersuasive" in ruling on Plaintiffs' class certification motion. *See* Doc. 701 at 22. But as that ruling made explicit, "[t]he Court need not determine for purposes of deciding whether certification is warranted what the applicable statute of limitations is, when it accrued, and whether it applies." Doc. 226 at 12. The certification ruling does not control here.

Social Security Offset applied to credited service under the Garrett Plan. *See* Doc. 701 at 22, Doc. 697 at 2-3, 6-7. Indeed, none of the considerations Plaintiffs list as somehow delaying the accrual of the Two Remaining Claims has any bearing on when Plaintiffs had information that, had Plaintiffs been "reasonably diligent, would have led to discovery" of the facts underlying those claims. *See Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001) (internal quotation omitted).

### 2. Each of Plaintiffs' Remaining Claims Is Untimely.

The Social Security Offset Claim is specifically defined in the PSA to assert a cutback violation based on the Signal Plan's application of its Social Security Offset formula to service credited before January 1, 1984. *See* Doc. 697 at 3. It is undisputed that by January 1984, Plaintiffs had received a brochure that clearly explained that: (1) one of two Signal Plan benefit formulas included a Social Security offset; and (2) the "credited service" component of the Signal benefit formula included all prior service under the Garrett Plan. *See* Doc. 676 at 21-22; *see also* PR-DSOF ¶¶ 110-11; DR-PR-DSOF ¶ 72. It is also undisputed that, by 1996, this information had been repeated in two SPDs. *See* Doc. 676 at 21; PR-DSOF ¶¶ 115-18, 131-36. It is difficult to see how Defendants could have more clearly repudiated Plaintiffs' Social Security Offset Claim.

In response, Plaintiffs argue the claim is timely because "the net effect of the introduction of the Social Security offset formula" was not "made known to participants at any point prior to the denial of the claims." Doc. 701 at 25. The Social Security Offset Claim Plaintiffs are limited to pursuing, however, is narrowly defined solely with regard to the application of an offset under the Signal Plan for prior service under the Garrett Plan. *See* Doc. 697 at 2-3. Once Plaintiffs had or should have had that information, their claim accrued. Moreover, when Plaintiffs *filed* their claims, they strongly argued *against* the applicability of a net effects analysis. *See, e.g.*, *Allen,* 382 F. Supp. 2d at 1150. Plainly, Plaintiffs could have pursued their claims without knowing whether liability would be evaluated on a net effects basis, and in fact did so. Notice of that offset triggered the statute of limitations. *See, e.g.*, Doc. 226 at 11-12.

14

The SBA Offset Claim, also specifically defined quite narrowly in the PSA, premises a cutback on the Signal Plan's increase (from 3.5% to 7.5%) of the projection-forward interest rate used to determine a portion of the SBA Offset. Plaintiffs do not dispute any of these conclusive facts: (1) in 1995, the company responded to "general issues of [employee] concern" regarding the SBA through presentations attended by more than 1,000 employees and spouses, *see* PR-DSOF ¶¶ 166-67, 170-71; (2) the 7.5% projection-forward interest rate was discussed at those meetings, *see id.* at ¶¶ 176-77, 183-84; (3) a focus group formed after these employee meetings conveyed the "general employee perception" that the SBA had been "manipulated and misrepresented," and presented that "problem" to AlliedSignal Aerospace's then-President for resolution, *see id.* at ¶¶ 186, 192-96; (4) the focus group believed their complaint represented "the views of the majority of Engines employees with SBA accounts," *see id.* at ¶ 196; (5) the focus group requested that the Company at least suspend the 7.5% projection forward interest rate, *see id.* at ¶¶ 199-200; and (6) AlliedSignal Aerospace's then-President rejected the focus group's request by letter in December 1995. *See id.* at ¶ 201. Even ignoring all of the other information that put Plaintiffs on notice of this claim, *see* Doc. 676 at 24, it is difficult to see how Defendants could have more clearly repudiated the SBA Offset Claim.

Plaintiffs nevertheless insist that claim is timely because the focus group letter, according to them, only constitutes "repudiation by proxy." Doc. 701 at 25. Not so. An "inquiry notice" standard applies in the accrual analysis of an ERISA claim. *See, e.g., Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998). Given all the publicly available information about the offset by that time, the entire class should have known, at least six years before the SBA Offset Claim was asserted, that the claim had been clearly repudiated. *See, e.g., Romero*, 404 F.3d at 223.[10]

---

[10] Plaintiffs also have inserted 10 declarations from never-before-disclosed class member witnesses who claim they were not aware of, or do not recall being told about, either challenged offset. *See* PSAF ¶¶ 17-27. Those declarations should be stricken. *See* DR-PR-DSOF, Section II at ¶¶ 28-48. Even if they are not, inquiry notice is an objective standard, and the undisputed facts confirm that Plaintiffs should have known of their

15

### 3. A One-Year Statute Of Limitations Applies.

Plaintiffs incorrectly state that Defendants failed to "cite controlling Ninth Circuit authority . . . that anything other than Arizona's statute of limitations on written contracts controls." Doc. 701 at 19. The case Plaintiffs cite, *see id.*, actually holds that Washington's statute of limitations applies, and does not even discuss Arizona's. *See Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1187 (9th Cir. 2010). Moreover, Defendants did cite controlling Ninth Circuit authority explaining that the "most analogous state statute of limitations" applies, and that a choice-of-law clause controls the inquiry. *See* Doc. 676 at 18 n.3. Accordingly, Delaware's one-year statute of limitations applies. *See id.* at 17-18.

Plaintiffs are equally wrong when they imply that Defendants do not understand that the statute of limitations on written contracts generally applies in the ERISA context. *See* Doc. 701 at 19. The question is **which** such limitations period applies in states like Delaware and Arizona that have two different periods for actions in contract. *See*, *e.g.*, Ariz. Rev. Stat. §§ 12-541(3), 12-548. The law is clear that the "more specific statute of limitations covering employment disputes" should apply over its "statute of limitations for general actions on a promise." *Syed v. Hercules, Inc.*, 214 F.3d 155, 160 (3d Cir. 2000).[11] Thus, if Arizona law applies, a one-year limitations period still governs. *See* Ariz. Rev. Stat. § 12-541(3).

## III. CONCLUSION

Summary judgment should be granted in Defendants' favor. *See also* Docs. 676, 695.

Respectfully submitted this 8th day of December, 2010.

---

claims years before October 2003. *See*, *e.g.*, *Noble v. Chrysler Motors. Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994).

[11] The *Wise* Court's statement that, "[w]hen choosing between multiple potentially-applicable statutes," the longer should apply, *see Wise*, 600 F.3d at 1187 n.2, does not change this result. The *Wise* Court was **not** addressing a situation, like the one here, where the state had a limitations period directed specifically to employment-related contracts. Nor is a one-year statute of limitations period "inconsistent with the policy of ERISA." *Syed*, 214 F.3d at 161; *see also Solien v. Raytheon Long Term Disability Plan # 590*, No. CV-07-456 TUC DCB, 2008 WL 2323915, at *3 (D. Ariz. Jun. 2, 2008)

OSBORN MALEDON

By: /s/ David B. Rosenbaum
David B. Rosenbaum
Dawn L. Dauphine
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ 85012-2794

Michael L. Banks
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103

Howard Shapiro
Robert Rachal
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA 70130

Amy Covert
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, NJ 07102-5211

Christopher Landau, P.C.
Craig S. Primis, P.C.
Abigail Diaz-Pedrosa
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I do certify that on December 8, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Kelly Dourlein