**SUSAN MARTIN (AZ#014226)**
**DANIEL L. BONNETT (AZ#014127)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

**PETER K. STRIS**, *Pro Hac Vice*
**STRIS & MAHER, LLP**
1920 Abrams Parkway, Suite 430
Dallas, TX 75214
Telephone: (214) 224-0091
Peter.stris@strismaher.com

**SHAUN P. MARTIN,** *Pro Hac Vice*
**UNIVERSITY OF SAN DIEGO**
**SCHOOL OF LAW**
5998 Alcala Park, Warren Hall
San Diego, CA 92110
Telephone: (619) 260-2347
smartin@sandiego.edu

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Barbara Allen; Richard Dippold; Melvin Jones; Donald McCarty; Richard Scates and Walter G. West, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Honeywell Retirement Earnings Plan; Honeywell Secured Benefit Plan; Plan Administrator of Honeywell Retirement Earnings Plan; and Plan Administrator of Honeywell Secured Benefit Plan,<br><br>Defendants. | No. CV04-0424 PHX ROS<br><br>**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION………………………………………………………………………1

I.    THERE IS NO FACTUAL DISPUTE THAT 71% OF GARRETT EMPLOYEES SUFFERED A REDUCTION IN ACCRUED BENEFITS AS OF 1/1/84……………………………………………………….………………….2

II.    THE LEGALITY OF A PLAN AMENDMENT MUST BE DETERMINED ON THE APPLICABLE AMENDMENT DATE…………………………………….3

III.    SECTION 4.10(c)(ii) DOES NOT "SAVE" DEFENDANTS ……..…………..5

      A.    Defendants' Efforts to Reconcile Section 4.10(c)(ii) with Section 4.10(c)(i) Fail………………………………………………………………7

      B.    Defendants' Latest Evidence Also Defeats the "Savings Clause" Argument………………………………………………………………..9

      C.    Section 4.10(c)(ii) Fails to Protect Both Normal and Early Retirement Benefits……………………………………………….........10

      D.    Defendants' Attempt to Distort Plaintiffs' Experts' Testimony Fail……………………………………………………………………..12

IV.    THE PLAN AMENDMENTS WERE NOT SIMULTANEOUS………..…..…12

V.    DEFENDANTS' OTHER ATTEMPTS TO MINIMIZE LIABILITY SHOULD BE REJECTED………………………………………………..……………….14

VI.    THE REMEDY FOR DEFENDANTS' ANTI-CUTBACK VIOLATIONS IS DETERMINED BY THE COURT ......................................………………..…15

CONCLUSION………………………………………………………………….…….16

**INTRODUCTION**

Central to ERISA's core protections are its accrued benefit provisions, including its anti-cutback rule, which provide minimum standards that enable employees to calculate the benefits earned at any given point in time so they can plan for retirement and, upon reaching retirement age, receive the promised benefits. *See Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 743 (2004). Each of Defendants' arguments ignore or attempt to circumvent ERISA rules governing the definition, calculation and protection of accrued benefits. If credited, Defendants' arguments would subvert ERISA's core principles, and effectively delete the words "Income Security" from the name of the statute. Given that their arguments are contrary to ERISA's fundamental protections, it is not surprising that Defendants have failed to address, much less rebut, Plaintiffs' controlling authority governing the anti-cutback rule and ERISA's accrued benefit provisions or to identify any legal support for their spurious arguments -- that a plan can reduce and "wear-away" participants' benefits for years in the absence of any provision protecting the actuarial equivalent of the pre-amended benefits from reduction, (even where the alleged protective provision was admittedly never applied, was never intended to apply and where participants were actually paid benefits below those earned before the amendments); that the Signal Plan somehow precludes measurement of an accrued benefit prior to retirement; that amendments adopted months or even years apart can be lumped together to determine if an amendment violates ERISA; that plans terms needn't be in formal plan documents yet can still be operative, or that the value of the pre-amended benefits can include an offset calculated based on the retroactive application of future accruals in a separate defined contribution plan.[1]

---

[1] *See, e.g.*, remarks of Chief Justice Roberts at argument in *Cigna Corp. v. Amara,* No. 09-804: "The whole point of these plans is to give some people some comfort and assurance when they are age whatever, that: Don't worry; retirement is taken care, or at least I can rely on that. And your formulation would sort of put that up in the air and say: We don't know if you are going to be harmed or not; wait until you are 65 and we will see." (pp.19-20, available at http://www.supremecourt.gov/oral_arguments/argument

1

None of Defendants' assertions are grounded in the language of the statute, its regulations or case law. Rather, Defendants' brief is a study in misdirection, misstatement, and table pounding.[2] Plaintiffs' motion for summary judgment on their Remaining Claims should be granted.

## I. THERE IS NO FACTUAL DISPUTE THAT 71% OF GARRETT EMPLOYEES SUFFERED A REDUCTION IN ACCRUED BENEFITS AS OF 1/1/84

Defendants have not contested as a factual matter, that 71% of Garrett participants' accrued benefits were reduced as of 1/1/84 as the result of the net effect of the SBA offset and Social Security amendments measured with all other amendments, even those that were not simultaneous. (Doc. 696 ¶54.) Although, Defendants take issue with Plaintiffs' assertion that Defendants conceded this claim, they have not come forward with any contrary facts and rely merely on legal arguments to refute it. (*See* Doc. 695, at p. 12.)  Defendants' sole challenge to the 71% reduction determined by Plaintiffs' expert Mr. Poulin shows there is no factual dispute:

> Mr. Poulin's methodology for performing that calculation is flawed, as it depends upon his ignoring the Signal Retirement Plan's savings clause protections, assumes a uniform hypothetical termination date of January 1, 1984 for the more than 13,000 evaluated participants when only one participant in fact terminated on that date (and his benefits improved under the Signal Retirement Plan) and ignores whether a participant elected to transfer his or her SBA to the Signal Retirement Plan.

 (Doc. 696 ¶54.)With respect to the claim that Mr. Poulin ignored participants who elected to transfer their accounts to the Signal Plan, it is no defense to the anti-cutback rule that participants harmed by a reduction have options to mitigate the harm (*e.g.*, working until age 65 if early retirement benefits are reduced, switching jobs if post employment options are curtailed).  If the possibility of mitigation were relevant to

---

_transcripts.aspx).

[2] Defendants' assertion that Plaintiffs' *arguments,* which are solely addressed to the Remaining Claims, are somehow foreclosed by the Partial Settlement has no merit. Plaintiffs reserved their right "to prosecute the Three Remaining Claims **in any manner they see fit…**"  (Doc. 312, Ex. A at §2.10, emphasis supplied.)

2

liability no reduction in benefits would ever be unlawful. In any event, a total of .4% (55 out of the 13,379 calculations performed) transferred their SBA to the Retirement Plan. (P:54.)[3] Defendants' argument that the fact that one person terminated on 1/1/84 is also beside the point. As the Supreme Court stated, "In a given case, the new condition may or may not be invoked to justify an actual suspension of benefits, but at the moment the new condition is imposed, the accrued benefit becomes less valuable, *irrespective of any actual suspension.*" *Heinz,* 541 U.S. 739, 746 (2005).

Because there are no material facts in dispute and Defendants' only defense to the 71% reduction relies on their meritless "savings clause/ wear-away" argument and their novel claim, that unlike the rest of the ERISA plan universe, accrued benefits under the Garrett and Signal plans *cannot* be computed until retirement, summary judgment on Plaintiffs' claims that Defendants reduced accrued benefits in violation of the anti-cutback rule should be granted.

## II. THE LEGALITY OF A PLAN AMENDMENT MUST BE DETERMINED ON THE APPLICABLE AMENDMENT DATE

Defendants' claim that the Court should ignore the reduction of accrued benefits on the applicable amendment date because the plan precludes measurement of accrued benefits until *actual* retirement would effectively wipe out most of ERISA's accrued benefits provisions and decades of case law confirming that accrued benefits must be determinable at any given point in time. Defendants' entire argument hinges on the words "determined under the Plan" in §3(23)(A) of ERISA. 29 U.S.C. § 1002(23)(A). (Doc. 695, p. 12.) But this merely states the obvious. Every defined benefit plan contains a formula for calculating benefits at *actual* retirement. That does not mean that accrued benefits are synonymous with actual retirement benefits. Rather, ERISA

---

[3] As in prior briefs, Plaintiffs refer herein to their Separate Statement of Facts,+(Doc. 679), as "S:"; Plaintiffs' Response to Defendants' Statement of Facts, (Doc. 698) as "R:"; and Plaintiffs' Additional Controverting Statements of Fact as "A:". In addition, references to Plaintiffs' Response to Defendants' Objections and Reply Re: Plaintiffs' Statement of Facts are referred to as "P:" and "PR:" respectively.

3

requires that utilizing the plan's formulas,' appropriate "snap shots" must be capable of calculation. Defendants play fast and loose with ERISA terminology. They attempt to cloud the issue by substituting the words "hypothetical termination" when referring to "accrued" benefits on the amendment date and they use the term "accrued benefits" when they are really referring to "actual" retirement benefits. It is self evident that every pension plan calculates actual retirement benefits at the actual retirement date and that before such time the precise dollar amount of the actual retirement benefit may not benefit be known. But this does not mean that whether or not an amendment reduces "accrued" benefits cannot be determined on the amendment date. Defendants' argument is also logically inconsistent. They do not explain why the calculation of the accrued benefit on the date of the amendment using the formula set forth in the Plan should be any different for the Signal Plan than it is for any other ERISA plan nor why the determination of the offset component of the accrued benefit should be any different than the determination of any other part of the benefit formula such as the "final average salary" component, the "years of service" component or the age or the marital status components. A change in an offset is not the only factor that could affect the accrued benefit. For example, in this recessionary time, it is not unreasonable to assume that "final average salary" may decline such that final average salary at actual retirement could be lower than today. Yet a determination of whether an amendment reduces accrued benefits on the day before and the day after the amendment is still possible even though the actual retirement benefit can vary from the measured comparisons.[4]

      The question under the anti-cutback rule is the impact on benefits earned up until

---

[4] Defendants proclaim concern about the defined benefit value if the defined contribution account were to decline after the measurement date. These are crocodile tears. Defendants uniformly reduced actual retirement benefits under the defined benefit plan for thousands of retirees by unlawfully amending the interest rate used to determine the value of the defined contribution account existing at retirement for purposes of determining the offset. As recently witnessed by the 2008 market crash, the value of the defined contribution benefits on which the offsets were based likely declined dramatically after retirement.

4

the time of the amendment. If the net effect of the amendment (determined immediately after the amendment) reduces accrued benefits earned up until the date of the amendment, the amendment violates ERISA. This determination does not depend on waiting until actual retirement. It is independent of the operation of any of a multitude of what Defendants call the "dynamic" features of a benefit formula that govern actual retirement benefits down the road.

Defendants' do not even attempt to reconcile the controlling regulations and legal authority cited by Plaintiffs. *See* cases cited by Plaintiffs at Doc. 678 pp. 19-20. Plan terms cannot be written to subvert ERISA's fundamental protections, which Defendants' arguments invariably attempt to do. Nothing in ERISA permits the Plan to trump the statute. *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 762 - 63 (7th Cir. 2003). *See, e.g.*, *Firestone Tire & Rubber Co. v. Pension Ben. Guar. Corp.,* 701 F.Supp. 836, 840 (D.D.C. 1988), *aff'd* 892 F.2d 105 (D.C. Cir. 1989).

**III. SECTION 4.10(c)(ii) DOES NOT "SAVE" DEFENDANTS**

The only other defense to Plaintiffs' proof that 71% of participants suffered a cutback in benefits as of 1/1/84 is Defendants' so-called "savings clause" argument. Summary judgment on Plaintiffs' anti-cutback claims should be granted because (1) nothing in the Signal Plan guaranteed that Garrett employees would receive the "greater of" the actuarial equivalent of their Garrett benefits earned up to the date of the change or their Signal benefits at retirement and in the absence of such a guarantee no wear-away would be permitted, and (2) even if there were a "savings clause," Defendants applied the amendments to reduce accrued benefits.

The law does not sanction retrospective legalization of ERISA violations. *See, e.g., Glenview Park Dist. v. Melhus*, 540 F.2d 1321, 27 (8th Cir. 1976) ("Retrospective hindsight is an improper basis for ascertaining the scope of legal duties."). Neither the IRS nor any Court that has permitted wear-away, has ever sanctioned a "greater of" formulation divorced from a plan provision that guarantees benefits earned up to the date

5

1   of amendment.  Although Plaintiffs have cited cases holding that in the absence of such a
2   "greater of" provision, wear-away is unlawful,[5] *Humphrey v. United Way of Texas Gulf*
3   *Coast*, 590 F.Supp.2d 837, 846 & 847(S.D.Tex. 2008); *French v. BP Corp. North*
4   *America, Inc.,* 2010 WL 2219337, at *14 (E.D.Ky. May 28, 2010).  *See* Doc. 704 pp. 12-
5   14. Defendants have cited nothing for their "wait and see" approach unanchored by any
6   guarantees in the plan.  Defendants' additional suggestion that using the measurement
7   date required by the anti-cutback regulations would somehow prevent application of
8   "wear-away" is also incorrect. Plan benefits and plan terms are analyzed as of the
9   amendment date to see if benefits are reduced or protected.  *See* Rev. Rul. 81-12
10  (methods must be "specified in the plan").  This, of course, does not immunize a plan
11  from an anti-cutback violation if, despite the existence of valid plan provisions,
12  amendments are applied to reduce accrued benefits.
13         Defendants offer no reasonable interpretation of §4.10(c)(ii) that can be
14  reconciled with the plain meaning of the Signal Plan and established principles of
15  contract interpretation. Their only comments specifically addressed to the part of the
16  sentence protecting only retirement eligible employees and the absence of such protection
17  for anyone else is that "the second part contemplates ***additional*** protections for a
18  narrower group of participants."  (Doc. 695, at p. 5.) Although Defendants never attempt
19  to explain what such "additional protections" might be, the claim that §4.10(c)(ii) offers
20  "additional protections for a narrower group of participants" defeats the savings clause
21  argument.  The only conceivable "additional protection"  accorded to people eligible to
22  retire as of 12/31/83 is to have their benefits determined on the basis of the actuarial
23  factors and interest rates set forth in the Garrett Plan.  By conceding that the second part
24  of §4.10(c)(ii) contemplates "additional protections,"  Defendants have conceded the
25  converse, that the first part does not provide those "additional protections."  This

---

[5] Even Defendants' expert agreed that the plan should contain a valid savings clause. (Doc. 677-1, Tab 1, at ¶ 27.)

6

conclusion is compelled by the canon of construction "*expressio unius est exclusio alterius.*"  *Allen*, 382 F.Supp.2d at 1162.  Here, where the Plan explicitly provides that "the actuarial equivalence tables or interest assumption [sic]" in the Garrett Plan applies to those eligible to retire on 12/31/83, it cannot be said that those same protections also apply to those not eligible to retire on 12/31/83.

**A. Defendants' Efforts to Reconcile Section 4.10(c)(ii) with Section 4.10(c)(i) Fail.**  In attempting to explain away the fact that for Garrett employees, § 4.10(c)(ii) only protects benefits under the Signal Plan as of 12/31/83 and § 4.10(c)(i) contains no such limitation, Defendants erroneously claim that the Signal Plan formulas were unchanged for Signal Plan participants. (Doc. 695, p. 8.) They are wrong. The 2/85 Signal Plan document changed the actuarial assumptions used to compute Signal Plan participants' benefits from those in place under the prior Signal Plan, including changes to the mortality tables used to compute Signal participants' joint and survivor benefits, optional forms of benefits and early retirement benefits.[6]

Defendants have offered no explanation for the use of the unambiguous 12/31/83 limits on protection under the Signal Plan contained in §4.10(c)(ii) or why that limitation should be ignored.[7]  What Defendants appear to be claiming is that it would not be reasonable to find that the Signal Plan fails to contain a provision protecting accrued benefits that could enable them to wear away those benefits and that the Court should

---

[6] *See, e.g.*, the prior Signal Plan at Doc. 686, Ex. T to Plaintiffs' Statement of Facts at HW0043161-HW0043165, specifying that for computing early retirement factors, a mortality table entitled GA [Group Annuity]-1971 was to be used and compare this with the new mortality assumptions contained in the 2/85 Signal Plan, Doc. 16, Ex. E, at HW 0000316, which directs use of the 1984 Unisex Pension Table. *See also* Chart of Equivalent  Factors HW0043159.

[7] While it is not Plaintiffs' burden, Plaintiffs offered several explanations for the plain meaning of the limitation including that the provision creates an opening account balance under the Signal Plan, (Doc.678 p.13 n.2), and aids in providing a reference for payment of benefits to employees who left Garrett before the merger because the Garrett Plan merger amendment provided that all benefits were to be determined under the Signal Plan and the Signal Plan expressly applied only to employees who left after 1/1/84.

7

1  read one into the Plan.  For the multiple reasons stated by Plaintiffs in their moving brief,
2  no amount of gloss or ignoring words or phrases can magically transform this sow's ear
3  provision into a silk purse of a Garrett Plan benefits guarantee.  *See, e.g.*, *Call v.*
4  *Ameritech Management Pension Plan*, 475 F.3d 816, 821 (7th Cir. 2007).  Giving an
5  expansive interpretation to a narrow exception to the anti-cutback rule by ignoring Plan
6  terms and differences in parallel provisions like §4.10(c)(i), should be rejected.  Words of
7  a contract or statute should be interpreted in accordance with their plain meaning, giving
8  effect to all the words and rendering none meaningless.  *United States. v. Hathaway*, 242
9  F.2d 897, 900 (9th Cir. 1957); *Ireland Miller, Inc. v. Shee Atika Holdings Phoenix, LLC*,
10  2010 WL 2743653, at *2 (D.Ariz. Jul. 12, 2010).

11       Defendants' failure to reconcile §4.10(c)(ii) with §4.10(c)(i) is not confined to the
12  date limitations.  Section § 4.10(c)(i), explicitly protects, without limitation, "the actuarial
13  equivalence tables specified in such plan in effect on December 31, 1983" for ***all*** Signal
14  employees and not just those age 55 and older.  A comparison of the two provisions
15  precludes a finding that § 4.10(c)(ii) means what §4.10(c)(i) says.  The Signal Plan
16  drafters were careful to protect Signal employees (a total of 176 active employees) and
17  indisputably failed to protect the 18,962 Garrett employees who were active participants
18  on 12/31/83.  (Coffey Dep. Hon. Ex. 607, at HW0057023.)

19       Canons of construction including the principles of *expressio unius*, interpreting
20  contracts *in pari materia* and giving meaning to all plan terms and ignoring and reading
21  out none, preclude Defendants' interpretation.  *Peterson v. Islamic Republic Of Iran*,
22  2010 WL 4910226, 12 (9th Cir. Dec. 3, 2010) ("it is unlikely that Congress would
23  absentmindedly forget to adopt a provision that appears a mere two [sections] below the [
24  ]section it adopted.") (*quoting Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th
25  Cir. 2000));  *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Intern.,*
26  *Ltd.,* 556 F.3d 459, 465 (6th Cir. 2009) (reading contract provisions *in pari materia*).
27  **B. Defendants' Latest Evidence Also Defeats the "Savings Clause" Argument.**  Any
28

8

doubt that Defendants' so-called "savings clause" doesn't save them is laid to rest by Defendants' evidence.  Defendants now contend that the 1985 SBA offset amendment (which was not incorporated into any Plan document until 2/85) was somehow effective in January 1984, based on a single memo sent to some management employees.  The memo was authored by William Coffey, a Signal benefits manager who never attended Board of Directors meetings, but who Defendants describe as the alleged "architect" of the plan amendments.  (PR: 10-11.)  It seems self-evident that a single memo either alone or in combination with a brochure that Defendants argued (and the Court agreed) was not binding and created no enforceable rights, is not a governing Plan document that can transform the February 1985 amendments into contemporaneous amendments adopted in January 1984.  However, the Coffey memorandum is relevant for another reason: it forecloses the claim that §4.10(c)(ii) can be read to protect the actuarial equivalent of Garrett employees' benefits existing on 12/31/83 for all employees, as it specifically directs that the Garrett Plan actuarial factors were to be used to determine Garrett employees' 12/31/83 protected accrued benefits "*only if …the participant was eligible to have benefits commence on 12/31/83.*"   (Coffey Dep. Exhibit 609, at HW0038261, cited by Defs as McLeod Dep. Exhibit Hon. 684, DSAF ¶ 13, Doc. 696-1, at Tab 93.)

Given the direction in the memo, Defendants' additional claim that "[t]here were no changes to these known, settled and documented plan terms from January 1, 1984 through February 4, 1985," (Doc. 695, at pp. 18-19), defeats any claim that the Signal Plan's so-called "savings clause" protected anyone who was not "eligible to have benefits commence on 12/31/83."[8]  Far from being some sort of administrative "error" in failing to apply the so-called savings clause, the cutback in benefits was the inexorable consequence of the clear language of the Signal Plan which, as the Coffey memo

---

[8] Defendants refused to produce multiple drafts of the Signal Plan claiming they were privileged. In light of this refusal, the Court should strike Defendants' allegations that "nothing changed," (Doc. 695, at p. 18), or order Defendants to produce the withheld documents. *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir. 1992).

9

1   confirms, intentionally and explicitly failed to protect the Garrett benefits from reduction.
2   Even under an inapplicable "wear-away" analysis, the Plan still applied the amendments
3   to reduce benefits below those accrued as of 12/31/83.

4   **C. Section 4.10(c)(ii) Fails to Protect Both Normal and Early Retirement Benefits.**

5   Plaintiffs' showed that Defendants' claim that the Garrett benefits were protected was
6   also wrong because the 2/85 Signal Plan did not protect early retirement benefits.[9]
7   Defendants' arguments that early retirement benefits are not involved and that the Signal
8   Plan did protect them have no merit and could not, in any event, vitiate the inadequacy of
9   §4.10(c)(ii) because actuarial factors are applied to determine all forms of benefits.  The
10  defects in §4.10(c)(ii) are also not ameliorated by Defendants' argument that the Signal
11  Plan should somehow be read to treat early retirement benefits as accrued benefits.
12  Defendants' own Rule 30(b)(6) witness admitted that the Signal Plan did not and was not
13  intended to protect early retirement benefits and this is confirmed by the May 1984 SPD.
14  Defendants had previously argued that, "To the extent the Retirement Plan is determined
15  to be ambiguous, the summary plan description (the "SPD") distributed to all participants
16  demonstrates the plan's clear intent…"  (Doc. 31, at p. 28.)  Aside from Defendants'
17  attempt to impeach their own witness designated to testify on the amendments, (P:85),
18  the defense has no merit.  Regardless of the Signal Plan's definition of accrued benefits,
19  §4.10(c)(ii) expressly excludes protection of the actuarial factors used to calculate those
20  benefits under the Garrett Plan.[10]  In any event, §4.10(c)(ii) makes no distinction between
21  factors used to calculate normal retirement benefits or early retirement benefits; the
22  defects impact both.  *See also* Coffey memo, which expressly instructs that the prior

---

[9] *See Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.,* 847 F.2d 329, 333 (6th Cir.1988).

[10] Defendants fare no better based on their arguments about the passage of the Retirement Equity Act ("REA"). The Plan was not amended before enactment of REA and the adoption of amendments reducing early retirement benefits clearly violated ERISA §204(g)(2).  Had Defendants intended to protect early retirement benefits, they could have done so but by their own claims, they made no changes to the Plan despite REA.

10

1  plan's "normal form of payment and optional form factors" are to be used only if the
2  participant was eligible to retire on 12/31/83.[11]

3  Defendants also misstate this Court's earlier ruling. The Court never ruled that the
4  second part of § 4.10(c)(ii) "provides additional protections not set forth in the first
5  prong." (Doc. 695 p. 7.) Nor did the Court rule that the only purpose of all of the tables in
6  Exhibit B was to determine the SBA offset annuity conversion rate. Neither party made
7  that argument. Exhibit B has multiple tables that are used for the calculation of many
8  forms of benefits, both normal and early. [12]

9  Plaintiffs demonstrated that Defendants' claim that the Plan prohibited a reduction
10 in accrued benefits failed because the Signal Plan failed to protect early retirement
11 benefits. The SBA interest rate claim has always been asserted on behalf of normal and
12 early retirees and Defendants argue that early retirement improvements negate the
13 reduction in benefits.[13] In fact, because the SBA interest rate change is used to determine

---

[11] Under ERISA, the "normal form" of benefit payable to a participant is the "joint and survivor" annuity, which can only be computed by reference to the plan's actuarial factors. *See* ERISA § 205(a), 29 U.S.C. §1055 (a) and ERISA §205(d)(1)l; *Miller v. Xerox Corp. Ret. Income Guar. Plan*, 464 F.3d 871, 874 n.3 (9th Cir. 2006).

[12] 382 F.Supp.2d at 1139. Contrary to Defendants' assertion, Plaintiffs did not lose an early retirement benefits claim. The Court's comments cited by Defendants, (Doc. 695, at p. 6), were in connection with Plaintiffs' claim, dismissed by the Court, that the Plan Administrator violated plan terms by failing to apply the Garrett Plan's Credited Interest rate to calculation of *ongoing* benefits under the *Signal Plan* for those who were eligible to retire on 12/31/83. Plaintiffs' Remaining Claims are asserted under ERISA's anti-cutback rules, not for violating Plan terms. Defendants' Rule 30(b)(6) witness admitted that the Tables in Exhibit B, including Tables I and III were required to be used to calculate the offset under the Garrett Plan, (including for purposes beyond the conversion offset into an annuity). The Court also had no occasion to consider §4.10(c)(ii) as a defense to the anti-cutback provision because a similar provision in *Michael v. Riverside Cement Co. Pension Plan,* 266 F.3d 1023, 1025 n.2 (9th Cir. 2001), had no impact on that court's determination that accrued benefits were reduced. 382 F.Supp. 2d at.1157-58.

[13] *See* Amended Complaint, Doc. 38, at ¶ 28. *See also* DSOF ¶ 65, citing Defendants' expert report claiming that early retirement benefits were more generous under Signal Plan; Doc. 16, Ex. 16, at HW 0000467, acknowledging Plaintiffs were alleging violations of REA; Doc. 31, at p. 10; Doc. 23 p.8 n.8.

11

growth in the account before age 65, the overwhelming majority of class members adversely affected by this change are early retirees. Plaintiffs explained, *inter alia*, that the language of the SPD expressly excluded early retirement benefits from the definition of accrued retirement benefits.

**D. Defendants' Attempts to Distort Plaintiffs' Experts' Testimony Fail.** Plaintiffs' experts have uniformly agreed that benefits were cutback. (S:54) Section 4.10(c)(ii) did not change their opinion. Not only did Mr. Holland not agree that Defendants argued-for interpretation was reasonable, he stated that Defendants' questions were asking him to give an opinion that "would be effectively deleting" critical parts of § 4.10(c)(ii) and that even read as not containing a temporal limitation, the Plan still did not protect early retirement benefits and optional forms of benefits. (P: 51) Far from agreeing that §4.10(c)(ii) was a protection clause, Mr. Holland thought §4.10(c)(ii) could be called a "reduction clause."(S:50)

**IV. THE PLAN AMENDMENTS WERE NOT SIMULTANEOUS**

The 71% reduction as of 1/1/84 is based on the net effect of all changes considered together. Whether Defendants amendments were simultaneous or not affects only the extent of Defendants' liability. Following Defendants' belated admission that the Signal Plan was not adopted until 2/85, it became even more apparent that these amendments were not simultaneous - not even close. *See* 26 CFR §1.411(d)-3 (1977) (requiring "same adoption and effective dates"). Between 12/83 and 2/85, the May 1984 SPD was drafted by the Plan Sponsor and did not incorporate the SBA interest rate change.[14]

Recognizing their dilemma, Defendants use the word "simultaneous" only in connection with the effective date of the amendments regardless of when the amendments were adopted. Defendants' experts even factor into their so-called "net effect" analysis,

---

[14] In addition, the Social Security offset formula set forth in §4.2(b) of the 2/85 plan (which was identical to the formula in the prior Signal Plan) that became effective on 1/1/84 as a result of the amendment adopted by the Signal Board of Directors in December 1983 was likewise adopted on a different date than the SPD or the 2/85 Plan.

12

1  the impact of a July 200 plan amendments). Defendants' abandonment of the regulations
2  they relied on in support of their simultaneous amendment rule should be rejected.[15]

3        To counter the conclusion that the amendments were not simultaneous,
4  Defendants argue two extremes. On the one hand, they argue that because the SBA
5  interest rate change appears in a memo, the Court should overlook the fact that the
6  amendment did not appear in *any* Plan document for an additional 13 months. On the
7  other hand, they argue that other Plan changes should be ignored even though they were
8  included in the May 1984 SPD. ERISA makes official plan documents such as the SPD
9  enforceable. It accords no weight to Defendants' slippery slope claims that memos or
10 other informal writings should be accorded weight.

11       Plaintiffs' moving brief cited authority that in the absence of a formal plan
12 document, the SPD is not only a plan document, it is the "Plan." (Doc. 678, at p. 23.)
13 Defendants' claim that the Court should accord no weight to the May 1984 SPD because
14 it is not a "plan sponsor" or "settlor" obligation is contrary to the facts and the law. The
15 ERISA provision Defendants rely on does not use the word "publish." (Doc. 695 pp. 19-
16 20.) It states that a plan administrator is obligated to "furnish" the SPD to Plan
17 participants, and in addition to furnish a copy of "other instruments under which the Plan
18 is established or operated" upon request. *See* 29 U.S.C. §§1021(a), 1024(b). ERISA
19 makes no rule concerning who writes the content of the SPD. *Curtiss-Wright Corp. v.*
20 *Schoonejongen*, 514 U.S. 73, 85 (1995) is not to the contrary. Here Defendants have
21 conceded that the settlor drafted the SPD.

---

[15] Further, Defendants now propose a false "net effect" analysis, asking the Court to consider only *positive* plan changes and to disregard evidence of other reductions in benefits. This is nonsensical. Either the net effect of all amendments with the same amendment date are relevant under the Treasury regulations or they aren't. Defendants do not get to cherry pick which evidence of alleged "simultaneous" changes get factored in. Even their own expert incorporated the effect of the other negative early retirement reduction factor such changes in his own analysis. These are facts relevant to the inquiry and there is no basis to disregard them merely because Plaintiffs are not asserting that such changes also violate ERISA.

13

1  Defendants contended that the SPD *was* a Plan Sponsor document and refused to
2  produce drafts over Plaintiffs' objections, claiming they were privileged as "settlor"
3  documents. (Doc. 584 p. 1 & Ex. F, documents 302, 303, 304 and 309 on 5/6/08 log.)
4  Pursuant to this court's ruling, (Doc. 558, at p.9), Defendants produced a revised
5  privilege log which continued to list draft summary plan descriptions and letters relating
6  to draft summary plan descriptions as privileged. Defendants again refused to turn them
7  over, contending that they were "settlor function documents created by … the two law
8  firms involved in drafting the plan amendment documents in 1983 and 1984 for Signal
9  and Garrett." (Doc. 584, p. 2.) According to Defendants' own admissions, the May 1984
10 SPD was a document created by the settlor. Defendants do not get to recharacterize the
11 SPD at will. Having already stated, in an argument the Court accepted, (*see* Doc. 587),
12 that the Company settlor drafted the May 1984 SPD, they cannot now argue it wasn't an
13 enforceable Plan document. The other case cited by Defendants, *Gridley v. Cleveland*
14 *Pneumatic Co.*, 924 F.2d 1310, 1316 (3rd Cir. 1991), (Doc. 695, p. 20), has been
15 criticized and limited as dicta. As the Third Circuit made clear in *Burstein v. Retirement*
16 *Account Plan For Employees of Allegheny Health Educ. and Research Foundation*, 334
17 F.3d 365, 377 (3rd Cir. 2003), the statements suggesting an SPD was not a plan in
18 *Gridley* were dicta that it was not bound to follow. The *Burnstein* court then joined ten
19 other circuits that had already determined that the SPD is an authoritative and enforceable
20 statement of plan terms.

**V.   DEFENDANTS' OTHER ATTEMPTS TO MINIMIZE LIABILITY SHOULD BE REJECTED**

Defendants' effort to minimize the extent of their liability by comparing actual retirement benefits (rather than the accrued benefits as of 1/1/84 under the Signal Plan) compared to the Garrett Plan benefits "calculated as of December 31, 1983 [*i.e.*, freezing service and compensation] (but using the actual SBA account balance at retirement or termination…)" is foreclosed by Ninth Circuit authority and should be rejected  (Doc.

14

1  695 p. 12.)  Even using that incorrect methodology, that calculation results in a cutback in
2  accrued benefits for hundreds of participants.
3       In the analogous situation in *Miller v. Xerox Ret. Income Guar. Plan*, 464 F.3d
4  871, 875 (9th Cir. 2006), the Ninth Circuit held that the defendants' method of
5  calculating offsets attributable to prior accrued benefit distributions from a defined
6  contribution plan, violated ERISA by improperly inflating the value of the defined
7  contribution account after employees left employment and received a distribution.  The
8  Ninth Circuit reached its conclusion under ERISA's actuarial equivalency requirements.
9  Defendants' proffered Garrett protected accrued benefit methodology suffers from the
10 same fundamental disregard of ERISA's accrued benefit provisions including the accrued
11 benefit definition for the defined contribution portion of the benefit formula.  29 U.S.C.
12 §1002(23).  The *Miller* court emphasized that while ERISA allows a floor offset plan
13 arrangement, the defined contribution portion of that arrangement "must satisfy the
14 ERISA requirements applicable to the respective types of plans."  464 F.3d at 875.   The
15 court stated:

> Although floor-offset plans are permissible, the offset permitted is not one
> increased *post hoc* by Xerox, but one based on the actual actuarial
> equivalent of the distribution. In short, Xerox may not use a projected-to-
> the-present value generated from a phantom account as a proxy for the
> actual distribution amount.

Id. at 875-76.

     Defendants cannot manipulate the anti-cutback rule by understating the value of
the Garrett accrued benefits protected from reduction.  To determine whether accrued
benefits were reduced Garrett accrued benefits must reflect the accrued benefit of the
Garrett Severance Plan account existing on 12/31/83.  Defendants' attempts to minimize
their liability by improperly calculating Garrett protected benefits for purposes of the net
effect analysis should be rejected.

## VI.    THE REMEDY FOR DEFENDANTS' ANTI-CUTBACK VIOLATIONS IS DETERMINED BY THE COURT

It is the Court's province to fashion a remedy, and the remedies Plaintiffs seek are

15

1  appropriate.  (See Doc. 678 at pp. 24-25.)  Defendants' claim that they should decide the
2  remedies for their own ERISA §204 (g) violations has no basis in law and should be
3  rejected.  Defendants' reliance on *Conkright v. Frommert*, 130 S.Ct. 1640, 1648 (2010)
4  is misplaced.  (Doc. 695, at p. 24.)  The issue before the Court involved a question of
5  plan interpretation.  The Second Circuit had held that while the provision the defendants
6  had argued entitled them to offset benefits did not apply, the plan had always contained
7  another applicable provision with ambiguous language.  The task on remand was for the
8  plan administrator to interpret how an offset under that applicable provision should be
9  treated.  *Conkright*, 535 F.3d 111, 117 (2d cir. 2008).  The Supreme Court stated that the
10 Plan was entitled to deference for that interpretation.  The *Conkright* Court did not
11 empower ERISA plan defendants to suddenly become arbiters of all remedies for ERISA
12 violations.  Rather, in the words of the plan in that case, the task on the administrative
13 remand was "to interpret the remaining Plan provisions that were unaffected by the
14 Second Circuit's finding of a technical ERISA disclosure violation." (Plan) Petitioners'
15 Supplemental Brief in Cigna, 2009 WL 1604443.
16      The Ninth Circuit, joined by other courts, applies the clear language of ERISA that
17 plan amendments that reduce accrued benefits never take effect.  In similar cases cited by
18 Plaintiffs, the courts have not hesitated to grant make whole relief.  See cases cited in
19 Doc. 678, at pp. 24-25.  This is also consistent with principles of trust law.  *See also*
20 Restatement (Second) of Trusts § 205, cmt. a.

**CONCLUSION**

For the foregoing reasons and those set forth in Plaintiffs' Motion for Summary Judgment, Plaintiffs respectfully request that Plaintiffs' Motion for Summary Judgment be granted. Plaintiffs request such other and further relief as is equitable and just.

Respectfully submitted this 8th day of December, 2010.

                         **MARTIN & BONNETT, P.L.L.C.**
                         By:   s/Susan Martin
                            Susan Martin

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel L. Bonnett
Jennifer L. Kroll
1850 N. Central Ave. Suite 2010
Phoenix, AZ 85004
(602) 240-6900

Attorneys for Plaintiffs

17

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David B. Rosenbaum
Dawn L. Dauphine
Osborn Maledon, P.A.
2929 North Central Ave., Suite 2100
Phoenix, AZ 85012-2794

Michael Banks
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

Howard Shapiro
Robert W. Rachal
Stacey Cerrone
Bridgit DePietto
Proskauer Rose LLP
650 Poydras Street, Suite 1800
New Orleans, LA  70112-4017

Amy Covert
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, NJ 07102-5211

Craig Primis
Michael Williams
Abigail Diaz-Pedrosa
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Attorneys for the Defendants

s/T.Mahabir